Jesse L. **NIPPER**; Donald A. Carter; Annie Ruth Williams; Selendra Williams; Katrina Miles; Desi Wayne Dunlap; Carol D. Days; Anthony Days, and D.W. Perkins Bar Association, Plaintiffs–Appellants,

v.

Jim **SMITH**; Dot Joyce, Director of the Florida Division of Elections; Tommie R. Bell, Supervisor of Elections in Duval County; and Lawton Chiles, Governor, Defendants–Appellees.

No. 92–2588.

United States Court of Appeals, Eleventh Circuit.

Dec. 2, 1994.

Brenda Wright, Washington, DC, Robert B. McDuff, Jackson, MS, Denise M. Prescod, Jacksonville, FL, Mitchell F. Dolin, Covington & Burling, Washington, DC, Sherrilyn A. Ifill, New York City, for appellants.

George L. Waas, Harry F. Chiles, Denis Dean, Dept. of Legal Affairs, Tallahassee, FL, Frank E. Brown, Asst. Atty. Gen., Tampa, FL, Leonard S. Magid, Jacksonville, FL, Mitchell D. Franks, Lakeland, FL, for appellees.

Rebecca K. Troth, Deval Patrick, Dept. of Justice, Civ. Rights Div., Appellate Section, Washington, DC, for amicus curiae U.S.

Howard C. Coker, Coker, Myers, Schickel, Cooper & Sorenson, The Fla. Bar, Tallahassee, FL, for amicus curiae Fla. Bar Trial Lawyers Section.

Before TJOFLAT, Chief Judge, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH and DUBINA, Circuit Judges.*

TJOFLAT, Chief Judge:

Section 2(a) of the Voting Rights Act, 42 U.S.C. § 1973 (1988), states that "[n]o voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." Under section 2(b) of the Act, "[a] violation of [section 2(a)] is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State ... are not equally open to participation by members of a class of citizens protected by [section 2(a)] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Section 2 applies to state judicial elections. *Chisom v. Roemer,* 501 U.S. 380, 404, 111 S.Ct. 2354, 2368, 115 L.Ed.2d 348 (1991); *Houston Lawyers' Ass'n v. Attorney Gen.,* 501 U.S. 419, 423–24, 111 S.Ct. 2376, 2379, 115 L.Ed.2d 379 (1991).

In this case, the appellants, black voters and an association of black attorneys, challenge the system used to elect the judges of Florida's Fourth Judicial Circuit Court, which encompasses Duval, Clay, and Nassau counties, and the judges of the Duval County Court. The appellants contend that the use of at-large elections in those trial court juris-

---

* Judges Black, Carnes and Barkett recused themselves and did not participate in the consideration or decision of this case.

dictions dilutes the voting strength of the black minority in violation of section 2; they seek a remedy, such as the creation of sub-districts, that will ensure their ability to elect black judges of their choice. The appellees contend that the appellants are entitled to no relief. First, the appellants and the black voters they represent have suffered no racial vote dilution. Second, assuming that vote dilution exists, the relief the appellants seek would so alter the structure of the Fourth Judicial Circuit and Duval County courts as to undermine the ability of those courts to administer justice.

Following a five-day bench trial, the United States District Court for the Middle District of Florida dismissed the appellants' case. The court did so on two grounds: (1) the appellants failed to establish an essential element of a vote dilution case—racially polarized voting in the relevant communities—as required by *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); and (2) the appellees' rebuttal evidence demonstrated that, under "the totality of the circumstances," racial discrimination was not playing a role in the judicial elections under challenge. The district court's finding of no section 2 liability made it unnecessary for the court to consider the matter of remedy.

On appeal, a panel of this court concluded that the evidence before the district court demonstrated racially polarized voting in the Fourth Judicial Circuit and Duval County as a matter of law, and thus a section 2 violation. Without considering, as required by *Houston Lawyers' Ass'n,* 501 U.S. at 426, 111 S.Ct. at 2380–81, the appellees' argument that the relief the appellants sought would undermine the administration of justice in those jurisdictions, the panel remanded the case to the district court for the imposition of a remedy. *Nipper v. Smith,* 1 F.3d 1171, 1184 (11th Cir.1993). The case is now before us on rehearing en banc. *Nipper v. Smith,* 17 F.3d 1352 (11th Cir.1994).

To determine whether the district court erred in holding that the appellants failed to establish a case of vote dilution, we must address a question the Supreme Court has not decided and our divided en banc court in *Solomon v. Liberty County,* 899 F.2d 1012 (11th Cir.1990) (en banc) (per curiam), *cert. denied,* 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991), has precluded us from answering: whether section 2 plaintiffs, in order to establish that the challenged electoral scheme is diluting their right to vote "on account of [their] race or color," must demonstrate that their diminished opportunity to participate in the political process and to elect representatives of their choice is being caused by the interaction of racial bias in the voting community and the challenged scheme. Without an answer to this question, we cannot determine what evidence is relevant, and the weight it should be accorded, in the totality of the circumstances inquiry of section 2(b). Specifically, we cannot determine the weight to be accorded the state policies underlying the challenged judicial electoral scheme. *Houston Lawyers' Ass'n,* 501 U.S. at 426, 111 S.Ct. at 2380–81. Nor can we determine, given those policies and the structure of the courts involved, whether the remedy sought is feasible.

In part I of this opinion, we set forth the facts and procedural history of the case. In part II, we address the question left unanswered in *Solomon:* whether the existence of racial bias in the voting community necessarily forms the basis of a section 2 violation. We hold that the totality of the circumstances must demonstrate that the voting community is driven by racial bias and that the electoral scheme in question permits that bias to dilute the plaintiff minority's voting strength. In part III, after noting several important differences between judicial and legislative elections, we discuss the factors, including the policies advanced by Florida's method of selecting its trial court judges, involved in the totality of the circumstances analysis in judicial election cases. In parts IV and V, we apply the principles set forth in parts II and III to the case at hand. In part

IV, we examine the district court's finding of no vote dilution and conclude, as did the panel, that the appellants established a case of dilution. In part V, we consider the matter of remedy. We find that the type of relief the appellants seek would undermine the administration of justice in the trial courts at issue; we therefore affirm the district court's denial of section 2 relief.

## I.

Voting rights cases are inherently fact-intensive, particularly those section 2 vote dilution claims alleging that, due to the operation of a challenged voting scheme, minority voters are denied an equal opportunity to participate in the political process and to elect representatives of their choice. In such cases, courts must conduct a "searching practical evaluation of the 'past and present reality'" of the electoral system's operation. *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2764 (quoting S.Rep. No. 417, 97th Cong., 2d Sess. 30 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 208). Accordingly, because a claim of vote dilution must be evaluated with a functional, rather than a formalistic, view of the political process, the Supreme Court has emphasized the importance of " 'an intensely local appraisal of the design and impact' " of the electoral structure, practice, or procedure at issue. *Id.* at 79, 106 S.Ct. at 2781 (quoting *Rogers v. Lodge*, 458 U.S. 613, 621, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 1012 (1982)). Given the necessity of a nuanced understanding of the election system in evaluating a claim of racial vote dilution, we set out the factual background of this case in some detail.[1]

## A.

Florida's judiciary employs two tiers of trial courts. The circuit courts have general jurisdiction over civil and criminal cases while the jurisdiction of the county courts is restricted to certain statutorily defined classes of misdemeanor and small claims cases.[2] Fla. Const. art. 5, §§ 5–6 (West Supp.1994); Fla.Stat.Ann. §§ 26.012, 34.01 (West 1988 & Supp.1994). Florida currently has twenty circuit courts (designated by number); they range from single-county circuits (in highly populated areas like Miami or Tampa) to circuits comprised of as many as six or seven counties (many of which are rural). *See* Fla.Stat.Ann. § 26.021 (West 1988). Each circuit judge has jurisdiction or authority within the entire circuit; similarly, the jurisdiction of each judge of the county court extends throughout the county. Although the circuit and county courts have multiple members, like most trial courts they do not operate as collegial bodies; rather, the judges exercise independent judicial authority, engaging in coordinated decision-making only for the handling of some administrative matters.

Circuit judges serve six-year terms and county judges serve four-year terms, Fla. Const. art. 5, § 10; in all other respects, the

---

1. A more extensive summary of the district court's factual findings can be found in that court's opinion. *See Nipper v. Chiles*, 795 F.Supp. 1525, 1532–39 (M.D.Fla.1992). The following discussion includes additional material not discussed by the district court of which we take judicial notice. Under Rule 201 of the Federal Rules of Evidence, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Moreover, it is recognized that:

    Appellate courts have a special need to resort to facts not found in the record. When the question before the court is not merely the rights of the parties, but the interests of others who may be affected by the rule the court makes to govern the case, it would be foolish for the court to rely only on the evidence the parties have chosen to prove below.

21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5102, at 462 (1977). Accordingly, we have attempted to develop a more complete picture of judicial elections in the Fourth Circuit and Duval County than that presented to the district court.

2. Florida also has two levels of appellate courts: the district courts of appeal (intermediate appellate courts) and a supreme court. Fla. Const. art. 5, §§ 3–4 (West Supp.1994). Only the selection of trial court judges is challenged in this case, however.

office of judge on the two benches is virtually identical. The judges of the circuit and county courts are elected at-large in nonpartisan circuitwide and countywide elections, respectively; they must reside within the territory of the court on which they serve. The at-large judicial elections for both courts are characterized by a majority vote requirement,[3] a numbered place system (meaning that candidates must run for a particular seat on the court),[4] and the use of staggered terms. In order to qualify to run for a judgeship, a candidate must pay a filing fee (although a candidate can avoid the fee by obtaining a number of signatures from registered voters on a petition), see Fla.Stat.Ann. §§ 105.031(3) & .035 (West 1992), and must have been a member in good standing of The Florida Bar for at least five years immediately preceding the election in question, see Fla. Const. art. 5, § 8. In the event of a mid-term vacancy on either court, the governor appoints a replacement to serve until the next general election. Id. § 11.

In the instant case, the appellants challenge the electoral system for both trial courts in and around Jacksonville, Florida.[5] The Fourth Judicial Circuit is located in northeast Florida and consists of Duval, Clay, and Nassau Counties. Duval County encompasses the City of Jacksonville; the county and city governments were consolidated in 1968. According to the 1990 census, the total population of the Fourth Circuit is 822,928; the black population is 173,937, or approximately twenty-one percent of the total. At the time of trial in 1991, the Fourth Circuit had twenty-eight circuit judges, only one of whom was black.[6] The total population of Duval County (as of the 1990 census) is 672,971, of which 163,902, or approximately twenty-four percent, are black. Two of the twelve judges on the Duval County Court at the time of trial were black judges.[7]

Although the voting age populations of the Fourth Circuit and Duval County are nineteen and twenty-two percent black, respectively, no black candidate for a judgeship on either court has ever been elected to office in a contested election. Every black judge who has served on one of these courts originally reached office by way of a mid-term appointment to a vacant seat. Although forming a powerful initial sketch of the role played by race in the relevant judicial elections, this bare description of circuit and county court election results paints only part of the total picture. To place the elections at issue in this litigation into their proper context, we first detail the historical evolution of the Florida scheme of judicial elections. We then describe the operation of the current

---

**3.** To be elected to office, a judicial candidate must receive a majority of the votes cast. All candidates for a particular seat first compete in nonpartisan primaries; if no candidate receives an outright majority, a runoff election is held between the two candidates who received the most votes in the primary.

**4.** A numbered place requirement forces candidates for multimember offices (like the courts at issue here) to run for a *particular* seat, rather than for any existing vacancy. Each seat is given a designated place on the ballot (group 1, 2, 3, and so forth) so that all of the candidates are not competing against one another. The effect of a numbered place system is therefore to break what would otherwise be a single contest into several mini-elections. See Pamela S. Karlan, *Maps and Misreadings: The Role of Geographic Compactness in Racial Vote Dilution Litigation,* 24 Harv.C.R.–C.L.L.Rev. 173, 186 (1989).

**5.** The appellees in this case are the Governor of Florida and the relevant state and county election officials.

**6.** The only black judge ever to have served on the Fourth Circuit bench at the time of trial was Judge Henry Adams, who testified in this case for the appellants. After the trial was completed but before the district court rendered its decision, a second black judge, Henry E. Davis, was appointed to the court. According to the district court, however, "[t]he Davis appointment has played no part in the Court's consideration of this case." *Nipper,* 795 F.Supp. at 1536 n. 10. In late 1993, after the district court issued its opinion, Judge Adams left the circuit court and joined the federal bench as a judge of the United States District Court for the Middle District of Florida.

**7.** The two black judges on the Duval County Court are Judges Alfred Washington and James Ruth. Both originally were appointed by the governor to fill vacancies, and both remain on the bench today.

model since its adoption in 1972 and examine the special circumstances and relative infrequency with which black candidates have sought judgeships on the Fourth Circuit and the Duval County Court.

## B.

Article 5 of the Florida Constitution, which governs the judicial branch of the state government, has evolved over the last twenty-five years, thereby changing the method of selecting state court judges dramatically.[8] For much of this century, judicial positions in Florida were filled through partisan elections. Florida voters adopted a revised constitution in 1968, but the new version temporarily retained the old system of partisan judicial elections. In 1971, the Florida legislature adopted its first nonpartisan electoral system for the state judiciary. The statute, the contemporary counterpart of which is now codified as Fla.Stat.Ann. § 105.011(2) (West 1992), provided essentially that "[a] judicial office is a nonpartisan office, and a candidate for election or retention thereto is prohibited from campaigning or qualifying for such an office based on party affiliation."[9] At that time, the process of selecting judges became fundamentally different from the methods used to choose other elected state officials.

Article 5 was significantly amended in 1972, although the revised version continued to provide that all judges would be elected "by vote of the qualified electors within the territorial jurisdiction of their respective courts." When a vacancy occurred on any court of the state, however, the governor would make an interim appointment until a permanent replacement for the remainder of the predecessor judge's term could be elected. Although the ultimate decision regarding such an interim appointment was entrusted to the discretion of the governor, the appointee nonetheless had to be selected from a slate of not fewer than three candidates submitted to the governor by a judicial nominating commission.[10] One commission was created for each court in the state to accept applications from interested eligible attorneys when vacancies arise and to make recommendations thereon. The nominating commission system was designed to inaugurate a merit selection process for members of the state judiciary through the submission of qualified nominees to the governor.

The system of judicial elections currently in place was created by a further amendment to Article 5 that was adopted by the citizens of Florida at the general election in November of 1976. At that time, Florida adopted the "Missouri Plan"[11] for the selection of supreme court justices and the judges of the

---

**8.** For scholarly treatment of the history of judicial elections in Florida, see Madison B. McClellan, Note, *Merit Appointment Versus Popular Election: A Reformer's Guide to Judicial Selection Methods in Florida*, 43 Fla.L.Rev. 529 (1991); Joseph W. Little, *An Overview of the Historical Development of the Judicial Article of the Florida Constitution*, 19 Stetson L.Rev. 1 (1989). The district court was apprised of much of this material because the appellees introduced into evidence a report on this subject from Dr. William Rogers, an historian at Florida State University.

**9.** *See also* Fla.Stat.Ann. § 105.041(3) (West 1992) ("No reference to political party affiliation shall appear on any ballot with respect to any nonpartisan judicial office or candidate."); *Id.* § 105.071 (listing limitations on partisan political activities by candidates for judicial office); *Id.* § 105.09(1) ("No political party or partisan political organization shall endorse, support, or assist any candidate in a campaign for election to judicial office.").

**10.** Earlier this year, the legislature amended Fla. Stat.Ann. § 26.021 (which, in part, defines the number of judges on the various circuit courts) to provide that "[t]he judicial nominating commission of each circuit, in submitting nominations for any vacancy in a judgeship, and the Governor, in filling any vacancy for a judgeship, shall consider whether the existing judges within the circuit, together with potential nominees or appointees, reflect ... the racial and ethnic diversity of the population within the circuit, and the geographic distribution of the racial and ethnic minority population within the circuit." 1994 Fla.Sess.Law Serv. ch. 94–137, § 1.

**11.** Missouri adopted its Nonpartisan Court Plan, which provided for merit-based selection of state court judges, in 1940; Missouri's plan has since been emulated for some courts in at least thirty states. For a more detailed discussion of the operation of Missouri's system, see Richard A. Watson, *Observations on the Missouri Nonpartisan Court Plan*, 40 Sw.L.J. 1 (1986).

district courts of appeal, the intermediate appellate courts of the Florida judiciary. Initial selection of those justices and judges was transferred away from the electorate to the nominating commissions and to the governor. The new selection process empowers the governor to fill any vacancy (not just an unexpired term) on the supreme court or the district courts of appeal, the only condition being that the selection must be made from a slate of "three persons nominated by the appropriate judicial nominating commission." Fla. Const. art. 5, § 11(a). These initial appointments are for partial terms of not less than one year, *id.*, at the end of which each justice or judge "may qualify for retention [and a full six-year term] by a vote of the electors." *Id.* § 10(a). The justices and judges of Florida's appellate courts then stand for retention at the end of every term. The retention elections, however, do not involve challenges to the incumbent by another competitor for office; rather, each candidate for retention under this approach runs against his or her established record of performance.

The 1976 constitutional amendments, however, did not alter the method of selecting circuit and county court judges. Therefore, under the present system, which constitutes a partial "Missouri Plan," judges of the circuit and county courts continue to be elected (in nonpartisan elections) to six- and four-year terms, respectively, by vote of the qualified electors in their jurisdictions. *Id.* § 10(b). When a mid-term vacancy occurs, the governor appoints a replacement from a slate provided by the appropriate nominating commission, with a single commission handling nominations for vacancies on a circuit court as well as the county courts in that circuit's territory. *Id.* § 11. As a result, subsequent elections, even at the trial court levels, are affected by the merit selection of interim appointments by the governor upon the recommendation of the judicial nominating commissions; the momentum gained from initial selection by such an independent review panel has a telling effect upon later races in which the incumbent is a candidate.

Under the current system of electing trial court judges in Florida, therefore, merit selection plays a part in all but a few: those to fill vacancies on the circuit or county court benches that occur at the end of a term— when, for example, a judge retires and two challengers compete to fill his or her seat.

These changes in Florida's constitution were clearly designed to eliminate the vices of partisan, electoral politics from the process of selecting state court judges. The goal of merit selection of judges, naturally, is to insulate them from popular pressure and to make them more willing to decide an unpopular case fairly and impartially while, at the same time, raising the level of qualifications of judicial officers.

## C.

A total of five black candidates have run for seats on either the Fourth Circuit or the Duval County Court in six elections since 1972. We now highlight the circumstances surrounding each of those electoral races while describing the methods by which the judges on those courts have generally reached office during the same period.

The first of the elections relied on by the parties in litigating this case predates the inauguration of Florida's partial merit selection system for trial court judges. In 1972, Leander Shaw became the first black candidate for a judgeship on a court at issue in this litigation. A black lawyer who now serves as a justice of the Florida Supreme Court, Shaw ran for a vacant seat on the Fourth Circuit bench. In the nonpartisan primary, he was opposed by two white candidates, John S. Cox and George L. Proctor. Shaw and Cox advanced to a runoff election, which Cox ultimately won. The Shaw election was one of only four Fourth Circuit electoral races that were contested during the 1972 election cycle; the other fifteen Fourth Circuit judgeships at stake in that year's elections were filled by candidates who ran unopposed.

The parties in this case introduced a wealth of statistical evidence that indicates

how Florida's scheme of trial court elections has operated in the Jacksonville area under the current model. A pattern readily emerges that has prevailed throughout the period at issue in this case: relatively few judicial elections have been contested in the Fourth Circuit and in Duval County.[12] Between January 1, 1973, when the current system for selecting circuit and county court judges went into effect, and the end of 1990, the last year for which information was available at the time of trial, the record reflects that seventy-eight circuit judgeships were filled by election.[13] Of those positions, only ten (or approximately thirteen percent) were contested; the rest were filled by candidates who ran unopposed.[14] Only one black candidate ran for a seat on the Fourth Circuit bench during this period: Harrell T. Buggs in 1978. In the primary, Buggs and two white candidates challenged an incumbent white judge, Lawrence D. Fay, who had been appointed to the court through the merit selection process approximately one hundred days before the election. Fay and one of the white challengers, John E. Palmer, advanced to the runoff; Buggs, who had obtained over eighty percent of the black vote but only approximately four percent of the white vote, was eliminated in the primary.

Focusing solely on the elections described above, however, paints an incomplete picture of how judges come to the circuit court bench in the Fourth Circuit. According to the Duval County Clerk's Office, a total of fifty-four judges have served on the Fourth Circuit since 1972. Fourteen were holdovers from the pre-reform system (six of whom were appointed by the governor before the merit selection process was instituted and eight of whom were elected). With respect to the remainder, twenty-eight circuit court judges began their judgeships after being appointed through the commission system although only twelve originally were elected in nonpartisan elections.[15] Furthermore, although it is true that no black candidates have been elected to judicial office in the Fourth Circuit, two black judges have been appointed under the nominating commission system (Judges Adams and Davis, see supra note 6).

The increasing reliance on the appointment process for selecting trial court judges is highlighted by an examination of the composition of the current Fourth Circuit Court. Of the twenty-eight judges presently sitting on the court, nineteen were appointed through the commission process, eight initially were elected in nonpartisan elections, and one was appointed by the governor in 1967

12. Recognizing how often elections for judicial officers are not contested in Florida generally, the legislature has provided that "[t]he name of an unopposed candidate for the office of circuit judge or county court judge shall not appear on any ballot, and such candidate shall be deemed to have voted for himself at the general election." Fla.Stat.Ann. § 105.051(1)(a) (West 1992).

13. The record does not reflect how many of these races involved an incumbent seeking reelection. Obviously, that information would be important in fleshing out the operation of the judicial election system in the Fourth Circuit and in Duval County.

14. The following information on the number of contested races for Fourth Circuit judgeships was provided to the district court by Dr. Ronald Weber, an expert witness for the appellees.

| Year | # of Seats Up | # Contested | % Contested |
|------|---------------|-------------|-------------|
| 1974 | 4 | 1 | 25.0% |
| 1976 | 2 | 1 | 50.0% |
| 1978 | 17 | 2 | 11.8% |
| 1980 | 5 | 1 | 20.0% |
| 1982 | 3 | 1 | 33.3% |
| 1984 | 16 | 2 | 12.5% |
| 1986 | 7 | 0 | 0.0% |
| 1988 | 9 | 1 | 11.1% |
| 1990 | 15 | 1 | 6.7% |
| Total: | 78 | 10 | 12.8% |

15. The method for filling some of these forty positions, however, was dictated by the fact that they corresponded to newly-created judgeships. According to the Duval County Clerk's Office, whether a new seat on the bench is filled by election or appointment depends upon the effective date set by the legislature. If the seat is created in an election year and the effective date is after the election, the seat is filled by election. If, on the other hand, the position is not created in an election year, or if it is created in an election year but with an effective date before the election, the seat is filled through the nominating commission and appointment process.

under the old system.[16] Moreover, at the time of trial, only one of the judges then serving on the Fourth Circuit bench had ever been opposed for reelection (Judge Fay by Harrell Buggs in 1978), although the twenty-eight judges collectively had stood for reelection over twenty times.

A similar pattern emerges from an examination of the county court selection process. From 1973 to 1990, fifty-six judgeships on the Duval County Court were decided by election; only twelve (or approximately twenty-one percent) of those electoral races were contested.[17] Black candidates participated in primaries for three of those elections and were defeated each time. As the district court noted, however, special circumstances surrounded two of these three races. Alfred Washington, a black candidate, lost his primary race for a seat on the Duval County Court in 1978 to Giles P. Lewis, despite garnering eighty-eight percent of the black vote. Prior to the election, however, Washington had resided in the community for only a short period of time whereas Lewis was a longtime resident with an established legal practice.

In 1984, two black candidates sought positions on the county court bench. Denise Prescod was defeated in her primary by incumbent, Edward P. Westberry, even though she garnered a similar proportion of the black vote. Judge Westberry was not a lawyer, but he was permitted to serve on the court under a grandfather clause in the 1972 constitutional revision that allowed former justices of the peace to become county court judges. He had, by all accounts, received consistently poor ratings from the local bar

but was acknowledged to be a vigorous and extremely effective campaigner. Judge Westberry also had been a judicial officer since 1966, thus claiming the mantle of experience. Prescod, a lawyer, received several important endorsements, including those from Jacksonville's only daily newspaper and the public school teachers' organization. At the time she ran for judicial office, however, Prescod had been admitted to The Florida Bar for only two years. Under the current five-year experience requirements, Prescod would not have been eligible to run for county court judge in 1984. The district court concluded that "neither candidate's qualifications ... were particularly helpful to their respective campaigns, and in all probability incumbency ultimately proved to be the deciding factor." *Nipper,* 795 F.Supp. at 1542 n. 18. In the remaining county court election involving a black candidate and the only one in which the black candidate did not challenge an incumbent, Dietra Micks won three-quarters of the black vote but failed to make the runoff for her position against a field of three white candidates.

Again, this time in the county court context, looking solely at elections tells only part of the story. Since 1972, a total of thirty judges have served on the Duval County Court. Ten initially were appointed by the governor under the commission nominating process while twelve originally obtained their positions by winning nonpartisan elections. Nine other county court judges were holdovers from the prior (pre–1972) system. As for the twelve county court judges serving at the time of trial, five were originally appointed to the bench, including both of the black judges.

**16.** The district court did make factual findings concerning the routes by which the twenty-eight judges on the circuit court at the time of trial in 1991 came to the bench: seventeen originally were appointed while eleven initially were elected to office; of those eleven, five ran unopposed. *Nipper,* 795 F.Supp. at 1538 & n. 14. Therefore, only six of the twenty-eight circuit judges serving at the time of trial had earned their place on the bench in a contested election.

**17.** Dr. Weber's report provides the following information concerning contested elections for the Duval County Court:

| Year | # of Seats Up | # Contested | % Contested |
|------|---------------|-------------|-------------|
| 1974 | 5 | 2 | 40.0% |
| 1976 | 7 | 1 | 14.3% |
| 1978 | 6 | 2 | 33.3% |
| 1980 | 6 | 0 | 0.0% |
| 1982 | 6 | 0 | 0.0% |
| 1984 | 8 | 4 | 50.0% |
| 1986 | 6 | 1 | 16.7% |
| 1988 | 7 | 1 | 14.3% |
| 1990 | 5 | 1 | 20.0% |
| Total: | 56 | 12 | 21.4% |

As the district court concluded, the evidence of black electoral success in the jurisdictions at issue in this case is mixed at best. The court found:

> The black circuit and county judges who have faced reelection have been unopposed and, of course, successful in their reelection bids. In a similar judicial election, Joseph Hatchett's 1976 Supreme Court [re]election, the incumbent Hatchett defeated a white candidate. Hatchett garnered a majority of the white vote in both the Fourth Judicial Circuit and Duval County. No black candidate has won a contested election for circuit or county judge at least since 1972.

*Id.* at 1537.[18] In addition, a review of non-judicial elections in the Jacksonville area reveals a dearth of black electoral success: "[N]o black candidate has won a contested circuitwide[19] or countywide election for any office since 1979," and only one city council member and three members of the civil service board in Jacksonville appear to have done so prior to that time. *Id.*

Black candidates fared better in the Fourth Circuit appointment process. Henry Coxe, the chairman of the Fourth Circuit Judicial Nominating Committee from 1987 to 1991, testified at trial concerning minority participation in the appointment process during his tenure on the committee. Based on that testimony, the district court found:

> Statistics provided by the [Fourth Circuit Judicial Nominating] Commission indicate that from 1987 to 1991, the Commission accepted applications for eleven circuit and county court vacancies. Of the total number of applicants, approximately eleven percent were black attorneys. An almost identical percentage of blacks were among

the total number of nominees sent by the Commission to the Governor. Nine percent of the total appointments made by the Governor during this period were black (specifically, the county judge appointment in the summer of 1991).

*Id.* at 1538.

Moreover, the court emphasized, "[i]n judicial elections, incumbency and name recognition are the primary factors behind electoral success." *Id.* Several witnesses testified to this effect. Indeed, only one of the twenty-eight incumbent circuit judges serving at the time of trial had ever faced electoral opposition subsequent to his or her initial appointment or election; none of the twelve incumbent county judges had ever been opposed in a reelection bid. Judge Adams agreed that incumbency is an important factor in determining the outcome of judicial elections and testified revealingly that "I don't think that a black could win a county-wide judicial election without the benefit of incumbency." By all accounts, the electoral benefits of incumbency accrue equally to black and white judges as none of the black judges on either the Fourth Circuit or Duval County Court benches has ever been opposed for reelection.

### D.

The complaint in this case was filed in the United States District Court for the Middle District of Florida on July 5, 1990. The plaintiffs (the appellants here) challenged the method of electing judges for the Fourth Circuit and the Duval County Court under section 2 of the Voting Rights Act as well as under the Fourteenth and Fifteenth Amendments of the Constitution; they alleged that those election systems unlawfully diluted the electoral strength of black voters.

---

18. Justice Hatchett, now a member of this court, was a United States magistrate in 1975 when Governor Rubin Askew appointed him to be the first black supreme court justice in Florida history. His 1976 reelection campaign, one of Florida's most highly publicized judicial elections, occurred during the few years in which the partial merit selection system applied to supreme court justices. Despite a challenge by Circuit Judge Harvey Duval, a white candidate from

Dade County, Justice Hatchett won reelection by garnering a majority of the white vote in both the Fourth Circuit as a whole and Duval County in particular.

19. There are no non-judicial circuitwide offices in the Fourth Circuit. The court was apparently referring to a compilation of the results from the Fourth Circuit counties for statewide elections.

Trial originally was scheduled for March 1991, but the district court stayed the proceedings pending the outcome of cases before the United States Supreme Court concerning the applicability of section 2 to judicial elections. After the Court confirmed that section 2 applies to the election of state court judges, *see Chisom v. Roemer,* 501 U.S. 380, 404, 111 S.Ct. 2354, 2368, 115 L.Ed.2d 348 (1991); *Houston Lawyers' Ass'n v. Attorney Gen.,* 501 U.S. at 419, 423–24, 111 S.Ct. 2376, 2379, 115 L.Ed.2d 379 (1991), the trial of this case was reset and commenced on December 12, 1991.

To resolve the issue of whether voting in circuit and county judicial elections was racially polarized, both sides offered expert testimony and statistical evidence. The appellants relied on the testimony of Dr. Allan Lichtman, Professor of History at American University in Washington, D.C. The appellees offered two expert witnesses: Dr. Ronald Weber, Professor of Government at the University of Wisconsin, and Dr. Joan Haworth, former Professor of Economics at Florida State University and currently the president of a private consulting company.

Although the ultimate conclusion reached by the two sides was different, the experts agreed on most of the foundational data. Indeed, all of these experts used the same or similar statistical techniques to analyze the election results at issue.[20] The experts divided sharply, however, over which types of elections should be analyzed in order to determine whether voting in Fourth Circuit and Duval County judicial elections has been, and continues to be, racially polarized.

The appellants' expert, Dr. Lichtman, studied the six circuit and county judicial elections in which black candidates have competed against white candidates since 1972.[21] He also analyzed numerous elections for offices not at issue in this litigation (referred to as "exogenous" elections) that involved black candidates, placing particular emphasis on Justice Hatchett's 1976 Florida Supreme Court reelection bid.[22] Almost all of the other exogenous elections studied by Dr. Lichtman were of a partisan nature (including Jesse Jackson's presidential primary campaigns in 1984 and 1988 and Alcee Hastings' various bids for statewide office). Based on his review of these elections, Dr.

20. All of the experts used ecological regression and extreme case analysis to study the voting behavior in the circuit and county judicial elections. As the district court explained:

    Ecological regression analysis permits estimation of the voting behavior of racial groups through comparison of the racial composition of the population at each precinct to the division of the vote among competing candidates at each precinct. The regression analysis uses data from all of the precincts participating in an election, and produces estimates of the voting behavior of both whites and blacks.

*Nipper,* 795 F.Supp. at 1533. The experts in this case used substantially the same techniques that were approved (and relied on) by the Supreme Court in *Gingles.*

21. To summarize, between 1972 and 1990, there were six contested elections for circuit and county judgeships in which black candidates participated. These elections involve only five seats because the first two were the primary and general elections for the same position. The elections and black candidates were: (1) 1972 Primary, Circuit Court, Leander Shaw; (2) 1972 Runoff, Circuit Court, Leander Shaw; (3) 1978 Primary, Circuit Court, Harrell Buggs; (4) 1978 Primary, Duval County Court, Alfred Washing-

ton; (5) 1984 Primary, Duval County Court, Denise Prescod; and (6) 1984 Primary, Duval County Court, Dietra Micks.

22. The only exogenous election to which the district court attached significance in its opinion was the 1976 Florida Supreme Court election involving Justice Hatchett—a statewide race involving one black and one white candidate. The district court adopted Dr. Lichtman's regression results as findings of fact on this point; those results demonstrate that a majority of white voters in the circuit generally, and in Duval County in particular, supported Justice Hatchett's reelection, along with virtually all blacks voting. The court rejected Dr. Lichtman's attempts to tie this race to the other exogenous elections, however, suggesting that "[e]quating Hatchett's non-partisan, lower profile, judicial election with Rev. [Jesse] Jackson's partisan, high profile, presidential election for the purpose of showing racial polarization in circuit and county judicial elections is misleading." *Nipper,* 795 F.Supp. at 1535 n. 8. Although it made findings of fact concerning the results of various other elections, the district court "accorded little weight to these non-judicial, exogenous elections." *Id.* at 1535.

Lichtman concluded that voting in the Fourth Circuit and in Duval County is racially polarized in judicial elections: Black voters prefer black candidates by overwhelming margins, but those candidates are not elected because they do not receive sufficient crossover votes from the white electorate.

According to the ecological regression studies, a large majority of black voters strongly supported the black candidate in each of the six circuit and county judicial elections. At the same time, the majority of white voters supported the white candidate, thereby resulting in the defeat of all of the black candidates except for Leander Shaw in the 1972 primary. Shaw, however, went on to lose in the general election. In these six elections, black support for the black candidates ranged from seventy-three to ninety-eight percent, while white support for those same black candidates varied from three to thirty-three percent. Black voter support for the white candidates never exceeded twenty-seven percent while white support for the white candidates ranged from sixty-seven to ninety-seven percent. The district court adopted Dr. Lichtman's statistical estimates concerning these six elections as findings of fact.[23] *Nipper*, 795 F.Supp. at 1534 n. 4.

The principal expert witness for the defense, Dr. Weber, also reviewed the six circuit and county court campaigns in which black candidates participated. Dr. Weber also examined a set of elections that Dr.

23. Dr. Lichtman's ecological regression analysis revealed the following degrees of racial polarization in the Fourth Circuit and Duval County. It should be noted that one of the appellees' experts, Dr. Haworth, produced estimates for these elections that were nearly identical to Dr. Lichtman's, even though she used a slightly different methodology.

| | % of Black Voters Voting for Black Cand. | % of Black Voters Voting for White Cand.(s) | % of White Voters Voting for Black Cand. | % of White Voters Voting for White Cand.(s) |
|---|---|---|---|---|
| **Fourth Circuit** | | | | |
| 1972 Primary Leander Shaw | | | | |
| Circuit | 92 | 8 | 24 | 76 |
| Duval Co. | 93 | 7 | 23 | 77 |
| 1972 Runoff Leander Shaw | | | | |
| Circuit | 97 | 3 | 33 | 67 |
| Duval Co. | 98 | 2 | 32 | 68 |
| 1978 Primary Harrell Buggs | | | | |
| Circuit | 82 | 18 | 3 | 97 |
| Duval Co. | 81 | 19 | 4 | 96 |
| **Duval Co. Court** | | | | |
| 1978 Primary Group 6 A. Washington | 88 | 12 | 13 | 87 |
| 1984 Primary Group 4 Denise Prescod | 73 | 27 | 31 | 69 |
| 1984 Primary Group 8 Dietra Micks | 76 | 24 | 4 | 96 |

Lichtman had not.[24] Declining to confine his analysis of Fourth Circuit and Duval County judicial elections to those races in which a black candidate had competed, Dr. Weber instead examined *all* of the judicial elections in the relevant jurisdictions between 1972 and 1990, even those in which only white candidates participated. In further refining his study sample, Dr. Weber "argued that only those non-judicial elections for low-visibility offices similar to judgeships would be of importance in a judicial elections case." *Id.* at 1533. Accordingly, he criticized Dr. Lichtman's reliance on high-profile elections for statewide or national office. Dr. Weber concluded that the candidate of choice of black voters wins elections in the Fourth Circuit and Duval County because of the high degree of black cohesion and sufficient white crossover voting—but he admitted on cross-examination that his conclusion should be qualified as follows: "These data show very clearly that black candidates of choice are regularly elected in both jurisdictions and white voters do not usually vote as a bloc to deny black voters the opportunity to elect candidates of choice to these judicial posts—so long as these candidates are white and not black." [25]

There were a total of nineteen contested elections for circuit judge between 1972 and 1990, of which sixteen involved only white candidates. Dr. Weber's analyses, which the district court "adopt[ed] as findings of fact for statistical purposes only," *id.* at 1534, revealed that the candidate of choice of black voters won thirteen, or sixty-eight percent, of these contested elections. During this same time period, there were twenty-four contest-

ed Duval County Court elections, three of which involved black candidates. Dr. Weber's study revealed that the candidate of choice of black voters won fourteen, or fifty-eight percent, of those elections. A somewhat different picture emerges, however, when "split preference" statistics are examined. Looking at both circuit and county court races, Dr. Lichtman testified that the candidate preferred by black voters differed from the candidate preferred by white voters in nineteen of the thirty-seven contested judicial elections that involved only white candidates. In those "split preference" elections, the black voters' preferred candidate lost eighty-four percent of the time.

At trial, the appellants also introduced non-statistical evidence of Florida's history of discrimination against black citizens, including its legacy of disfranchisement and segregation in most areas of life.[26] In particular, Florida employed various franchise restrictions—from the poll tax to the white primary—for decades in an attempt to restrict the access of black voters to the ballot. Those classic discriminatory devices have been eliminated, however, and the consensus at trial was that there is currently little disparity in voter registration in the Fourth Circuit and in Duval County by race. Blacks of voting age are registered at higher rates than whites of voting age in both the Fourth Circuit and Duval County.

Despite the removal of overt badges of segregation, the district court nonetheless found that "black citizens in Florida still suffer in some ways from the effects of Florida's history of purposeful discrimination,"

24. Dr. Haworth's role for the defense was to reexamine Dr. Lichtman's data, so she examined the same exogenous elections as Lichtman (albeit using a slightly different methodology) and reached a different conclusion. Dr. Haworth contended that any racial polarization in these elections was not significant, and that, indeed, strong support by black voters for black candidates corresponded to higher levels of white crossover votes.

25. "Black candidate of choice" is a term of art referring to a candidate who is preferred by the majority of black voters, without reference to the candidate's race.

26. Transportation facilities in Florida were segregated until the 1950s, and many area school systems still have not achieved unitary status. Moreover, until 1958, Florida refused to permit black students to attend the University of Florida College of Law. Florida A & M Law School was created in 1951 for black students but was not accredited until several years later. When the state opened another law school in Tallahassee in 1967 at Florida State University, it closed the law school at Florida A & M.

particularly in terms of socio-economic disparities, such as family income and high school graduation rates. *Id.* at 1536. Black citizens in the region covered by the Fourth Circuit have lower median incomes than whites and are more likely to be unemployed and to fall below the poverty line. In addition, the limited evidence presented at trial (reflected in a consensus among the experts) suggested that, although little disparity exists in voter registration, black voter turnout appears to be slightly lower than white turnout. And the "rolloff" effect—which measures the number of voters who sign in at the polls but fail to cast a vote for a particular election on the ballot—is greater among black voters than white voters.

The appellants also introduced into evidence a report issued in 1990 by the Florida Supreme Court Racial and Ethnic Bias Study Commission[27] that, according to the district court, "documented numerous features of Florida's justice system that allegedly have an adverse effect on the dispensation of justice to minority citizens, including the underrepresentation of minorities in the judiciary in comparison to the percentage of minorities in the total population." *Id.* at 1535. The Study Commission concluded:

> Clearly, the current election process, which provides for circuit-wide, at-large elections, is not yielding sufficient representation of minorities on Florida's bench. At the same time, the dramatic underrepresentation of minority judges reflected in the ... statistics compels the conclusion that the appointive system, as currently structured and implemented, has itself failed to achieve racial and ethnic diversity. The Commission strongly believes that serious measures need to be considered for imple-

mentation—in both systems—which are aimed at producing a more racially and ethnically sensitive judiciary.

To that end, the Study Commission recommended that the state legislature study the feasibility of utilizing subdistricts for judicial elections as a means of redressing prior discrimination and increasing minority representation on the bench.[28] The appellants established that the low number of minority judges on the trial courts cited by the Study Commission affects the perception, if not the reality, of the system's fairness; all of the witnesses acknowledged, however, that the judges of the Fourth Circuit and the Duval County Court are fair and impartial in their administration of justice without regard to race.

### E.

The record in this case therefore reveals a somewhat conflicted picture of the judicial selection process in the Fourth Circuit and Duval County. On the one hand, all of the black candidates for judicial office in those jurisdictions have been defeated by their white opponents. Several of the elections involving black candidates also involved other special circumstances, such as incumbency, that cloud the issue of whether race was the factor most responsible for the outcome. On the other hand, black judges have been appointed to the bench under the merit selection nominating commission system roughly in proportion to the number of minority applicants; once in office, moreover, those black judges have enjoyed the same benefits of incumbency as their white counterparts (including standing unopposed for reelection). The influence of the merit appointment system has been significant: Since its institution

---

27. Judge Adams served on the Study Commission and described its composition and conclusions at trial. The Commission was appointed by the Florida Supreme Court and contained a cross-section of judges, lawyers, and lay citizens from various parts of the state.

28. The Study Commission highlighted its view of the need for heightened representation of minorities on the state's courts in a subsequent report issued in 1991:

> [T]he underrepresentation of minorities as attorneys and judges serves to perpetuate a system which is, through institutional policies or individual practices, unfair and insensitive to individuals of color.... [B]y threatening the withdrawal of the tacit "consent of the governed," the underrepresentation of minorities in positions of responsibility in the judicial system weakens the very system of ordered liberty upon which our democracy is based.

in 1972, more judges initially have reached the bench by appointment than by election.

Based upon this evidence, the district court issued an order containing findings of fact and conclusions of law on June 2, 1992. In that order, the court rejected all of the appellants' statutory and constitutional claims and denied relief. *Id.* at 1548. The court first ruled against the appellants on the critical issue of racially polarized voting, concluding that the statistical evidence, viewed in light of the special circumstances surrounding the judicial elections in question, failed to demonstrate sufficient racial bloc voting such that the white majority usually defeats the minority's preferred candidate.[29] *Id.* at 1543. The court then concluded alternatively that:

> [E]ven if Plaintiffs had made a sufficient showing of racial polarization, Defendants have offered overwhelming proof of objective factors in rebuttal that demonstrate, under the totality of the circumstances, that the social conditions in the Fourth Judicial Circuit and Duval County are such that their interaction[s] with the electoral scheme do not, and will not, result in voting discrimination in the judicial elections under challenge.

*Id.* at 1548. Judgment was entered for the appellees that same day.

In this appeal, the appellants challenge only the district court's denial of their section 2 claim; this court is not asked to review the court's rulings on the constitutional issues. In an opinion issued on September 15, 1993, a panel of this court reversed, and remanded the case to the district court for the imposition "forthwith [of] an appropriate remedy."

*Nipper v. Smith,* 1 F.3d 1171 (11th Cir.1993). Much of the panel's opinion was devoted to evaluating the evidence before the district court on the issue of racially polarized voting. According to the panel opinion, the district court had discounted the appellant's statistical evidence (which the district court had acknowledged would ordinarily be sufficient to establish racially polarized voting) for three reasons: because "(1) the judicial elections involving black candidates were stale; (2) black voters occasionally elected candidates of choice in elections involving only white candidates; and (3) two of the black-white elections involved incumbents." *Id.* at 1178–79. The panel "reject[ed] as clear error each of the district court's reasons for concluding that appellants failed to show racial polarization" and held that "the evidence in the entire record demonstrates racially polarized voting in the Fourth Judicial Circuit and Duval County." *Id.* at 1181–82. In the panel's view, the district court also "erred in ruling that appellees discharged their burden of proving that the voting communities were not driven by racial bias"; specifically, the appellees had not shown "an absence of racially biased voting in the Fourth Judicial Circuit and Duval County."[30] *Id.* at 1184. Subsequently, we vacated the panel opinion and granted rehearing en banc. *Nipper v. Smith,* 17 F.3d 1352 (11th Cir. 1994).

## II.

Section 2 of the Voting Rights Act, adopted in 1965 and amended in 1982, outlaws election practices that result in racial

---

**29.** According to the district court, "[t]his finding alone require[d] a ruling in favor of the [appellants].... [I]n the interests of providing a comprehensive opinion [, however,] the court [considered the appellees'] proof of other objective factors in rebuttal that indicate, under the totality of the circumstances, that the voting community is not driven by racial bias." *Nipper,* 795 F.Supp. at 1543 (citation omitted).

**30.** As we discuss *infra* part V, after finding vote dilution in violation of section 2, a court, before

imposing a remedy, should consider the state's argument that the remedy the plaintiffs propose is not feasible because, if implemented, it would undermine the administration of justice in the challenged court. *Houston Lawyers' Ass'n,* 501 U.S. at 426, 111 S.Ct. at 2380–81. The appellees made such an argument in urging the panel to affirm the district court's denial of relief, but the panel did not address the argument in its opinion.

discrimination.[31]  Of particular concern are electoral structures, such as at-large elections in areas with white majorities, that produce racial vote dilution because "[t]he right to vote can be affected by a *dilution* of voting power as well as by an absolute prohibition on casting a ballot." [32] *Allen v. State Bd. of Elections,* 393 U.S. 544, 569, 89 S.Ct. 817, 833, 22 L.Ed.2d 1 (1969) (emphasis added).  Since racial and ethnic groups tend, at times, to be geographically compartmentalized in our society, a districting plan drawn without regard to the physical distribution of such groups may nevertheless operate to distort their relative voting strengths, as well as to provide the opportunity for subtle discrimination through the manipulation of electoral structures.  Vote dilution cases involve allegations that the location of district lines or the use of other electoral practices, such as at-large voting, may " 'interact with social and historical conditions,' [thereby] impair[ing] the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Voinovich v. Quilter,* — U.S. —, —, 113 S.Ct. 1149, 1155, 122 L.Ed.2d 500 (1993) (quoting *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986)).  Cases alleging a distortion of group voting power of this type have been termed "qualitative" (as opposed to quantitative) [33] reapportionment cases because they focus "not on population-based apportionment but on the quality of representation." *Whitcomb v. Chavis,* 403 U.S. 124, 142, 91 S.Ct. 1858, 1868, 29 L.Ed.2d 363 (1971).

To prevail on a claim of vote dilution under section 2, plaintiffs generally must meet certain threshold requirements that the Supreme Court first identified in *Gingles.*  Specifically, plaintiffs in vote dilution cases must establish as a threshold matter: (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the minority group is "politically cohesive"; and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate. *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67; *Growe v. Emison,* — U.S. —, —, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (quoting *Gingles* ).  The second and third of these threshold preconditions, or factors, relate to the question of whether the challenged electoral scheme is abridging the right of the plaintiff minority group "to vote

---

**31.** Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1988), provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

**32.** This conclusion is not, however, universally accepted. *See, e.g., Holder v. Hall,* — U.S. —, —, 114 S.Ct. 2581, 2603, 129 L.Ed.2d 687 (1994) (Thomas, J., concurring) ("Properly understood, the terms 'standard, practice, or procedure' in § 2(a) refer only to practices that affect minority citizens' access to the ballot.  Districting systems and electoral mechanisms that may affect the 'weight' given to a ballot duly cast and counted are simply beyond the purview of the Act.").

**33.** A case alleging violation of the one person, one vote standard, *see, e.g., Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), based solely on a mathematical analysis of population inequalities among voting districts, is generally termed a "quantitative" reapportionment case.  The issue in such a case is whether population deviations from the average district are impermissibly large.  The Supreme Court has held, however, that one person, one vote requirements do not apply to judicial elections. *See Wells v. Edwards,* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973).

on account of race or color." The first precondition, or factor, asks whether the court can fashion a remedy for a demonstrated abridgement.[34]

In addition to the second and third preconditions, the *Gingles* Court identified other factors that may, in "the totality of the circumstances," support a claim of racial vote dilution. Derived from the Senate Report accompanying the 1982 amendment to section 2, those factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political

subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles,* 478 U.S. at 37, 106 S.Ct. at 2759 (quoting S.Rep. No. 417, at 28–29, *reprinted in* 1982 U.S.C.C.A.N. at 177, 206–07). Additional factors that may be probative of vote dilution in some cases are:

■ whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; [and]

■ whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.,* at 37, 106 S.Ct. at 2759.[35]

The *Gingles* Court emphasized that "this list of typical factors is neither comprehensive nor exclusive," *id.* at 45, 106 S.Ct. at 2763, although evidence of the third precondition, racially polarized voting, is "the linch-

**34.** The Supreme Court developed the three-part *Gingles* threshold test in a case challenging North Carolina's multimember legislative district scheme. The remedy the plaintiffs sought in that case was the creation of single-member districts in which the minority voters they represented would constitute a sufficient majority to elect representatives of their choice. The first *Gingles* threshold factor addressed this remedy and asked, at the outset of the case, whether such districts could be drawn. If not, the case would have ended.

As we discuss in further detail, *infra* part III. B.1., the first *Gingles* threshold factor is properly read, in light of *Holder,* —— U.S. ——, 114 S.Ct. 2581, to stand for the broader proposition that a district court must determine whether it can identify an alternative electoral scheme against which to measure the existing voting practice. Outside of the multimember legislative district context, this benchmark scheme may or may not

involve the use of single-member districts, depending on the facts of the case. In this case, we do not limit the remedy aspect of the vote dilution inquiry to whether single-member districts can be drawn, *see infra* part V.

**35.** The Senate Report, in turn, drew on the decisions in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd sub nom. East Carroll Parish Sch. Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). *See* S.Rep. No. 417, at 28 n. 113, *reprinted in* 1982 U.S.C.C.A.N. at 177, 206 n. 113. This development process is detailed in *Solomon v. Liberty County,* 899 F.2d 1012, 1021 (11th Cir.1990) (en banc) (Tjoflat, C.J., specially concurring), *cert. denied,* 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991).

pin of a § 2 vote dilution claim," *Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496, 499 (5th Cir.1987), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989), and thus forms the basis of the *Gingles* threshold inquiry on the issue of liability (as opposed to remedy). Regardless of the particular factors that the plaintiff in a vote dilution case is able to demonstrate, however, the essence of a section 2 claim is that certain electoral characteristics, in conjunction with "social and historical conditions," operate to eviscerate the ability of minority voters to elect their candidates of choice. *Gingles,* 478 U.S. at 47, 106 S.Ct. at 2764; *see also Carrollton Branch of the NAACP v. Stallings,* 829 F.2d 1547, 1555 (11th Cir. 1987), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

In 1990, this court divided on the issue of whether voting rights plaintiffs can establish a section 2 violation merely by satisfying the second and third *Gingles* threshold factors or whether the ultimate inquiry is always under the totality of the circumstances, such that the defendants have the opportunity to rebut the plaintiffs' showing of vote dilution—and thereby avoid liability—by demonstrating a lack of racial bias in the voting community.[36] *See Solomon v. Liberty County,* 899 F.2d 1012, 1017 (11th Cir.1990) (en banc) (per curiam) (division detailed in the concurring opinions of Kravitch, J., and Tjoflat, C.J.), *cert. denied,* 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991). The Supreme Court's recent decision in *Johnson v. De Grandy,* —— U.S. ——, 114 S.Ct. 2647, 129 L.Ed.2d 775

(1994), has essentially resolved this issue as the following discussion indicates.

## A.

Proof of the three core factors emphasized in *Gingles* is necessary, *Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766, but not always sufficient, to establish a claim for relief under section 2. Rather, plaintiffs in such cases also must show that, under the totality of the circumstances, "they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *League of United Latin Am. Citizens, Council No. 4434 v. Clements,* 999 F.2d 831, 849 (5th Cir.1993) (en banc) ("*LULAC*"), *cert. denied,* —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994).

In *Gingles,* the Court stated that, "[a]s both amended § 2 and its legislative history make clear ... the trial court is to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters."[37] *Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781 (internal quotation marks and citation omitted). The *Gingles* threshold factors (specifically, the second and third) constitute "essentially a 'gloss' on the Senate factors and a limitation on the interpretation of those factors in proving a vote dilution claim." *Stallings,* 829 F.2d at 1555; *accord Collins v. City of Norfolk,* 816 F.2d 932, 935 (4th Cir.1987). Thus, the *Gingles* Court did not decree that a plaintiff who proves the three preconditions invariably will win; instead, it merely held that the three factors are prerequisites to a successful

---

**36.** The division has been noted in several recent opinions of this court. *See, e.g., Hall v. Holder,* 955 F.2d 1563, 1568 n. 9 (11th Cir.1992) ("Although the *Gingles* factors may have been established in a particular case, the continuing role of the parties and of the court is unclear."), *rev'd,* —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994); *Meek v. Metropolitan Dade County,* 908 F.2d 1540, 1544 (11th Cir.1990) ("The en banc court divided on the question of whether proof of the [second and third] *Gingles* factors was sufficient and whether a defendant could raise as a defense the lack of racial bias in the

community."), *cert. denied,* 499 U.S. 907, 111 S.Ct. 1108, 113 L.Ed.2d 217 (1991).

**37.** In *Hall,* a panel of this court recognized that "the *Gingles* majority did not ... limit the manner in which the [second and third] factors may be proven [and that] the totality of the circumstances surrounding a § 2 claim may properly be considered when determining whether plaintiffs have established the [those two] *Gingles* preconditions."

claim.[38]  *See Gingles,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15.

The Supreme Court's recent decision in *De Grandy,* —— U.S. ——; 114 S.Ct. 2647, resolved any doubt as to the threshold nature of the *Gingles* factors.  In *De Grandy,* a case involving a challenge to Florida's legislative reapportionment plan, the Court definitively characterized the "*Gingles* factors (compactness/numerousness, minority cohesion or bloc voting, and majority bloc voting) as 'necessary preconditions,' for establishing vote dilution."[39]  *Id.* at ——, 114 S.Ct. at 2657 (citation omitted).  The Court went on to say, however, that "the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts."  *Id.* at ——, 114 S.Ct. at 2657.  Thus, under *De Grandy,* reviewing courts are required—not just invited—to look beyond the *Gingles* threshold factors when evaluating vote dilution claims.[40]  As the Court stressed, "[l]ack of electoral success is evidence of vote dilution, but courts must also examine other evidence in the to-

tality of circumstances, including the extent of the opportunities minority voters enjoy to participate in the political processes."  *Id.* at ——, 114 S.Ct. at 2657.  In *De Grandy,* the Court assumed that the *Gingles* preconditions had been satisfied, but nevertheless concluded that section 2 relief should not be granted because, notwithstanding the presence of continued discrimination and racial bloc voting, minority voters were able to form effective voting majorities in a number of legislative districts that were roughly proportional to their respective shares in the voting age population.[41]  *See id.* at ——, 114 S.Ct. at 2663.

As an initial matter, therefore, proof of the *Gingles* threshold factors is a necessary precondition to section 2 relief; such a showing, however, will not guarantee relief.  A defendant in a vote dilution case may always attempt to rebut the plaintiff's claim by introducing evidence of objective, non-racial factors under the totality of the circumstances standard.[42]  Indeed,

> [i]f the Court meant to deny the defendant an opportunity to rebut the plaintiff's case

---

**38.** Significantly, the *Gingles* Court itself discussed the broader totality of the circumstances after it had noted the plaintiffs' success in proving the three threshold factors.  *See Gingles,* 478 U.S. at 80, 106 S.Ct. at 2781.

**39.** In two other cases decided after *Gingles,* the Supreme Court reiterated that the *Gingles* core factors are threshold conditions.  *See Growe,* —— U.S. at ——, 113 S.Ct. at 1083; *Voinovich,* —— U.S. at ——, 113 S.Ct. at 1157.

**40.** The same point had been suggested in several of the Court's prior cases.  In *Chisom,* for example, the Court held that the 1982 amendment to section 2 "make[s] clear that an application of the results test *requires* an inquiry into 'the totality of the circumstances.'"  *Chisom v. Roemer,* 501 U.S. 380, 393, 111 S.Ct. 2354, 2363, 115 L.Ed.2d 348 (1991) (emphasis added).  Similarly, the Court echoed in *Houston Lawyers' Ass'n* that "an analysis of the totality of the circumstances ... *must be considered* in an application of the results test embodied in § 2, as amended."  *Houston Lawyers' Ass'n v. Attorney Gen.,* 501 U.S. 419, 426, 111 S.Ct. 2376, 2381, 115 L.Ed.2d 379 (1991) (emphasis added).

**41.** *De Grandy* therefore discusses a new element—proportionality—to be weighed in the totality of the circumstances.  As the Court ex-

plained, "[o]ne may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast."  *De Grandy,* —— U.S. at ——, 114 S.Ct. at 2660.  Nevertheless, "while proportionality in the sense used here is obviously an indication that minority voters have an equal opportunity, in spite of racial polarization, 'to participate in the political process and to elect representatives of their choice,' 42 U.S.C. § 1973(b), the degree of probative value assigned to proportionality may vary with other facts."  *Id.* at ——, 114 S.Ct. at 2661.

**42.** This is precisely what the Supreme Court permitted the defendants to do in *De Grandy.*  In that case, "[t]he District Court found that the three *Gingles* preconditions were satisfied, and that Hispanics had suffered historically from official discrimination, the social, economic, and political effects of which they generally continued to feel."  *De Grandy,* —— U.S. at ——, 114 S.Ct. at 2656.  The Court concluded that, even with all three *Gingles* conditions satisfied, the circumstances in totality would not support a finding of vote dilution where Hispanics could be expected to elect their preferred candidates in proportion to their percentage of the area's population.  *Id.* at ——, 114 S.Ct. at 2663.  In that context, "the District Court was not critical enough in asking whether a history of persistent discrimination reflected in the larger society and

after the plaintiff has offered evidence of the three factors, then the three factors would be both necessary *and always suffi-cient* to win under section 2.... The Court's adherence to the totality-of-the-circumstances test *must* mean that the defendant can rebut the plaintiff's claim— even after the plaintiff has offered proof of the three *Gingles* factors.

*Solomon,* 899 F.2d at 1035 (Tjoflat, C.J., specially concurring). Because the ultimate inquiry is under the totality of the circum-stances, courts must consider not only evi-dence of the *Gingles* threshold factors but also any other evidence offered by the par-ties that is relevant to the statutory test. It may well be true, as the Third Circuit has suggested, that "it will be only the very unusual case in which the plaintiffs can es-tablish the ... *Gingles* [threshold] factors but still have failed to establish a violation of § 2 under the totality of the circumstances." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,* 4 F.3d 1103, 1135 (3d Cir.1993). Nev-ertheless, the Supreme Court cautions:

> To be sure, some § 2 plaintiffs may have easy cases, but although lack of equal elec-toral opportunity may be readily imagined and unsurprising when demonstrated un-der circumstances that include the ... es-sential *Gingles* factors, that conclusion

must still be addressed explicitly, and without isolating any other arguably rele-vant facts from the act of judgment.

*De Grandy,* ——— U.S. at ———, 114 S.Ct. at 2657. It is, therefore, under the totality of the circumstances that courts must decide, in the final analysis, whether a violation of sec-tion 2 has been established.

### B.

Given that courts evaluating section 2 claims must look beyond the *Gingles* thresh-old factors, we must determine what consti-tutes a violation of the statute's "results" test under the totality of the circumstances. As the Supreme Court has stated, section 2 "make[s] clear that certain practices and pro-cedures that *result* in the denial or abridge-ment of the right to vote are forbidden even though the absence of proof of discriminatory intent [in the adoption or maintenance of those practices and procedures] protects them from constitutional challenge" under the Fourteenth and Fifteenth Amendments. *Chisom v. Roemer,* 501 U.S. 380, 383–84, 111 S.Ct. 2354, 2358, 115 L.Ed.2d 348 (1991). The concern thus becomes what proof is required to satisfy the results test, as well as what form of intent inquiry is forbidden thereunder.[43]

We hold that section 2 prohibits those voting systems that have the effect of allow-

---

its bloc-voting behavior portended any dilutive effect from a newly proposed districting scheme, whose pertinent features were majority-minority districts in substantial proportion to the minori-ty's share of voting-age population." *Id.* at ———, 114 S.Ct. at 2658.

**43.** Initially, it bears noting that the Supreme Court itself was divided in *Gingles* on this point. In a concurring opinion joined by three other justices, Justice O'Connor wrote:

Evidence that a candidate preferred by the minority group in a particular election was rejected by white voters for reasons other than those which made that candidate the preferred choice of the minority group would seem clear-ly relevant in answering the question whether bloc voting by white voters will consistently defeat minority candidates....

... The overall vote dilution inquiry neither requires nor permits an arbitrary rule against consideration of all evidence concerning voting preferences other than statistical evidence of racial voting patterns. Such a rule would give

no effect whatever to the Senate Report's re-peated emphasis on "intensive racial politics," on "racial political considerations," and on whether "racial politics ... dominate the elec-toral process" as one aspect of the "racial bloc voting" that Congress deemed relevant to showing a § 2 violation.

*Gingles,* 478 U.S. at 100–01, 106 S.Ct. at 2792 (O'Connor, J., concurring). Justice White wrote separately, suggesting that he would find it sig-nificant if partisan affiliation—and therefore not race—were shown to be the consideration driv-ing the election results. *Id.* at 83, 106 S.Ct. at 2783 (White, J., concurring). Justice Brennan, the author of the majority opinion, took the con-trary position: "Plaintiffs need not prove causa-tion or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent." *Id.* at 74, 106 S.Ct. at 2778. Only three other justices joined the portion of Justice Bren-nan's opinion discussing this issue, however.

ing a community motivated by racial bias to exclude a minority group from participation in the political process. Therefore, if the evidence shows, under the totality of the circumstances, that the community is not motivated by racial bias in its voting patterns, then a case of vote dilution has not been made. Our interpretation of the Voting Rights Act is supported by the text of the statute, the legislative history accompanying the 1982 amendment to section 2, and the Supreme Court's vote dilution cases. We now discuss these sources in greater detail.

### 1.

At first glance, the language of section 2, as amended in 1982, appears somewhat inconsistent and unclear. Subsection (a) forbids the use of electoral structures that "result[ ] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Subsection (b), on the other hand, appears more generous, explaining that a violation of subsection (a) is established if members of a minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 1973(b). We believe, however, that the statutory language, when properly understood, circumscribes the universe of prohibited electoral structures and requires more than a mere showing of electoral losses at the polls by minority candidates.

The appellants argue that the language of section 2 requires nothing more than proof of disparate election results—i.e., that, when observed from a numerical/success rate point of view, minorities have less opportunity than their white counterparts to participate in the political process and to elect representatives of their choice. Such proof, they argue, sufficiently demonstrates the required denial or abridgement of a minority group's right to vote.

This reading of section 2, however, ignores crucial portions of the language in both subsection (a) and subsection (b). It is an axio-matic principle of statutory construction that statutes are to be read in their entirety, not in the piecemeal fashion employed by the appellants. Accordingly, we "follow the cardinal rule that a statute is to be read as a whole, see *Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989), since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991). When the entire statutory provision is examined, it becomes clear that the well-known first portion of subsection (b) can only be understood in light of subsection (a), which requires that the denial or abridgement of the right to vote be "on account of race or color," and the final clause of subsection (b), which makes clear that the 1982 amendment was not designed to create a right of proportional representation. This comprehensive reading plainly precludes the appellants' interpretation of section 2.

First, the language of section 2 as amended, by prohibiting voting structures that "result[ ] in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color,*" explicitly retains racial bias as the gravamen of a vote dilution claim. 42 U.S.C. § 1973(a) (emphasis added). The existence of some form of racial discrimination therefore remains the cornerstone of section 2 claims; to be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause. As the Fifth Circuit has explained, "[t]he scope of the Voting Rights Act is indeed quite broad, but its rigorous protections, as the text of § 2 suggests, extend only to defeats experienced by voters 'on account of race or color.'" *LULAC,* 999 F.2d at 850.

Furthermore, this linguistic conclusion is supported by the fact that any other reading might well render section 2 outside the limits of Congress' legislative powers and therefore unconstitutional. It is important to remember that the Voting Rights Act was adopted

pursuant to Congress' authority to enforce the Fourteenth and Fifteenth Amendments. The Civil War Amendments to the Constitution were designed to remedy pervasive racial discrimination, and Congress has broad power to enforce those amendments by appropriate legislation.[44] Congressional actions, however, must remain rooted in the purpose of the amendments. Accordingly, the Supreme Court has upheld the ban on electoral changes in section 5 of the Voting Rights Act (the preclearance provision) because "the Act's ban on electoral changes that are discriminatory in effect is an appropriate method of promoting the purposes of the Fifteenth Amendment, even if it is assumed that § 1 of the Amendment prohibits only intentional discrimination in voting." *City of Rome v. United States,* 446 U.S. 156, 177, 100 S.Ct. 1548, 1562, 64 L.Ed.2d 119 (1980). Thus, Congress' decision to include and retain the "on account of race or color" language was not merely fortuitous. Indeed, "[t]his limitation was not so much the product of legislative discretion as constitutional imperative, given that the scope of Congress' remedial power under the Civil War Amend-

ments is defined in large part by the wrongs they prohibit." *LULAC,* 999 F.2d at 854. As the Senate Judiciary Committee concluded, the proposed amendment to section 2 was constitutional because of "the very terms and operation of the provision, which confine its application to actual racial discrimination." S.Rep. No. 417, at 43, *reprinted in* 1982 U.S.C.C.A.N. at 177, 221.

In addition, to accept the appellants' interpretation of section 2—that is, to read the "on account of race" language out of the statute by allowing section 2 plaintiffs to establish a violation merely by proving numerical differences in representation levels— would be to create a *de facto* right to proportional representation, a result explicitly prohibited by section 2 itself.[45] *See* 42 U.S.C. § 1973(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). For, under the appellants' reading, courts would do no more than simply determine whether black voters are able to elect their candidates of choice and whether they might be more effective under a different electoral arrangement.

---

**44.** Congress' authority to enforce the Civil War Amendments approximates its power under the Necessary and Proper Clause, as described by *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 315, 4 L.Ed. 579 (1819), to implement the powers granted by Article I. *See City of Rome v. United States,* 446 U.S. 156, 174–77, 100 S.Ct. 1548, 1560–61, 64 L.Ed.2d 119 (1980) (approving the preclearance provisions of section 5 of the Voting Rights Act while expressing no opinion as to the constitutionality of section 2). Indeed, the Court held that "Congress may prohibit practices that in and of themselves do not violate § 1 of the [Fifteenth] Amendment, so long as the prohibitions attacking racial discrimination in voting are 'appropriate' as that term is defined in *McCulloch v. Maryland* and *Ex parte Virginia,* 100 U.S. [10 Otto] 339 [25 L.Ed. 676] (1880)." *City of Rome,* 446 U.S. at 177, 100 S.Ct. at 1561–62. Quoting *Ex parte Virginia,* 100 U.S. at 345–46, the Court explained in *South Carolina v. Katzenbach,* 383 U.S. 301, 327, 86 S.Ct. 803, 818, 15 L.Ed.2d 769 (1966), that:

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or

invasion, if not prohibited, is brought within the domain of congressional power.

Similarly, in *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1724, 16 L.Ed.2d 828 (1966), the Court held that legislation enacted pursuant to section 5 of the Fourteenth Amendment would be upheld as an appropriate exercise of congressional power if the statute " 'is plainly adapted to [the] end' " of enforcing the Equal Protection Clause and "is not prohibited by but is consistent with 'the letter and spirit of the constitution,' " regardless of whether the practices outlawed by Congress violated the Equal Protection Clause in and of themselves.

**45.** In amending section 2, the Judiciary Committee noted, with approval, that "*Whitcomb [v. Chavis]* and *White [v. Regester]* both recognized that, in order to prevail, plaintiffs had to prove more than that minority members had not elected legislators in proportion to their percentage of the population." S.Rep. No. 417, at 23, *reprinted in* 1982 U.S.C.C.A.N. at 177, 200; *see also id.* at 34, *reprinted in* 1982 U.S.C.C.A.N. at 177, 212 ("If the mere existence of underrepresentation plus a history of dual schools had been sufficient under *White,* then plaintiffs would have won in every lawsuit brought in the Fifth Circuit [after *Zimmer* ], which was clearly not the case.").

Taken a step further, the appellants' interpretation necessarily requires a finding that, whenever minority candidates are not succeeding in at-large elections despite the fact that the minority population is reasonably large and politically cohesive, the only possible explanation for the minority candidates' lack of success is white bloc voting. Such a holding would amount to no less than the creation of a right to proportional representation, while also serving to eviscerate the very reason for the adoption of the Voting Rights Act—to prevent the abridgement of the right to vote "on account of race."

## 2.

An examination of the legislative history surrounding the 1982 amendment to the Voting Rights Act (along with the Supreme Court cases that preceded that legislation) confirms that racial bias in the voting community remains the keystone of section 2 vote dilution claims.

### a.

Congress amended section 2 in 1982 to overturn the plurality decision of the Supreme Court in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which had announced a standard requiring plaintiffs in vote dilution cases to prove that "the disputed [electoral] plan was 'conceived or operated [as] a purposeful devic[e] to fur-

ther racial ... discrimination,' " *id.* at 66, 100 S.Ct. at 1499 (quoting *Whitcomb v. Chavis,* 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971)). The report on the proposed amendment issued by the Senate Judiciary Committee stated that the statutory changes were intended to codify the "results" test of *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), which had established the vote dilution standard that applied before *Bolden.*[46] In response to concerns that the results test embodied in section 2 as amended would prove difficult to interpret, the Committee stressed that the amendment "codifies the holding in *White,* thus making clear the legislative intent to incorporate that precedent and extensive case law which developed around it, into the application of Section 2." S.Rep. No. 417, at 32, *reprinted in* 1982 U.S.C.C.A.N. at 177, 210. Because of this stated purpose to return the section 2 burden of proof to pre-*Bolden* standards,[47] "it is to *Whitcomb* and *White* that we should look in the first instance in determining how great an impairment of minority voting strength is required to establish vote dilution in violation of § 2." *Gingles,* 478 U.S. at 97, 106 S.Ct. at 2791 (O'Connor, J., concurring).

The Supreme Court began the development of a standard for racial vote dilution cases in *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), which involved a challenge to the multimember, at-

---

**46.** *See* S.Rep. No. 417, at 2, *reprinted in* 1982 U.S.C.C.A.N. at 177, 179. Similar statements are found throughout the Judiciary Committee's report. *See, e.g., id.* at 15, *reprinted in* 1982 U.S.C.C.A.N. at 177, 192 ("The proposed amendment to Section 2 of the Voting Rights Act is designed to restore the legal standard that governed voting discrimination cases prior to the Supreme Court's decision in *Bolden.*"); *id.* at 27, *reprinted in* 1982 U.S.C.C.A.N. at 177, 205 ("The 'results' standard is meant to restore the pre-*[Bolden]* legal standard which governed cases challenging election systems or practices as an illegal dilution of the minority vote. Specifically, subsection (b) embodies the test laid down by the Supreme Court in *White.*"). Confirmation of this congressional intention can be gleaned from remarks made during the floor debates on the Voting Rights Act amendments. For a more detailed discussion of this material, see *Solomon,*

899 F.2d at 1028–31 (Tjoflat, C.J., specially concurring); *see also Gingles,* 478 U.S. at 97, 106 S.Ct. at 2790 (O'Connor, J., concurring) ("In enacting § 2, Congress codified the 'results' test this Court had employed, as an interpretation of the Fourteenth Amendment, in *White* and *Whitcomb.*"); *LULAC,* 999 F.2d at 851 ("[T]he 1982 amendments to § 2 were intended to 'codify' the results test as employed in *White* and *Whitcomb.*").

**47.** Several decisions of this court have recognized that Congress intended the 1982 amendment to section 2 to restore the standard that governed vote dilution cases before *Bolden. See, e.g., United States v. Marengo County Comm'n,* 731 F.2d 1546, 1562–63 (11th Cir.), *cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); *see also McMillan v. Escambia County,* 748 F.2d 1037, 1041 (Former 5th Cir.1984).

large legislative district scheme in Marion County, Indiana (the Indianapolis area). In that case, black voters claimed that the use of at-large elections diluted the voting strength of minorities in violation of the Equal Protection Clause of the Fourteenth Amendment.[48] After noting that multimember district systems are not per se unconstitutional, *id.* at 142, 91 S.Ct. at 1868, the Court determined that they "may be subject to challenge where the circumstances of a particular case may 'operate to minimize or cancel out the voting strength of racial ... elements of the voting population,'" *id.* at 143, 91 S.Ct. at 1869 (quoting *Fortson v. Dorsey,* 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965)). The Court then turned to the question of how such unconstitutional vote dilution could be proved.

The Court first noted that any schemes "conceived or operated as purposeful devices to further racial discrimination" would be struck down under the Equal Protection Clause. *Id.* at 149, 91 S.Ct. at 1872. It found, however, that the plaintiffs had made no showing that the system used in urban Indianapolis had been explicitly designed or maintained by the relevant public officials to dilute the minority vote. *Id.* The Court then shifted its attention from the intent of the legislators who had framed the electoral system to conditions in the voting community as a whole. The Court stressed that invidious discrimination could not satisfactorily be proved through evidence of minority candidates' lack of success "absent evidence and findings that [minority voters] had less opportunity than did other Marion County residents to participate in the political process

and to elect legislators of their choice." *Id.* To make this showing, the Court explained that plaintiffs could rely on evidence of various objective factors, such as limitations on minority registration or participation in political parties, that are probative of the presence or absence of racial bias in all levels of the political community and not just of "official" discrimination by legislators.[49] Thus, *Whitcomb* indicates that the actions of the members of the voting community as a whole, not just the conduct of officials responsible for designing or maintaining the electoral structure at issue, are relevant to inquiries into discrimination in the voting process.

In *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, the Supreme Court retained proof of invidious discrimination as a requirement of a successful vote dilution case brought under the Equal Protection Clause. The Court explained that, in vote dilution cases, it had "entertained claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups." *Id.,* 412 U.S. at 765, 93 S.Ct. at 2339. The plaintiffs in *White* challenged, under the Fourteenth Amendment, the multimember legislative apportionment plan, which employed multimember districts in certain Texas counties. Accordingly, in framing the constitutional issue before it, the Court explained that it was required to determine whether the use of multimember districts had "been invidiously discriminatory against cognizable racial or ethnic groups in those counties." *Id.* at 756, 93 S.Ct. at 2335.

The plaintiffs in *White* apparently never attempted to demonstrate invidious discrimi-

---

**48.** The Fourteenth Amendment states, in pertinent part, that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

**49.** In *Whitcomb,* the Court concluded that the evidence of objective factors demonstrated a lack of racial bias in the voting community. Nothing in the record suggested that black citizens were prevented from registering to vote, were excluded from political parties, or were overlooked in

the candidate slating process. Had the Democrats won more elections, the Court concluded, the black community would have had no complaints about its representation. Because most of the elections under consideration were won by Republicans, however, "the failure of the [black community] to have legislative seats in proportion to its population[] emerges more as a function of losing elections than of built-in bias against poor Negroes. The voting power of ghetto residents may have been 'cancelled out' ..., but this seems more a euphemism for political defeat at the polls." *Whitcomb,* 403 U.S. at 153, 91 S.Ct. at 1874.

nation through proof of the subjective intent of the legislators who designed or maintained the challenged election scheme. Instead, the plaintiffs only offered—and the Court only discussed—circumstantial evidence that pointed to objective factors that, like those in *Whitcomb*, shed light on the presence or absence of racial bias in the voting community. Echoing the language used in *Whitcomb*, the Court framed the relevant standard as follows:

> To sustain [vote dilution] claims, it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential. The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

*Id.* at 765–66, 93 S.Ct. at 2339. The Supreme Court approved the district court's use of several objective factors to determine whether the plaintiffs had met this burden of proof. Those factors included the state's history of official racial discrimination; the use of certain voting structures that, although not in themselves improper or invidious, nevertheless enhanced the opportunity for racial discrimination; the influence of all-white political organizations over the process; and the use of overt racial campaign tactics to defeat candidates supported by the black community. *See id.* at 766–67, 93 S.Ct. at 2339–40. Based upon an evaluation of these factors, the Court affirmed the district court's determination that the minority population had been excluded unconstitutionally from the political process in those Texas counties.

The relevance of the objective factors discussed in *White* clearly was not limited to the narrow issue of legislators' intent in the adoption or maintenance of a challenged voting scheme. Instead, those factors were indicative of racial bias in the political community as a whole and of interaction between that bias and the challenged electoral structure. The opportunity, or lack of opportunity, to participate in the political process was proved in *White* with objective factors that indicated that the voting scheme, "overlaid, as it was, on the cultural and economic realities of the [minority] community in Bexar County and its relationship with the rest of the county," closed the political process to the minority group. *Id.* at 769, 93 S.Ct. at 2341.

*Whitcomb* and *White* thus established that proof of invidious discrimination constituted an essential element of voting rights claims under the Equal Protection Clause. Plaintiffs could establish this element: (1) by proving that the legislators or other officials intended to enact or maintain a discriminatory voting scheme; *or* (2) by demonstrating objective factors indicating that the minority group has less opportunity to participate in the political process and to elect officials of its choice. As Justice White recently explained, *Whitcomb* and *White* carry the following theme: "[I]t is not mere suffering at the polls but discrimination in the polity with which the Constitution is concerned." *Shaw v. Reno*, ____ U.S. ____, ____, 113 S.Ct. 2816, 2835, 125 L.Ed.2d 511 (1993) (White, J., dissenting).

It was against this jurisprudential backdrop that a plurality of the Supreme Court in *Bolden* eliminated the second of these two methods of establishing invidious discrimination available to voting rights plaintiffs under *Whitcomb* and *White*—objective factors indicating that the minority group has less opportunity to participate in the political process and to elect officials of its choice. Specifically, the *Bolden* plurality held that plaintiffs in voting rights cases, whether claiming a violation of the Fourteenth Amendment, Fifteenth Amendment, or section 2 of the Voting Rights Act, "must prove that the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further racial ... dis-

crimination.' " [50] *Bolden,* 446 U.S. at 66, 100 S.Ct. at 1499 (quoting *Whitcomb,* 403 U.S. at 149, 91 S.Ct. at 1872). *Bolden* involved a challenge to the at-large system of elections for the three-member city commission governing Mobile, Alabama, whose members jointly exercised legislative and executive power. In rejecting each of the plaintiffs' claims, the plurality read the same intent requirement into both the Civil War Amendments and section 2: An electoral scheme would be invalidated only where the plaintiff could prove racially discriminatory intent on the part of legislators (or other relevant officials) in designing or maintaining the challenged scheme.[51] *See id.* at 62, 66–67; 100 S.Ct. at 1499–1500.

Thus, the legislative history surrounding the 1982 amendment to section 2 supplies significant insight into Congress' intent to overturn the *Bolden* intent test by codifying *White.* The Judiciary Committee's report makes clear that amended section 2 restored the pre-*Bolden* standard by eliminating the absolute requirement that plaintiffs prove a discriminatory intent on the part of the legislators or officials responsible for designing or maintaining the challenged electoral scheme. The 1982 amendment, however, was not designed completely to eliminate consideration of the presence or absence of racial bias from the vote dilution inquiry; instead, it was meant merely to restore the invidious discrimination requirement as articulated by the *Whitcomb* and *White* Courts. Thus, under section 2 as amended, a plaintiff once again may demonstrate a violation by proving *either:* (1) the subjective discriminatory motive of legislators or other relevant officials; *or* (2) the existence of objective factors demonstrating that the electoral scheme interacts with racial bias in the community and allows that bias to dilute the voting strength of the minority group.

### b.

Appearing before this court as amicus curiae on behalf of the United States, the Department of Justice joined the appellants in opposing the foregoing reading of the legislative history and pre-amendment caselaw surrounding section 2. The Department contends that section 2 does not require any proof whatsoever of intentional discrimination or racial animus; to consider a lack of racial bias in the voting community as a means of avoiding a section 2 vote dilution claim under the totality of the circumstances, the Department contends, would be to reintroduce the type of intent-based inquiry that Congress repudiated in the 1982 amendment.[52] This position, however, ignores the very important distinction between racial

**50.** The plurality reviewed many cases in the process of distilling this intent test, and it imported from those cases the basic principle that purposeful discrimination is a requirement for a violation of the Fifteenth Amendment, citing *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and *Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), and of the Fourteenth Amendment, citing *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), *Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). *See Bolden,* 446 U.S. at 62–63, 66–67, 100 S.Ct. at 1497, 1499. The plurality held that, as a matter of statutory construction, "the language of § 2 no more than elaborates upon that of the Fifteenth Amendment, and the sparse legislative history of § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself." *Id.* at 60–61, 100 S.Ct. at 1496 (footnote omitted).

**51.** Further evidence that the plurality was altering the standard established in *Whitcomb* and *White* can be derived from the Court's holding that the objective factors discussed in those opinions could not provide sufficient proof of the discriminatory purpose the plurality opinion now required. *See Bolden,* 446 U.S. at 73, 100 S.Ct. at 1502–03. As we explain above, those factors are relevant to a determination of racial bias in the voting community as a whole, not to racial motivations on the part of the creators of a state's electoral scheme. Thus, the *Bolden* plurality's holding that the circumstantial evidence factors alone could not support a finding of invidious discrimination indicates that only evidence of racial bias on the part of legislators or other responsible officials could demonstrate the required discriminatory purpose.

**52.** The Department's argument is essentially the same as that advanced by Justice Brennan in a portion of his *Gingles* opinion that commanded the support of only a plurality of the Court. Justice Brennan contended that requiring section

bias in general and racially discriminatory intent on the part of legislators in particular. Some might suggest that the standard we enunciate today is nothing more than a return to the discredited *Bolden* test. Because of the symbolic power of that characterization, we address the Department's reading of the legislative history in some detail.

In support of its position, the Department of Justice focuses upon certain language in the Judiciary Committee's report, particularly the comment that "the specific intent of [the 1982] amendment is that the plaintiffs may choose to establish discriminatory results without proving any kind of discriminatory purpose." S.Rep. No. 417, at 28, *reprinted in* 1982 U.S.C.C.A.N. at 177, 205–06. This expression of legislative intent, the Department argues, forecloses the reading into the statute of any requirement that the presence or absence of racial bias in the voting community be considered in determining whether a section 2 violation has been established.

As noted above, however, the overriding intent of the 1982 amendment to section 2, as expressed repeatedly in the Senate Report, was to reject the position of the plurality in *Bolden,* "which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters." *Gingles,* 478 U.S. at 43–44, 106 S.Ct. at 2762–63. The Department of Justice, however, contends that the goals Congress sought to achieve were broader: to divorce the issue of racial bias from the section 2 inquiry altogether and essentially to limit the relevant considerations to the rate of minority electoral success at the polls. "Given the palpable tension between 'the goals Congress sought to achieve' and those it actually expressed, it is hardly surprising that the principles [the

appellants] purport[ ] to locate in the Senate Report bear only a passing resemblance to those offered by Congress." *LULAC,* 999 F.2d at 862. The Senate Report leaves no doubt that Congress' view of the vice of the *Bolden* decision comports with our description above:

> In pre-*Bolden* cases plaintiffs could prevail by showing that a challenged election law or procedure, in the context of the total circumstances of the local electoral process, had the result of denying a racial or language minority an equal chance to participate in the electoral process. Under this results test, it was not necessary to demonstrate that the challenged election law or procedure was designed or maintained for a discriminatory purpose.

S.Rep. No. 417, at 16, *reprinted in* 1982 U.S.C.C.A.N. at 177, 193. The Committee thus concluded that the *Bolden* "intent test places an unacceptably difficult burden on plaintiffs" because "[i]t diverts the judicial [inquiry] from the crucial question of whether minorities have equal access to the electoral process to a historical question of individual motives." *Id.* The *Whitcomb* and *White* decisions, in the Committee's view, were correct because "in neither … did the Supreme Court undertake a factual examination of the intent motivating those who designed the electoral districts at issue." *Id.* at 22, *reprinted in* 1982 U.S.C.C.A.N. at 177, 200.

In context, therefore, the phrases from the Senate Report highlighted by the Department of Justice and the appellants refer to this particular form of intent.[53] The Report states that the intent test "asks the wrong question" precisely because it probes the racial motivations of lawmakers (and not because it inquires into racial bias in general):

> [I]f an electoral system operates today to exclude blacks or Hispanics from a fair

---

2 plaintiffs to prove that the failure of minority voters to elect representatives of their choice was attributable to racial considerations would "frustrate the goals Congress sought to achieve by repudiating the intent test of [*Bolden* ]." *Gingles,* 478 U.S. at 71, 106 S.Ct. at 2777.

**53.** Our reading of the Senate Report comports with the conclusion reached by the Fifth Circuit.

*See LULAC,* 999 F.2d at 862 ("The Senate Report quite unambiguously declares that Congress intended to 'make clear that plaintiffs need not prove a discriminatory purpose *in the adoption or maintenance* of the challenged practice or system in order to establish a violation.' ").

chance to participate, then the matter of what motives were in an official's mind 100 years ago is of the most limited relevance.... If [minorities] are denied a fair opportunity to participate ... the system should be changed, regardless of what may or may not be provable about events which took place decades ago.

S.Rep. No. 417, at 36, *reprinted in* 1982 U.S.C.C.A.N. at 177, 214; *see also Shaw*, —— U.S. at ——, 113 S.Ct. at 2823 ("In 1982, [Congress] amended § 2 of the Voting Rights Act to prohibit legislation that *results* in the dilution of a minority group's voting strength, regardless of the legislature's intent."). Statements in the Report about avoiding a requirement that plaintiffs prove "discriminatory intent" must be considered in light of the meaning provided to that phrase in the document as a whole, wherein the Committee expressed its intent to overturn the *Bolden* legislative intent requirement. The many references to "intent," "motivation," and "purpose" throughout the report therefore must be read to refer to the intent of those responsible for erecting or maintaining the challenged scheme.[54]

Not only does the context of the passage from the Senate Report clearly indicate what Congress meant by forbidden inquiry into discriminatory intent, but the Committee's language in other sections of its report also

demonstrates a congressional desire to retain a basic inquiry into racial bias in the voting community—an inquiry that is qualitatively different from the question whether a challenged election law or procedure was designed or maintained for a discriminatory purpose. The Senate Report explains:

> The results test *makes no assumptions one way or the other* about the role of racial political considerations in a particular community. If plaintiffs assert that they are denied fair access to the political process, in part, because of the racial bloc voting context within which the challenged election system works, they would have to prove it.

S.Rep. No. 417, at 34, *reprinted in* 1982 U.S.C.C.A.N. at 177, 212. The Judiciary Committee thus explicitly recognized the need to prove this interaction between the challenged scheme and racial bias in the community. Discussing the standard developed in *Whitcomb, White,* and *Zimmer,* the Committee stated that, "[u]nder the results test, the court[s] distinguished between situations in which racial politics play an excessive role in the electoral process, and communities in which they do not." [55] *Id.* at 33, *reprinted in* 1982 U.S.C.C.A.N. at 177, 211. In the latter, "it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the

---

**54.** In the section of the Senate Report dealing with the operation of amended section 2, the Committee consistently contrasts the results test, which it adopts, with the forbidden intent test, because the former avoids inquiry into the motivations of legislators. For example, the Committee noted:

> The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system [or] practice in order to establish a violation. Plaintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.

S.Rep. No. 417, at 27, *reprinted in* 1982 U.S.C.C.A.N. at 177, 205 (footnote omitted). The Committee continued: "If the plaintiff proceeds under the 'results test', then the court would assess the impact of the challenged structure or

practice on the basis of objective factors, rather than making a determination about the motivations which lay behind its adoption or maintenance." *Id.* The Committee, therefore, drew a distinction between the forbidden inquiry into the motives of the designers of an electoral scheme and the use of objective factors to evaluate whether minorities are denied equal access to the political process on account of race—an evaluation that focuses on racial bias in the voting community.

**55.** The Committee developed a list of objective factors, culled from the *White* and *Zimmer* opinions, that should be used to evaluate whether, under section 2, members of a minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. These objective factors, as discussed above, bear on the existence or nonexistence of racial bias in the community as a whole.

political process under the results test." *Id.* But where racial politics—characterized by the interaction between racial bias and the political system—plays a large role, the outcome is different. The Committee explained:

> Unfortunately, ... there still are some communities in our Nation where racial politics do dominate the electoral process.
>
> In the context of such racial bloc voting, and other factors, a particular election method can deny minority voters equal opportunity to participate meaningfully in elections.

*Id.* The Judiciary Committee therefore conceived of racial bias at work in the electoral process as the key to separating, within the meaning of the Voting Rights Act, those jurisdictions in which minority voters have an equal opportunity to participate from those in which they do not.[56]

Contrary to the assertion of the appellants and the Department of Justice, permitting inquiry into racial bias would not reintroduce into section 2 cases the divisiveness that Congress sought to eliminate. In language heavily relied on by these parties, the Senate Report explains that exploring racial motivations as an element of proof is divisive because "it involves charges of racism on the part of individual officials or entire communities." *Id.* at 36, *reprinted in* 1982 U.S.C.C.A.N. at 177, 214. Significantly, however, the Senate Report continues on in the very same paragraph to reproduce testimony suggesting that this concern arises because, under the *Bolden* intent test, "litigators representing excluded minorities will have to

explore the *motivations of individual council members, mayors, and other citizens.* The question would be whether their decisions were motivated by invidious racial considerations." *Id.* (emphasis added). Moreover, an inquiry into racial bias in the voting community, using objective factors, does not require that any individuals be labelled as racists because section 2 contemplates proof by circumstantial evidence.[57]

### 3.

The legislative history, therefore, does not reveal an intent on the part of Congress to limit the section 2 inquiry to numbers alone, without any corresponding consideration of racial bias. Such a position directly contravenes the language of section 2, which prohibits voting practices that deny minority voters equal access to the political process *on account of race.* Indeed, "[w]ithout an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense 'discriminatory,' and any distinction between deprivation and mere losses at the polls becomes untenable." *LULAC,* 999 F.2d at 850. As we have emphasized, and as the Supreme Court recognized in *Gingles,* "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."[58] *Gingles,* 478 U.S. at 47, 106 S.Ct. at 2764. Unless the tendency among minorities and white voters to support different candidates, and the accompanying losses

---

**56.** As a panel of this court has explained, "[t]his section of the Senate Report makes it clear that section 2 is intended not to create race-conscious politics, but to remedy it where it already exists." *Marengo,* 731 F.2d at 1567.

**57.** As Professor (and now Solicitor General) Drew Days testified during the congressional hearings, "[i]n those jurisdictions where the evidence supports the conclusion that a combination of public and private actions, over time, have succeeded in 'fencing out' minorities from the electoral process, [it is] difficult to understand how requiring that corrective measures be undertaken brands that community and its officials as 'racists,' as some critics of the proposed

Amendment have suggested." Hearings on the Voting Rights Act Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary, 97th Cong., 2d Sess. 1402 (statement of Prof. Drew S. Days, III, Yale Law School).

**58.** *See also id.* at 1367–68 (statement of Prof. Days) (explaining that 1982 amendment to section 2 was designed to restore a remedy in cases "where a combination of public activity and private discrimination have joined to make it virtually impossible for minorities to play a meaningful role in the electoral process").

by minority groups at the polls, are somehow tied to race, voting rights plaintiffs simply cannot make out a case of vote dilution.

## C.

In summary, a plaintiff must prove invidious discrimination in order to establish a violation of section 2 of the Voting Rights Act. Specifically, the plaintiff may prove *either*: (1) discriminatory intent on the part of legislators or other officials responsible for creating or maintaining the challenged system; *or* (2) objective factors that, under the totality of the circumstances, show the exclusion of the minority group from meaningful access to the political process due to the interaction of racial bias in the community with the challenged voting scheme. Given the obvious fact that evidence of legislators' bias will generally be difficult to find, we envision that section 2 plaintiffs usually will pursue the second option, the "results test."

The contours of the proper inquiry under the results test emerge from the Supreme Court's opinion in *Gingles*, which identified three preconditions to obtaining relief under section 2.[59] A plaintiff cannot obtain relief unless he or she can establish: (1) the existence of a permissible remedy (in legislative cases like *Gingles*, the existence of a sufficiently large and compact minority group to constitute a single-member district); (2) that the minority group is politically cohesive; and (3) that the white majority typically votes as a bloc so as to defeat the black community's preferred candidate. *See id.* at 50–51, 106 S.Ct. at 2766–67. Proof of the second and third *Gingles* factors—demonstrating racially polarized bloc voting that enables the white majority usually to defeat the minority's preferred candidate—is circumstantial evidence of racial bias operating through the electoral system to deny minority voters equal access to the political process. Accordingly, the existence of those factors, and a feasible remedy, generally will be sufficient to warrant relief.

The defendant may rebut the plaintiff's evidence by demonstrating the absence of racial bias in the voting community; for example, by showing that the community's voting patterns can best be explained by other, non-racial circumstances.[60] If the defendant offers such proof, the court must be satisfied, before ruling in favor of the plaintiff, that, under the totality of the circumstances, the minority group is denied meaningful access to the political process "on account of race or color."[61] A violation of section 2 may be established under the "results test" without proof of discriminatory intent in the design or maintenance of the challenged scheme. Nonetheless, we hold that section 2 plaintiffs must demonstrate, through the test's objec-

---

**59.** It should be remembered that *Gingles* involved a challenge to a system of at-large multimember legislative districts. Although the preconditions described by the Supreme Court are applicable to vote dilution claims generally, they must be modified to take into account the particular characteristics of the electoral scheme at issue. As we describe *infra* part III, such a modification is necessary in the judicial elections context.

**60.** It is important to note that, by demonstrating the absence of racial bias, a defendant is not rebutting the plaintiff's evidence of racial bloc voting. Bloc voting is only one factor (albeit an important factor) in determining whether vote dilution exists under the totality of the circumstances. And, "[i]f the defendant can affirmatively prove, under the totality of the circumstances, that racial bias does not play a major role in the political community, and the plaintiff cannot overcome that proof, then obviously [Congress] did not intend the plaintiff to win,

even if the plaintiff has proven bloc voting." *Solomon*, 899 F.2d at 1034 (Tjoflat, C.J., specially concurring).

**61.** Here, we are talking about the practical manner in which vote dilution cases should be approached at trial. We do not mean to create a requirement that the defendant present evidence of the lack of racial bias in the voting community as a formal affirmative defense; he or she may always elicit such testimony on cross-examination of the plaintiff's witnesses. The burden of proving vote dilution under the totality of the circumstances remains with the plaintiff, and "[t]here is ... no textual reason to segregate some circumstances from the statutory totality, to be rendered insignificant unless the defendant pleads them by way of affirmative defense." *Johnson v. De Grandy*, —— U.S. ——, ——, 114 S.Ct. 2647, 2662, 129 L.Ed.2d 775 (1994).

tive factors taken as a whole, that a voting community is driven by racial bias and that the challenged electoral scheme allows that bias to dilute the minority population's voting strength.

Our reasoning on this point is substantially similar to the approach taken by the Fifth Circuit in *LULAC*, which concerned vote dilution challenges to the election of Texas state trial court judges. In that case, the Fifth Circuit reversed the judgment of the district court (which found section 2 violations in several counties) because the disparate electoral results were principally caused by a factor other than race.[62] Specifically, the court concluded that, "[w]hen the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens in the contested counties, ... the district court's judgment must be reversed." *LULAC*, 999 F.2d at 850. The *LULAC* court gave the following explanation for the need to examine the reasons for the electoral patterns that statistical evidence reveals:

> Absent evidence that minorities have been excluded from the political process, a "lack of success at the polls" is not sufficient to trigger judicial intervention. Courts must undertake the additional inquiry into the

reasons for, or causes of, these electoral losses in order to determine whether they were the product of "partisan politics" *or* "racial vote dilution," "political defeat" *or* "built-in bias." It is only upon concluding that a minority group's failure to prevail at the polls ... was the "result" or "function" of "racial vote dilution" or "built-in bias," that a court may find that minority plaintiffs have suffered "a denial or abridgement of the right ... to vote on account of race or color."

*LULAC*, 999 F.2d at 853–54.[63] "Electoral losses that are attributable to partisan politics," the court concluded, "do not implicate the protections of § 2." *Id.* at 863.

It is a difficult task to articulate a standard for vote dilution cases that does not raise insurmountable hurdles for section 2 plaintiffs while at the same time avoiding the equally forbidden result of guaranteeing a right of proportional representation. We submit, however, that the burden allocation detailed above strikes the appropriate balance, such that plaintiffs to make out a case of vote dilution are not required to prove the negative; rather, proof of the second and third *Gingles* factors will ordinarily create a sufficient inference that racial bias is at work.[64] In many cases, "[t]he surest indica-

**62.** Given this holding—that race did not cause the challenged electoral results—it was unnecessary for the *LULAC* court to resolve the issue we address today: whether Congress intended that section 2 liability turn on the existence of racial bias in the community interacting with the challenged electoral scheme to dilute the voting strength of the minority plaintiffs. *See infra* note 63. Nor was it necessary for that court to address the matter of an appropriate remedy.

**63.** It should be noted, however, that the Fifth Circuit's decision in *LULAC* rested on narrower reasoning than does ours today. Because the Fifth Circuit held that "plaintiffs, to establish legally significant racial bloc voting, must prove that their failure to elect representatives of their choice cannot be characterized as a 'mere euphemism for political defeat at the polls,' ... or the 'result' of 'partisan politics,' " the court determined that it "need not hold that plaintiffs must supply conclusive proof that a minority group's failure to elect representatives of its choice is caused by racial animus in the white electorate in order to decide that the district

court's judgment must be reversed." *LULAC*, 999 F.2d at 859 (citations omitted). Nevertheless, the court did indicate its belief that "such a requirement could be inferred from the text of § 2; the caselaw Congress intended to codify in amending the provision; the Senate Report; the testimony of prominent supporters of the Act; and the controlling opinions of the Supreme Court." *Id.* (citations omitted).

**64.** Accordingly, we avoid the Fifth Circuit's concern that "[a] rule conditioning relief under § 2 upon proof of the existence of racial animus in the electorate would require plaintiffs to establish the absence of not only partisan voting, but also all other potentially innocent explanations for white voters' rejection of minority-preferred candidates." *LULAC*, 999 F.2d at 859. The defendants would have the obligation to introduce evidence of such innocent explanations; section 2 plaintiffs would be under no obligation to search them out and disprove them preemptively. If the plaintiffs have proved the *Gingles* factors, and if the defendants say nothing in response, the plaintiffs ordinarily will have discharged their obligation.

tion of race-conscious politics is a pattern of racially polarized voting." *United States v. Marengo County Comm'n,* 731 F.2d 1546, 1567 (11th Cir.), *cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); *see also United States v. Dallas County Comm'n,* 850 F.2d 1430, 1439 (11th Cir.1988), *cert. denied,* 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989). The standard we articulate today simply allows a defendant to rebut proof of vote dilution by showing that losses by minority-preferred candidates are attributable to non-racial causes.

### D.

As should be obvious from the foregoing discussion, vote dilution cases are circumstantial evidence cases: Section 2 violations generally will not be established by direct testimonial evidence that resolves the matter at issue. In listing of factors that ordinarily will be most relevant to the section 2 inquiry into the totality of the circumstances, the Senate Judiciary Committee and the *Gingles* Court, like the *White* and *Zimmer* courts before them, attempted to describe the types of evidence that will assist a reviewing court in determining whether the influence of a given racial group has been distorted through the denial of equal access to the political processes. The enumerated objective factors were designed to guide district courts in the receipt of evidence in vote dilution cases by clarifying certain subsidiary inquiries that are relevant to the ultimate issue. The presence or absence of each factor therefore serves as a piece of evidence pointing either towards or away from an ultimate conclusion that an electoral system is or is not operating to dilute a minority group's voting strength on account of race. It is only after making particularized determinations as to these various factors that a district court may weigh its findings in order to ascertain whether, in the aggregate, they point to dilution.

Of course, although Congress and the Court expect that the factors listed will be the most relevant in the majority of cases,

courts evaluating vote dilution claims should consider all evidence that is probative of the ultimate issue. As *Gingles* emphasizes, section 2 mandates a multifactor circumstantial evidence test for vote dilution such that, despite the Senate Report's express enumeration of typical circumstantial evidence factors, "this list of factors is neither comprehensive nor exclusive." *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2763. Still, in reviewing these factors, we are reminded once more that, although proof of any factor will be helpful to a plaintiff's section 2 claim, it is only the second and third *Gingles* threshold factors (in addition to the first factor, which relates to the availability of a remedy) that *must* be proven in every case. In particular, before a challenged procedure will violate section 2, "a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Id.* at 49, 106 S.Ct. at 2765–66.

This court has previously recognized the need to consider a wide variety of circumstances when evaluating claims of racial vote dilution under section 2. *Hall v. Holder,* 955 F.2d 1563, 1568 (11th Cir.1992) (quoting *Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764), *rev'd on other grounds,* —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994). Therefore, the full totality of the circumstances surrounding a section 2 claim must be considered appropriately when evaluating the *Gingles* preconditions as well as when deciding the ultimate issue of vote dilution:

> If the totality of circumstances could not be considered in reviewing the *Gingles* factors, then courts would often be left to consider statistical and census data in an inappropriate contextual vacuum. The interaction of social and historical conditions with the challenged system would not be considered despite the fact that such interactions are central to § 2 claims.

*Hall,* 955 F.2d at 1568 n. 8. Of course, some Senate Report factors are particularly important because they have a direct bearing on the *Gingles* threshold inquiry while others to the extent that they are relevant, remain

"supportive of, but *not essential to,* a minority voter's claim." *Gingles,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15. Although the additional factors need not be present to satisfy the *Gingles* threshold, they must be examined when determining whether, considering all of the circumstances in the case, the plaintiffs are entitled to section 2 relief.

Courts evaluating vote dilution claims, therefore, must consider all relevant evidence; "[n]o single statistic provides courts with a short-cut to determine whether a set of [electoral structures] unlawfully dilutes minority voting strength."[65] *Johnson v. De Grandy,* — U.S. ——, ——, 114 S.Ct. 2647, 2661–62, 129 L.Ed.2d 775 (1994). Because the court must conduct a "searching practical evaluation of the 'past and present reality'" of the challenged electoral system in operation, *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2764 (quoting S.Rep. No. 417, at 30, *reprinted in* 1982 U.S.C.C.A.N. at 177, 208), the types of evidence that would be relevant under this standard plainly defy categorization. Instead, a court gradually draws together a picture of the challenged electoral scheme and the political process in which it operates by accumulating pieces of circumstantial evidence. Like a Seurat painting, a portrait of the challenged scheme emerges against the background of the voting community. Only by looking at all of the dots on the canvas is a district court able to determine whether vote dilution has occurred.[66]

A court should not exclude certain types of relevant evidence—certain colors on the canvas—from its examination if doing so would leave an incomplete view of the circumstantial evidence picture. A piece of evidence is irrelevant only if, after the receipt of that evidence, the existence of a fact appears no more or less probable than it did before that evidence was offered. That is, an item of circumstantial evidence is irrelevant only if it does not allow the trier of fact reasonably to infer anything about whether or not the voting strength of the minority group has been impermissibly diluted.

Having articulated the standard that governs vote dilution cases generally, we now turn to the more particular problems involved in evaluating challenges to judicial election schemes.

### III:

The principles governing vote dilution claims, including the *Gingles* threshold factors, "cannot be applied mechanically and without regard to the nature of the claim." *De Grandy,* — U.S. at ——, 114 S.Ct. at 2655 (quoting *Voinovich v. Quilter,* — U.S. ——, ——, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993)). The command that a claim of vote dilution be evaluated with a functional, not a formalistic, view of the political process, *see Gingles,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15, requires that we consider the

**65.** In *De Grandy,* the Supreme Court confirmed that no single type of evidence is dispositive by rejecting the rule of thumb apparently adopted by the district court: namely, that "anything short of the maximum number of majority-minority districts consistent with the *Gingles* conditions would violate § 2, at least where societal discrimination against the minority had occurred and continued to occur." *De Grandy,* — U.S. at ——, 114 S.Ct. at 2659. The Court also declined to introduce proportionality as a safe harbor for any districting scheme because "[a]n inflexible rule would run counter to the textual command of § 2, that the presence or absence of a violation be assessed 'based on the totality of circumstances.'" *Id.* at ——, 114 S.Ct. at 2660 (quoting 42 U.S.C. § 1973(b)). Thus, "[t]he opinion's central teaching is that proportionality—defined as the relationship between the number of majority-minority voting districts and the minority

group's share of the relevant population—is *always* relevant evidence in determining vote dilution, but is *never* itself dispositive." *Id.* at ——, 114 S.Ct. at 2664 (O'Connor, J., concurring).

**66.** The appellants suggest that allowing a fact-intensive inquiry into the presence or absence of racial bias in the voting community "would facilitate the use of thinly-veiled proxies by permitting, for example, evidence that a minority candidate was regarded as 'unqualified' or 'corrupt' to defeat a claim that white voters' refusal to support him was based on race or ethnicity." *LULAC,* 999 F.2d at 860. We trust, however, that district courts will be able to reject such contentions when they are not supported by the evidence. If a defendant contends that racially disparate voting results are best explained by some factor other than race, then that proposition must be proved.

unique features of judicial elections and the manner in which they affect the vote dilution inquiry. Our analysis focuses on two themes: (1) the need to adjust the factors enunciated in cases involving legislative elections to the judicial context: and (2) the importance of considering the state's interest in the structure of its judiciary. By way of introduction, however, we begin with the Supreme Court's treatment of section 2 challenges to judicial elections.

## A.

The Supreme Court considered the application of section 2 to judicial elections in the companion cases of *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), and *Houston Lawyers' Ass'n v. Attorney General,* 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991).[67] Essentially, the Court determined that plaintiffs may bring vote dilution claims under section 2 with respect to the election of state judges, but it left open the issue of what a plaintiff would have to establish to obtain relief.

*Chisom* involved challenges to the election of two justices of the Louisiana Supreme Court from a multimember district encompassing the New Orleans area; all of the other justices of the court were elected from single-member districts. *Houston Lawyers' Ass'n* concerned the Texas system for electing trial court judges. Under review in these cases was the Fifth Circuit's en banc decision holding that vote dilution claims in judicial elections are not covered by section 2 because judges are not "representatives" within the meaning of the statute. *League of United Latin Am. Citizens, Council No. 4434 v. Clements,* 914 F.2d 620, 622–23 (5th Cir. 1990) (en banc).

The Supreme Court took pains to stress that its decisions in these cases were limited to the threshold issue of whether section 2 of the Voting Rights Act would allow claims of vote dilution in state judicial elections. In delineating the scope of section 2's coverage, the Court emphasized that it did "not address any question concerning the elements that must be proved to establish a violation of the Act [in this context] or the remedy that might be appropriate to redress a violation if proved." *Chisom,* 501 U.S. at 390, 111 S.Ct. at 2361. ·The Court simply held that "state judicial elections are included within the ambit of § 2 as amended" and are, therefore, to be analyzed under the established section 2 results test. *Id.* at 404, 111 S.Ct. at 2368. More specifically, the Court explained in *Houston Lawyers' Ass'n* that the Voting Rights Act covers "the election of ... trial judges whose responsibilities are exercised independently in an area coextensive with the districts from which they are elected." 501 U.S. at 426, 111 S.Ct. at 2380. The two cases were then remanded for further proceedings.[68]

Although *Chisom* and *Houston Lawyers' Ass'n* do not purport to develop the standard to be applied to the merits in judicial election cases, several passages in the Court's opinions are significant. First, Justice Stevens' majority opinion in *Chisom* explained that the Court's holding that section 2 should be read to cover judicial elections was based on the fact that judicial offices may be akin to representative positions if the state provides for the partisan election of judges, thereby infusing those offices with the characteristics of other elective positions. As the Court noted:

The fundamental tension between the ideal character of the judicial office and the

---

**67.** In *Clark v. Roemer,* 500 U.S. 646, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991), the Court held that section 5 of the amended Voting Rights Act (the preclearance provision) also applies to judicial elections.

**68.** On remand, the Fifth Circuit wrestled with how to apply the *Gingles* threshold test and the subsequent review under the totality of the circumstances to elections of judges. In *League of*

*United Latin American Citizens, Council No. 4434 v. Clements,* 986 F.2d 728 (5th Cir.1993), a panel of the court affirmed the district court's conclusion that the method of electing district court judges in eight Texas counties, but not in a ninth, violated section 2. The panel's decision (with respect to the eight Texas counties) was then reversed by the full court sitting en banc in *LULAC,* 999 F.2d at 877. *Chisom* was ultimately disposed of by a consent judgment. *See Chisom v. Edwards,* 970 F.2d 1408 (5th Cir.1992).

real world of electoral politics cannot be resolved by crediting judges with total indifference to the popular will while simultaneously requiring them to run for elected office. When each of several members of a court must be a resident of a separate district, and must be elected by the voters of that district, it seems both reasonable and realistic to characterize the winners as representatives of that district.

*Chisom*, 501 U.S. at 400–01, 111 S.Ct. at 2367 (footnote omitted). In such systems, where judges are thought to be accountable in some sense to the people who elect them, the Voting Rights Act should apply to ensure that the judiciary is equally accountable to *all* of the people—in particular, to ensure that the vote of a group of minority citizens is not diluted on account of race. Hence, the Court concluded, vote dilution claims are cognizable with respect to judicial elections.

■ The Court specifically left open the possibility, however, that a state's judiciary could be excluded from the coverage of section 2 if its judges were not intended to have, and in reality did not have, this representative character. The Court explained that:

> [A state] could, of course, exclude its judiciary from the coverage of the Voting Rights Act by changing to a system in which judges are appointed, and in that way, it could enable its judges to be indifferent to popular opinion. The reasons why Louisiana has chosen otherwise are precisely the reasons why it is appropriate for § 2, as well as § 5, of the Voting Rights Act to continue to apply to its judicial elections.

*Id.*, at 401, 111 S.Ct. at 2367.[69] Essentially, the Court appears to suggest that it is equally wrong to say that section 2 covers all judicial selections as it is to say it covers none. Coverage by the Voting Rights Act, then, turns on the method by which the judges are selected.

Second, the Court indicated in *Chisom* and *Houston Lawyers' Ass'n* that the factors relevant in the totality of the circumstances analysis under section 2 in the legislative context might not be relevant for judicial elections. Emphasizing that "[t]he standard that should be applied in litigation under § 2 is not at issue here," the Court nevertheless predicted that "serious problems [may] lie ahead in applying the 'totality of circumstances'" factors developed in section 2 cases involving legislative elections to the election of judges. *Chisom*, 501 U.S. at 403, 111 S.Ct. at 2368. The difficulty mandating further consideration of the application of vote dilution principles to judicial elections arises from the transformation of a standard developed in the context of one type of election— for representatives in multimember legislative bodies—to a qualitatively different type of election—for state court judges. The Court suggested the following as one modification to the totality of the circumstances inquiry: A state's interest in maintaining the challenged electoral system for its judges is a legitimate factor to be considered when determining liability under section 2. *See Houston Lawyers' Ass'n,* 501 U.S. at 426–27, 111 S.Ct. at 2381 (citing *Zimmer v. McKeithen,* 485 F.2d 1297, 1305 (5th Cir.1973) (en banc), *aff'd sub nom. East Carroll Parish Sch. Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976)).[70] Such a state interest should also be considered when determining whether the remedy the plaintiff seeks is a feasible alternative to the challenged electoral system. *Id.* at 426–27, 111 S.Ct. at 2380–81.

In the instant case, Florida appoints a large percentage of its trial court judges through a merit selection process—but requires judges to compete in nonpartisan retention elections. Thus, the first issue raised in *Chisom* and *Houston Lawyers' Ass'n*— whether a non-elected judiciary could escape

---

**69.** Similarly, the Court concluded in *Houston Lawyers' Ass'n:* "If a State decides to elect its trial judges, as Texas did in 1861, those elections must be conducted in compliance with the Voting Rights Act." 501 U.S. at 426, 111 S.Ct. at 2380.

**70.** *Zimmer* is a principal source of the totality of the circumstances factors. *See supra* note 35.

the ambit of section 2—is not implicated. But the second issue—how the courts' totality of the circumstances analysis must be modified in order to adapt to the judicial model—is before us. In turn, we examine the *Gingles* threshold factors; the other totality of the circumstances factors discussed in *Gingles* and the Senate Report; and, finally, the Supreme Court's judicially-specific consideration—the state's interest in maintaining its judicial elections structure.

### B.

The language of the Court's opinion in *Gingles* suggests that the principles enunciated therein are relevant to claims of vote dilution generally, at least to some degree, and, therefore, their application is not limited to the multimember legislative context. The black voters' in *Gingles* claimed that the North Carolina legislature's decision to employ multimember, rather than single-member, districts for selecting legislators in the contested North Carolina jurisdictions diluted minority votes by submerging them in a white majority, thereby impairing the plaintiffs' ability to elect representatives of their choice. *See Gingles*, 478 U.S. at 46, 106 S.Ct. at 2764. Obviously, the nature of the offices sought—representative positions—shaped the Court's analysis. Nevertheless, the threshold test the Court developed and the accompanying discussion of the totality of the circumstances were not dependent on the representative quality of the offices sought. Rather, they depended on an analysis of section 2, the legislative history behind the 1982 amendment, and the "theoretical basis"

for vote dilution: namely, that "where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." *Id.* at 48, 106 S.Ct. at 2765.

The rationale of the *Gingles* decision demonstrates that, if a plaintiff's section 2 claim alleges vote dilution, then the plaintiff must meet *Gingles'* threshold criteria regardless of the nature of the office at stake. As we discuss above, *Gingles* held that plaintiffs in vote dilution cases brought under section 2 must initially establish geographic compactness, minority cohesiveness, and white bloc voting as preconditions to stating a valid claim. *See id.* at 50–51, 106 S.Ct. at 2766–67. Those three factors are used to evaluate two critical points: (1) the possibility of a remedy and (2) the existence of racially polarized, legally significant racial bloc voting.

### 1.

The first *Gingles* precondition, informed by the second, dictates that the issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases. As the Supreme Court has explained, "[t]he 'geographically compact [minority]' and 'minority political cohesion' showings [in the *Gingles* threshold test] are needed to establish that the minority has the potential to elect a representative of its own choice from some single-member district." *Growe v. Emison*, —— U.S. ——, ——, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (citing *Gingles*, 478 U.S. at 50, n. 17, 106 S.Ct., at 2765, n. 17).[71] The inquiries into remedy and liability, therefore,

---

71. In *Growe*, the Court held that the district court had erred in concluding that a Minnesota state court's legislative redistricting plan, produced as a result of litigation by Minnesota voters, violated section 2 of the Voting Rights Act. Choosing not to apply the *Gingles* preconditions for a vote dilution violation claim because single-member (not multi-member) districts were at issue, the district court instead proceeded directly to the "totality of circumstances" test in section 2(b) and found unlawful dilution. *Growe*, —— U.S. at ——, 113 S.Ct. at 1083. The Supreme Court unanimously reversed, in part, because "the *Gingles* preconditions were not only ignored but were unattainable. As the district

court acknowledged, the record simply 'contains no statistical evidence' of minority political cohesion ... or of majority bloc voting in Minneapolis." *Id.* at ——, 113 S.Ct. at 1085.

The Court in *Growe* explicitly extended the *Gingles* threshold requirements to challenges to single-member district schemes. *See id.* at ——, 113 S.Ct. at 1084–85. The Court explained that, in general, multimember districting plans pose a greater threat to minority participation in the electoral process than do single-member districts. Accordingly, "[i]t would be peculiar to conclude that a vote-dilution challenge to the (more dangerous) multimember district requires

cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system.

■ Implicit in this first *Gingles* requirement is a limitation on the ability of a federal court to abolish a particular form of government and to use its imagination to fashion a new system. Nothing in the Voting Rights Act suggests an intent on the part of Congress to permit the federal judiciary to force on the states a new model of government; moreover, from a pragmatic standpoint, federal courts simply lack legal standards for choosing among alternatives. Accordingly, we read the first threshold factor of *Gingles* to require that there must be a remedy within the confines of the state's judicial model that does not undermine the administration of justice.

In *Voinovich v. Quilter*,[72] —— U.S. ——, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), the Court suggested that the first *Gingles* threshold factor means more than the literal ability (and need) to be able to draw single-member districts in legislative vote dilution cases. Indeed, the Court indicated that the particular showing required by that threshold factor must be modified according to the type of claim alleged. *Gingles* itself involved challenges to multimember legislative districts. The *Voinovich* Court noted: '

> [T]he *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim. For example, the first *Gingles* precondition, the requirement that the group be sufficiently large to constitute a majority in a single district, would have to be modified or eliminated when analyz-

ing the influence-dilution claim we assume *arguendo* to be actionable today. The complaint in such a case is not that black voters have been deprived of the ability to constitute a *majority*, but of the possibility of being a sufficiently large *minority* to elect their candidate of choice with the assistance of cross-over votes from the white majority.

*Voinovich*, —— U.S. at ——, 113 S.Ct. at 1157 (citation omitted). In *Gingles*, the necessary showing was that the minority group was sufficiently large and geographically compact to constitute a majority in a single-member district; such a showing was logical because the plaintiffs were alleging vote dilution in a system of multimember legislative districts. In judicial cases, however, single-member districts may run counter to the state's judicial model. Thus, the question under the first *Gingles* threshold factor may not be whether the minority group could constitute a majority in a single-member district, but whether, within the state's judicial model, there exists an alternative election scheme that could serve as an appropriate section 2 remedy. *Houston Lawyers' Ass'n*, 501 U.S. at 426, 111 S.Ct. at 2380–81.

■ In *Holder v. Hall*, —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994), there was general accord on an otherwise divided Court that plaintiffs in vote dilution cases must demonstrate that the challenged system suppressed minority voting strength in comparison to some alternative, feasible benchmark system: "In a § 2 vote dilution suit, along with determining whether the *Gingles* preconditions are met and whether the totality of the circumstances supports a finding of liability, a court must find a reasonable alternative practice as a benchmark against which

---

a higher threshold showing than a vote-fragmentation challenge to a single-member district." *Id.* at ——, 113 S.Ct. at 1084.

**72.** The *Voinovich* plaintiffs challenged the validity of an Ohio reapportionment plan, that allegedly deprived black voters of "influence districts" in which they would have constituted a formidable and influential minority. *Voinovich*, —— U.S. at ——, 113 S.Ct. at 1153. The Court declined to decide whether such influence-dilution claims are cognizable under section 2, *id.* at ——, 113

S.Ct. at 1155, but reversed the judgment of the district court, in part, because the black voters had "failed to demonstrate *Gingles'* third precondition—sufficient white majority bloc voting to frustrate the election of the minority group's candidate of choice," *id.* at ——, 113 S.Ct. at 1158. The district court had specifically found that Ohio did not suffer from racially polarized voting.

to measure the existing voting practice." [73] *Id.* at ——, 114 S.Ct. at 2585 (Kennedy, J.) (footnote omitted); *see also id.* at ——, 114 S.Ct. at 2589 (O'Connor, J., concurring) (noting "general agreement" that "to determine whether voters possess the potential to elect representatives of choice in the absence of the challenged structure, courts must choose an objectively reasonable alternative practice as a benchmark for the dilution comparison"); *id.* at ——, 114 S.Ct. at 2621–22 (Blackmun, J., dissenting) (detailing "widespread agreement that minority voters' potential 'in the absence of' the allegedly dilutive mechanism must be measured against the benchmark of an alternative structure or practice that is reasonable and workable under the facts of the specific case" (citation omitted)). That alternative plan, five justices held, cannot alter the size of the governmental body. Furthermore, although not focusing explicitly on the first *Gingles* threshold factor, three justices in the majority based their decision on the fact that there can

never be an objective alternative benchmark for comparison where the size of the governmental body is at issue, as was the case in *Holder.* [74]

■ In short, under *Holder,* federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies. Implicit in this holding, however, is a broader concern. Federal courts may insist that a state or political subdivision operate a governmental structure fairly, thereby allowing all groups equal access to the political process. Courts may require, for example, that black voters are not denied the equal opportunity to elect representatives of their choice for the state legislature. Federal courts may not, however, alter the state's form of government itself when they cannot identify "a principled reason why one [alternative to the model being challenged] should be picked over another as a benchmark for comparison." [75] *Id.* at ——, 114 S.Ct. at 2586.

---

**73.** As Justice O'Connor explained in *Gingles:* "[T]he phrase [vote dilution] itself suggests a norm with respect to which the fact of dilution may be ascertained." *Mississippi Republican Executive Comm. v. Brooks,* 469 U.S. 1002, 1012, 105 S.Ct. 416, 422, 83 L.Ed.2d 343 (1984) (Rehnquist, J., dissenting from summary affirmance). Put simply, in order to decide whether an electoral system has made it harder for minority voters to elect the candidates they prefer, a court must have an idea in mind of how hard it "should" be for minority voters to elect their preferred candidates under an acceptable system. *Gingles,* 478 U.S. at 88, 106 S.Ct. at 2786. Thus, "where there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice, it follows that the voting practice cannot be challenged as dilutive under § 2." *Holder,* —— U.S. at ——, 114 S.Ct. at 2586 (Kennedy, J.).

**74.** *See, e.g., Holder,* —— U.S. at ——, 114 S.Ct. at 2588 (O'Connor, J., concurring) (describing agreement between herself and Justice Kennedy, in whose opinion Chief Justice Rehnquist joined). Justice Blackmun, writing for the four dissenters, concluded, on the other hand, that "the proposed five-member Bleckley County Commission presents a reasonable, workable benchmark against which to measure the practice of electing a sole commissioner." *Id.* at ——, 114 S.Ct. at 2622 (Blackmun, J., dissenting). The other two Justices who comprised the majority, Justices Thomas and Scalia, agreed that

the size of a governing body cannot be attacked under section 2. They focused not on the practical concerns of locating a benchmark but instead on a novel reading of the statutory text; they would have held that the size of a governing body is not a "standard, practice, or procedure" within the terms of the Voting Rights Act. *Id.* at ——, 114 S.Ct. at 2591. Justices Thomas and Scalia would overrule all of the Court's precedents holding that vote dilution claims are cognizable under section 2.

**75.** Implicit in the *Holder* plurality's conclusion may be the notion that the Voting Rights Act, under our federal system, could not constitutionally authorize federal courts to order the reconstitution of state governmental institutions. It is important to note that "the [Supreme] Court has recognized that the States' power to define the qualifications of their officeholders has force even as against the proscriptions of the Fourteenth Amendment" and that "the Fourteenth Amendment does not override all principles of federalism." *Gregory v. Ashcroft,* 501 U.S. 452, 469, 111 S.Ct. 2395, 2405, 115 L.Ed.2d 410 (1991) (upholding Missouri mandatory retirement law for state court judges). Of course, the Civil War Amendments were specifically designed as intrusions on state sovereignty; as a result, the *Gregory* Court articulated a plain statement rule for determining when Congress intends to enforce the Fourteenth Amendment guarantees in contravention of the traditional power of the states.

■ *Holder* also confirms that, from the inception of a section 2 case, the existence of a workable remedy within the confines of the state's system of government is critical to the success of a vote dilution claim. The absence of an available remedy is not only relevant at the remedial stage of the litigation, but also precludes, under the totality of the circumstances inquiry, a finding of liability. *Gingles,* 478 U.S. at 51, 106 S.Ct. at 2766. As we note above, a court cannot determine whether the voting strength of a minority group has been impermissibly diluted without having some alternative electoral structure in mind for comparison. Thus, "where there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice, it follows that the voting practice cannot be challenged as dilutive under § 2." *Holder,* —— U.S. at ——, 114 S.Ct. at 2586.

In the case at hand, the appellees contend that none of the judicial election schemes the appellants propose as a remedy for the alleged abridgement of their right to vote constitutes a feasible solution. Specifically, the appellees submit that each of the alternatives proposed would undermine the administration of justice in the trial courts at issue. We address this argument *infra* part V.

### 2.

As noted, proof of the second and third *Gingles* preconditions, that the white majority votes sufficiently as a bloc to prevent a cohesive minority group from electing the representatives of its choice, is essential to establishing a section 2 violation. That is, "the 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a

distinctive minority vote by submerging it in a larger white voting population." *Growe,* —— U.S. at ——, 113 S.Ct. at 1084 (citing *Gingles,* 478 U.S. at 51, 106 S.Ct. at 2766). In *Voinovich,* the Court stressed the importance of these preconditions: "Here, as in *Gingles,* 'in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters.' " [76] *Voinovich,* —— U.S. at ——, 113 S.Ct. at 1158 (quoting *Gingles,* 478 U.S. at 49 n. 15, 106 S.Ct. at 2765 n. 15).

Proof of these *Gingles* threshold factors is central to the ultimate finding of whether minority voters have an equal opportunity to participate in the electoral process and to elect the candidates of their choice. Indeed, "[a]lthough no factor is indispensable, the legislative history of the amendment to section 2 indicates that racially polarized voting will ordinarily be the keystone of a dilution case." *McMillan v. Escambia County,* 748 F.2d 1037, 1043 (Former 5th Cir.1984); *see also United States v. Marengo County Comm'n,* 731 F.2d 1546, 1566 (11th Cir.), *cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984). Racial bloc voting is, therefore, the essence of a vote dilution claim because, to be actionable, the electoral defeat at issue must come at the hands of a cohesive white majority.

### 3.

The Court's cases applying the *Gingles* threshold test reveal two basic principles that we have been discussing: first, that the possibility of an acceptable remedy is essential to a successful section 2 vote dilution claim; and, second, that, as the *Gingles* opinion itself makes clear, a minority group cannot

---

Justice Kennedy's opinion in *Holder* relies, however, on a construction of the statute, not on constitutional federalism principles. The questions of whether the remedy the appellants ultimately seek (the possibilities of which we discuss *infra* part V) would be beyond the reach of the Voting Rights Act or foreclosed by the Constitution are not before us. Accordingly, we intimate no view concerning these sensitive issues.

**76.** The Court had explained in *Gingles* that, "in general, a white bloc vote that normally will defeat the combined strength of [cohesive] minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769. The level of white bloc voting necessary to minimize or cancel black voters' ability to elect the representatives of their choice necessarily will vary according to local circumstances.

prove that it has less opportunity than other members of the voting community to elect representatives of its choice without demonstrating the existence of significant white bloc voting. Absent such a showing, there can be no section 2 relief because, "[u]nless these points are established, there neither has been a wrong nor can [there] be a remedy." *Growe*, —— U.S. at ——, 113 S.Ct. at 1084. These requirements are equally applicable to judicial, legislative, and executive branch cases. With that in mind, we now consider the application of the circumstantial evidence factors referred to in *Gingles*, and in the Senate Report accompanying the 1982 amendment to the Voting Rights Act, to vote dilution claims challenging the merits of electing state trial court judges. *Gingles*, 478 U.S. at 36–37, 106 S.Ct. at 2752; S.Rep. No. 417, at 28–29, *reprinted in* 1982 U.S.C.C.A.N. at 177, 206–207.

The statutory touchstone of a vote dilution claim is whether the members of a protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The circumstantial evidence factors summarized in *Gingles* ordinarily support an inference of vote dilution under section 2. These factors were designed as objective indicia that ordinarily would show whether the voting community as a whole is driven by racial bias as well as whether the contested electoral scheme allows that bias to dilute the minority group's voting strength. The Supreme Court consistently has emphasized, however, that these factors were enumerated *solely* to assist courts in evaluating vote dilution claims; their application is not legally required for any other reason. Thus, some of the factors relevant to a vote dilution claim in the legislative context may not be helpful in the context of judicial elections; conversely, circumstances that have been traditionally excluded from the list of legislative factors might be highly probative to claims of vote dilution in state trial court elections.

Obviously, there are significant differences between the legislative and judicial arenas,

chief among them being the varied expectations of responsiveness and bias in favor of constituents. An examination of the circumstantial evidence factors listed by the *Gingles* Court reveals that several of these factors are either inapplicable, or at most only marginally applicable, in the context of Florida's system of trial court elections.

Legislators are generally viewed as advocates, or "representatives" in the conventional sense of the word, of their constituents. Their loyalties lie, first and foremost, with the people in their districts. In a collegial legislative body, representatives compromise in order to satisfy both the needs of the voters back home and the competing goals of various groups. Accordingly, one of the totality of the circumstances factors listed in the Senate Report and in *Gingles* concerned " 'whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.' " *Gingles*, 478 U.S. at 37, 106 S.Ct. at 2759 (quoting S.Rep. No. 417, at 28–29, *reprinted in* 1982 U.S.C.C.A.N. at 177, 206–07). As the *Gingles* Court indicated, "[n]ot only does '[v]oting along racial lines' deprive minority voters of their preferred representative in these circumstances, it also 'allows those elected to ignore [minority] interests without fear of political consequences.' " *Id.* at 48 n. 14, 106 S.Ct. at 2765 n. 14 (quoting *Rogers v. Lodge*, 458 U.S. 613, 623, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982)). This is because "[p]ublic officials need not address concerns expressed by minorities so long as white bloc voting ensures that they will remain *minority* concerns." *LULAC*, 999 F.2d at 858. The statement implicit in *Gingles* and other legislative voting rights cases is that black voters need an advocate for their race in the legislative process and that, by diluting the voting strength of the black community, an electoral scheme may deny them such a representative.

Trial court judges, on the other hand, are neither elected to be responsive to their constituents nor expected to pursue an agenda

on behalf of a particular group.[77] Engaging in legislative-style "logrolling" and negotiating would be reprehensible conduct in a judge and would violate the core principles governing the judicial role.[78] The factor calling for an evaluation of whether the elected officials are addressing the "particularized needs of the members of the minority group" is, therefore, inappropriate in the judicial context.[79]

The unique nature of judicial elections has other implications as well. The *Gingles* Court and the Senate Report, for example, suggest that whether political campaigns have been characterized by overt or subtle racial appeals is a relevant factor for courts to consider in the totality of the circumstances. Given the nonpartisan, low-profile nature of many judicial races, however, this factor seems far less probative in judicial elections than in legislative or executive contests. If there is no campaign in general, the corresponding absence of racial appeals is of minimal value in determining whether the voting strength of minority voters is being diluted.

Because of the low-profile nature of judicial races, the effects of incumbency and success in the appointment process tend to be more probative in judicial elections than in the legislative context; these differences must be considered by courts evaluating section 2 claims such as the one before us. The record in this case indicates that most judicial incumbents run for reelection unopposed, the importance of which was highlighted by numerous witnesses at trial.

In *Gingles*, the Court touched briefly on the issue of incumbency, recognizing it as one of the "special circumstances" that could explain a deviation from a pattern of racially polarized voting. The Court explained:

> [I]n a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting. Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest.

*Gingles*, 478 U.S. at 57, 106 S.Ct. at 2770 (emphasizing in an accompanying footnote that "[t]his list of special circumstances is

---

77. The judicial election schemes challenged in the instant case minimize the potential for a trial judge to pursue an agenda on behalf of a particular group of constituents by "linking" the territory over which the judge's court exercises jurisdiction and the judge's electoral base. The subdistricting remedy the appellants propose would reduce the size of the judge's electoral base (while maintaining the size of the judge's territorial jurisdiction) and thus increase the potential for responsiveness to special interest groups in the constituency. The policy underpinning the linkage provided by the challenged schemes is a factor to be taken into account in deciding whether, under the totality of the circumstances analysis, the appellants have presented a case of vote dilution. *Houston Lawyers' Ass'n,* 501 U.S. at 426, 111 S.Ct. at 2380–81; *Gingles,* 478 U.S. at 37, 106 S.Ct. at 2759 (citing S.Rep. No. 417, at 28–29, *reprinted in* 1982 U.S.C.C.A.N. at 177, 206–07). We take this policy into account *infra* part IV.D. That policy also plays a role in our determination, *infra* part V, whether the relief the appellants seek is feasible.

78. This case concerns the election of trial court judges, not the members of a multimember appellate court. Traditional legislative-style "logrolling" would not be appropriate even on a court that decides cases as a group, but there might be more to be said for some form of "representation" on a collegial court (like a state supreme court) than on a single-judge trial court. The ability to bring diverse perspectives to the court, not the prospect of outright dealmaking, would be relevant in such a context.

79. As the Fifth Circuit has noted when considering a vote dilution challenge to the election of trial court judges in Texas, "[t]he irony, of course, is that the subdistricting remedy sought by plaintiffs provides most judges with the same opportunity to ignore minority voters' interests without fear of political reprisal they would possess if elections were in fact dominated by racial bloc voting." *LULAC,* 999 F.2d at 859. We discuss this issue in greater detail *infra* part V.

illustrative, not exclusive"). Some courts, including the panel in this case, have "interpret[ed] *Gingles* to permit consideration of special circumstances only to explain variations from a usual pattern of racially polarized voting"; that is, they suggest, while "special circumstances may explain minority electoral success in a polarized election ..., the converse is not also true."[80] *Nipper v. Smith,* 1 F.3d 1171, 1181 (11th Cir.1993). Given that incumbency is often the determining factor in judicial elections, we conclude that the effect of incumbency should play a crucial role in the vote dilution inquiry in judicial election cases. In addition to its effect on the probative value of statistics concerning the polarized voting inquiry, the significance of incumbency likewise merits its placement on the list of relevant factors to be considered when making the ultimate determination of section 2 liability under the totality of the circumstances.

Florida's institution of a modified "Missouri Plan," combining merit appointment with contested nonpartisan elections, for the selection of its trial court judges is also highly relevant in the vote dilution inquiry. Two of the legislative-based circumstantial evidence factors touch on this area: *Gingles* and the Senate Report note that whether members of the minority group have been denied access to a candidate slating process may be considered in the totality of the circumstances, as may " 'the extent to which mem-

bers of the minority group have been elected to public office in the jurisdiction.' " *Gingles,* 478 U.S. at 36–37, 106 S.Ct. at 2759 (quoting S.Rep. No. 417, at 28–29, *reprinted in* 1982 U.S.C.C.A.N. at 177, 206–07). The operation of the judicial appointment process is the correlative factor in this case. Where a large number of trial court judges first reach the bench through the appointment process and many of them are subsequently reelected unopposed, the effect of appointment is particularly pronounced. If incumbents who originally gained office through a process of merit selection win consistently, a strong inference arises that qualifications are significant to the electorate and that voters generally place confidence in the nominating commission process. A functional and realistic view of the political process for selecting state court judges therefore must include an examination of the appointment process; correspondingly, the access to the bench that it provides to black judicial applicants cannot be ignored.[81]

In sum, the factors to be considered in the totality of the circumstances must be modified to account for the unique features surrounding judicial elections. Although we have given some examples of the modulations that courts must undertake in tailoring their inquiries to the nature of the vote dilution claims before them, we by no means intend this discussion to be exhaustive. Following our painting analogy, the palette of circum-

---

80. *See also Williams v. State Bd. of Elections,* 718 F.Supp. 1324, 1329–30 (N.D.Ill.1989) ("[T]he 'special circumstances' the [*Gingles*] Court had in mind were circumstances that would explain the minority's candidates winning the election in spite of white bloc voting. Plaintiffs' argument turns the Court's language on its head and would have it refer to circumstances explaining the *defeat* of the minority's candidate....").

81. In *Stallings,* a case challenging the single county commissioner form of government in Carroll County, Georgia, this court discounted evidence that black citizens had been appointed to various county boards and commissions because, despite the numerous appointments cited by the defendants, "no black ha[d] ever been *elected* to *any* county office in Carroll County." *Carrollton Branch of the NAACP v. Stallings,* 829 F.2d 1547,

1560 (11th Cir.1987), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). As the court explained, "[w]hile appointments to boards and commissions may be evidence of the willingness of some whites to allow some black participation in the political process, it does not demonstrate the ability of blacks to get elected to political office in Carroll County." *Id.*

The principle enunciated in *Stallings* will hold true in many cases. Where, however, the appointment process is not a seldom-used aberration but the principal method by which public officials first reach office (as may be the case for trial court judges in Florida), minority success in the appointment process becomes a far more important and relevant factor to be considered. Moreover, the appointments at issue in *Stallings* were for exogenous county offices, not the county commissioner positions that were the subject of that litigation.

stantial evidence to be used in judicial elections may differ from that used in the legislative context; courts must be cognizant of this reality throughout the process. Nonetheless, the act of painting an accurate portrait of the electoral process remains the same: A court should not escape the mechanistic application of the established Senate Report and *Gingles* factors only to substitute another, equally rigid, set of considerations merely because it is tailored more precisely to the judicial context. Each court, in determining whether the circumstantial evidence points to the dilution of minority voters' electoral opportunities, must continue to take all relevant evidence into account.

### IV.

With the foregoing principles in mind, we now examine the district court's disposition of this case. First, we examine the record to determine whether, contrary to the district court's conclusion, the appellants' evidence satisfies *Gingles'* second and third threshold factors: racially polarized voting that enables the white majority usually to defeat the cohesive minority's candidate of choice. We conclude that the appellants' evidence satisfies these factors. Second, having reached this conclusion, we determine whether the appellees have rebutted this evidence, so that under the totality of the circumstances the appellants failed to prove a case of vote dilution.[82]

In considering the appellants' evidence of racially polarized voting, and the relative weight it should be given, the district court took a rigid, formulaic approach. Instead of undertaking the type of practical, searching inquiry the Supreme Court requires in vote dilution cases, the district court only counted judicial elections in the Fourth Circuit and in

Duval County and erroneously discounted several of them as not relevant. The court then ruled that the appellants had failed to meet their *Gingles* threshold burden of proving racial bloc voting because the percentage of elections lost by black candidates of choice did not demonstrate that black candidates of choice are "usually" defeated by the cohesive white majority. *Nipper*, 795 F.Supp. at 1548.

In its dispositive opinion, the district court acknowledged that the statistics concerning the six Fourth Circuit and Duval County Court elections since 1972 that involved black candidates "would ordinarily make out a sufficient showing of racial polarization in these six judicial elections." *Id.* at 1540. Indeed, the figures for those elections show greater polarization by race in voting patterns than the elections analyzed in both *Gingles,* 478 U.S. at 80–82, 106 S.Ct. at 2781–83, and *Solomon v. Liberty County,* 899 F.2d 1012, 1021 (11th Cir.1990) (en banc) (Kravitch, J., specially concurring) (wherein all ten judges of the en banc court agreed that racially polarized voting had been established as a matter of law), *cert. denied,* 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991). The district court's effort to whittle down this seemingly conclusive evidence by deeming certain elections not relevant demonstrates the problem with a mechanistic approach to vote dilution cases. When the evidence in this case is examined and weighed, not merely compiled and totaled, the picture that emerges is quite different from the one painted by the broad brush strokes of the district court. Indeed, a more nuanced view of the record reveals the existence of legally significant racially polarized voting and, therefore, vote dilution.

### A.

The district court first discounted the probative value of the six circuit and county

---

**82.** The determination of vote dilution under the totality of the circumstances in a section 2 case is subject to review under the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure, as are the subsidiary factual findings made by the district court in reaching its ultimate conclusion. *Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781. At the same time, however, "Rule 52(a) 'does not inhibit an appellate court's

power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.'" *Id.* (quoting *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984)); *see also Stallings,* 829 F.2d at 1554.

court elections by suggesting that they were "stale." Indeed, as we discuss *supra* part I, the two most recent elections occurred in 1984 while the other four took place more than fifteen years ago. *See Nipper v. Chiles*, 795 F.Supp. 1525, 1540 (M.D.Fla.1992). Although staleness may become a factor when the nature of the electorate or the office at stake has changed significantly during the intervening period,[83] the mere fact that the analyzed elections were somewhat dated has not prevented this court from finding racial vote dilution in a number of our section 2 cases.[84] In *Solomon*, for example, all members of this court agreed in 1990 that the existence of polarized voting had been established as a matter of law on the basis of six elections that involved black candidates seeking county offices and that were held between 1968 and 1984.

The six elections in which black candidates ran for seats on either the Fourth Circuit or the Duval County Court should not have been discounted because there was no evidence that those elections were unrepresentative of conditions prevailing under the current electoral scheme. There have been no significant structural changes in the system used to elect circuit and county court judges in Florida in the past twenty years, and the electorate in the Fourth Circuit and Duval County has not changed in character since the elections in question took place.

## B.

In addition to minimizing the significance of all of the circuit and county court elections

involving black candidates, the district court improperly discounted the probative value of two of these elections by pointing to what it termed "special circumstances." In two of the six judicial elections in which black candidates participated (the 1978 election for circuit judge involving Harrell Buggs and the 1984 election for county judge involving Denise Prescod), the black candidate challenged an incumbent judge. According to the district court, "[g]iven the undeniable power of incumbency in judicial elections, the probative value of these two elections is significantly diminished on the issue of racial polarization." *Nipper*, 795 F.Supp. at 1542. The court further explained its decision on this point as follows:

> In *Gingles*, the Supreme Court stated that minority electoral success does not foreclose a vote dilution claim if that success can be explained by special circumstances, such as the minority candidate running unopposed, or the fact that the minority candidate ran as an incumbent. *See Gingles*, 478 U.S. at 57, 106 S.Ct. at 2770. The converse of this proposition must also be true. That is, any balanced consideration of a vote dilution claim should also take into account any special circumstances that may explain minority electoral failure in a polarized contest. In particular, the same special circumstances identified by the *Gingles* Court to explain minority success—incumbency and the absence of an opponent—should be considered in analyzing elections in which minority candidates have been defeated.

*Id.* Thus, the district court concluded that the Buggs and Prescod elections were "bet-

---

83. The radical changes made in the system of electing judges in Florida, *see supra* part I.B., presumably account for the decision of the experts in this case to begin their analyses with the 1972 elections. The implication is that elections that took place under the former system were sufficiently different so as to shed little light on whether the current scheme is diluting the voting strength of the minority group.

84. To require plaintiffs in vote dilution cases to show recent electoral defeats of black candidates would be to penalize black candidates for not running in the face of long odds. Moreover, testimony adduced at trial suggested a reason for the reluctance of black candidates to seek judi-

cial office in the Fourth Circuit and in Duval County: the futility of running in the face of pervasive racial bloc voting and the history of black electoral defeat in circuitwide and countywide at-large races. *Cf. Gingles*, 478 U.S. at 57 n. 25, 106 S.Ct. at 2770 n. 25 ("Where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim."); *Solomon*, 899 F.2d at 1021 (Kravitch, J., specially concurring) (noting that "[n]ot a single black has ever been elected in Liberty County" and suggesting that "[s]ix futile elections is enough").

ter viewed as evidence of the power of incumbency rather than as strong evidence of racial polarization." *Id.* Moreover, because Leander Shaw actually "won" the 1972 circuit judge primary by finishing first and advancing to the runoff, the court concluded that "in only three of the six judicial elections for circuit and county judge did white bloc voting operate to defeat the black candidate in the absence of special circumstances." *Id.*

Incumbency, as we have noted, often will be the determining factor in judicial elections and therefore serves as an important factor to be considered in judicial vote dilution cases. The presence or absence of incumbents in particular races may go a long way toward explaining the pattern of election results presented, thereby aiding in the resolution of the fundamental question of whether the voting community is driven by racial bias that is operating through the challenged at-large election system to dilute the voting strength of minority voters. Yet, even if incumbency often is a determining factor in judicial elections, it nonetheless remains only one factor to be considered. The badge of office should not be viewed as a talisman by courts, sufficient in and of itself to deem an election involving an incumbent irrelevant to a plaintiff's vote dilution claim.

Moreover, the record in this case reveals that the candidacies of the white incumbents against whom Buggs and Prescod ran were surrounded by "special circumstances" of their own. Buggs' opponent had been in office only approximately one hundred days while Prescod's opponent was not a lawyer and had received the worst ratings in the bar polls of any judge in the circuit.[85] Thus, although it was relevant that the black candidates in these elections ran against incumbents, the fact that the white opponents were anything but established, strong incumbents was equally worthy of judicial consideration.

## C.

Because it believed that the "stale" nature of the six judicial elections involving black

candidates reduced their probative value, the district court felt obliged to examine all elections for circuit and county judge from 1972 to 1990, regardless of whether a black candidate participated.[86] In examining that broader group of contests, the court found that the candidate of choice of black voters won sixty-eight percent of the circuit court elections and fifty-eight percent of the county court races. "Clearly," the court concluded, "when all elections for circuit and county judge from 1972 to 1990 are considered, Plaintiffs have failed to prove that the white majority votes sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate." *Nipper,* 795 F.Supp. at 1540.

The district court's use of elections involving only white candidates to reject the appellants' allegations of racially polarized voting derived from the comment by the *Gingles* plurality that "the race of the candidate *per se* is irrelevant to racial bloc voting analysis." *Id.* at 1541 (quoting *Gingles,* 478 U.S. at 67, 106 S.Ct. at 2775). That statement, however, cannot be relied on for the proposition suggested by the district court. As the Fifth Circuit has held, "*Gingles* is properly interpreted to hold that the race of the candidate is in general of less significance than the race of the voter—but only within the context of an election that offers voters the choice of supporting a viable minority candidate." *Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496, 503 (5th Cir.1987), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); *see also Campos v. City of Baytown,* 840 F.2d 1240, 1245 (5th Cir. 1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). Therefore, that court has stressed that "the evidence most probative of racially polarized voting must be drawn from elections including both black and white candidates." *Westwego Citizens for Better Gov't v. Westwego,* 872 F.2d 1201, 1208 n. 7 (5th Cir.1989); *see also LU-LAC,* 999 F.2d at 864 ("This court has consis-

---

85. Of course, Prescod herself lacked significant legal experience, having run for county court judge just two years after being admitted to the bar.

86. The district court failed to explain why many of these elections would not be as stale and lacking in probative value as those involving black candidates that it had already discounted.

tently held that elections between white candidates are generally less probative in examining the success of minority-preferred candidates, generally on grounds that such elections do not provide minority voters with the choice of a minority candidate."). As we have explained, "[i]t is the access of minority voters to the political process, not the majority's access to the black vote, which is the chief concern of Section 2 of the Voting Rights Act." *Carrollton Branch of the NAACP v. Stallings,* 829 F.2d 1547, 1559 (11th Cir.1987), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

It is logical, as the Fifth Circuit suggests, that the most probative evidence of whether minority voters have an equal opportunity to elect candidates of their choice is derived from elections involving black candidates. Certainly, where only white candidates are competing for office in a particular jurisdiction, it is "virtually unavoidable that certain white candidates would be supported by a large percentage of ... black voters." *Citizens for a Better Gretna,* 834 F.2d at 502. Such elections, however, may reveal little about the issue to be determined: the capacity for white bloc voting usually to defeat black candidates of choice. Particularly where voting is extremely polarized by race in elections in which black candidates participate, white-on-white elections in which a small majority (or a plurality) of black voters prefer the winning candidate seem comparatively less important.

In holding as we do, however, we do not foreclose the consideration of electoral races involving only white candidates where the record indicates that one of the candidates was strongly preferred by black voters. Under such circumstances, the preference of the black electorate *might be proved through the*

use of anecdotal testimonial evidence, polling data, a review of the appeals made during the campaign, and turnout information,[87] indicating whether black voters were energized to support a particular white candidate. As the Supreme Court has explained:

> If the lesson of *Gingles* is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics.

*Johnson v. De Grandy,* —— U.S. ——, ——, 114 S.Ct. 2647, 2661, 129 L.Ed.2d 775 (1994). Where black voters have a genuine candidate of choice in an election involving only white candidates, then the results will be relevant to the question of whether racial bloc voting enables the white majority usually to defeat the minority's preferred candidate. The district court suggested that it had found such elections, but it did so based only on a cursory examination of the circumstances surrounding the elections in question.

In any event, the conclusion that the candidate of choice of black voters won a majority of the white-on-white judicial elections at issue in this case partially misconstrues the evidence in the record. In the great majority of those elections, *the candidate of choice*

---

**87.** In its opinion, the district court noted that "[n]o comprehensive evidence on black and white voter turnout was presented to the Court" at trial. *Nipper,* 795 F.Supp. at 1544 n. 23. Accordingly, the court's only findings were that black voters "have had no problems registering, voting, or participating in judicial elections," and that "[w]hile there does appear to be a higher 'rolloff' effect in judicial elections for blacks than

whites, there is no evidence that this 'rolloff' effect is attributable in any way to Florida's history of discrimination." *Id.* at 1544. The "rolloff" effect refers to the behavior of voters who sign in at the polls but fail to cast a vote for a particular contest on the ballot; it is generally more pronounced for the low-profile contests, such as judicial elections, that are typically printed near the bottom of the ballot.

of black voters was also the preferred candidate of the white voters, thus making those elections of relatively little use in evaluating the power of white bloc voting. Only nineteen of the white-on-white elections appear particularly probative—those in which the candidate of choice of black voters differed from the candidate of choice of white voters. In those nineteen "split preference" elections, as identified by Dr. Lichtman, the black voters' preferred candidate lost eighty-four percent of the time.[88] The district court's attempt to minimize the evidence of racial polarization in the electorate in general, and of the strength of white bloc voting in particular, was misguided; the evidence clearly established that, even in the white-on-white judicial campaigns at issue here, racial bloc voting played a role in judicial elections in the Fourth Circuit and in Duval County.

### D.

As our previous discussion clearly demonstrates, the record reveals that sufficient racial bloc voting exists in Fourth Circuit and Duval County Court elections, such that the white majority usually defeats the minority's candidate of choice. In short, the evidence the appellants presented creates a strong inference of racial vote dilution. The district court assumed that this might be the case and, therefore, addressed the question of whether the appellees adduced evidence sufficient to rebut, under the totality of the circumstances, that inference of vote dilution. *Nipper*, 795 F.Supp. at 1543. The court concluded that the appellees had done so; they "offered overwhelming proof of objective factors in rebuttal that demonstrate . . . that the social conditions in the Fourth Judicial Circuit and Duval County are such that their interaction[s] with the electoral scheme do not, and will not, result in voting discrimination in the judicial elections under challenge." *Id.* at 1548. In reaching this conclu-

sion, however, the district court did not explain how, if at all, the appellees' proof rebutted the appellants' evidence of racial bloc voting and the substantial inference of vote dilution that evidence yields. Rather, the court appears to have found for the appellees because justice in the Fourth Circuit and Duval County courts is being administered fairly and impartially by judges who are "responsive to the needs of all citizens." *Id.* Moreover, in the court's view, "there are legitimate state interests in maintaining the current [electoral] system" which preclude a finding of section 2 liability. *Id.*

The finding that justice is being administered fairly and impartially begs the question of whether the racial bias existing in the voting community is interacting with the challenged electoral systems to dilute the minority's voting strength. We think this is self-evident. Florida's interest in maintaining the current electoral systems in the Fourth Circuit and Duval County, however, should be taken into account in determining whether, under the totality of the circumstances, the appellees have violated section 2. As the Supreme Court stated in *Houston Lawyers' Ass'n v. Attorney General*, 501 U.S. 419, 426, 111 S.Ct. 2376, 2381, 115 L.Ed.2d 379 (1991), "the State's interest in maintaining an electoral system . . . is a legitimate factor to be considered by courts among the 'totality of circumstances' in determining whether a § 2 violation has occurred."

The state's interest in the case at hand, which is the same interest as the one involved in *Houston Lawyers' Ass'n*, is "in maintaining a link between a trial judge's jurisdiction and the judge's elective base." *Nipper*, 795 F.Supp. at 1547. Accepting the appellees' argument on the point, the district court found "that [this linkage] serves to foster judicial independence, or at least the appearance of judicial independence. In a system of single-member subdistricts, [one of

---

88. Because of this pattern, Dr. Weber, one of the appellees' experts, admitted that he would not rely on the results of the white-on-white elections in advising a potential black candidate of his chances to be elected to the Fourth Circuit or the Duval County Court even if he or she were the overwhelming candidate of choice of black voters. Those results, he acknowledged, do not indicate a likelihood of success because the evidence shows that the electoral dynamic is fundamentally different when there is a black candidate in the race.

the alternative remedies the appellants were seeking,] there would be some pressure on elected judges to respond to specific electoral constituents when one of their constituents is involved in litigation against a nonresident of that subdistrict. The at-large system eliminates this pressure by linking the judge's jurisdiction and elective base." *Id.*

The question facing the district court was the precise role the linkage interest, as a piece of circumstantial evidence, plays in the totality of the circumstances analysis. The district court was unable to answer this question because precedent, especially our divided en banc opinion in *Solomon,* had not established what the totality of the circumstances was supposed to demonstrate. We answer the question today, holding that the totality of the circumstances must indicate whether racial bias exists in the voting community and is interacting with the challenged electoral system to dilute the plaintiff minority's voting power.

The State's linkage interest is of little, if any, relevance in this inquiry. First, the linkage interest neither establishes nor rebuts the existence of racial bias in the voting community; rather, with one exception, the interest constitutes a neutral factor in the totality of the circumstances. Racial concerns did not inform the creation of Florida's judicial circuits or its counties; nor did race play a role in the State's decision to link the judges' territorial jurisdiction and electoral base and to require the judges to reside within their jurisdictions. Similarly, racial concerns did not prompt the several judicial reforms that have taken place over the past twenty-four years. In the main, those reforms were adopted to remove the judiciary from the evils of party politics, to enhance the independence of the judiciary, and to improve the overall quality of the bench.

The one exception to the linkage interest's neutrality as a relevant circumstance lies in the State's decision to employ the commission feature of the Missouri plan in filling mid-term vacancies on its courts. As our discussion, *supra* part I, indicates, the use of this feature has enhanced minority access to the bench and, coupled with the incumbency benefit that flows from merit selection, has ensured the retention in office of minority appointees. An inference can be drawn from this that the State, in partially adopting the Missouri plan for its trial courts, is attempting to negate the influence of racial bias in the *selection* of some trial court judges. This may or may not, however, enhance the ability of minorities to *elect* candidates of their choice. In sum, we conclude that the state's linkage interest does not rebut the appellants' evidence that racial bloc voting exists in the Fourth Circuit and Duval County in such a way that the white majority usually defeats the minority's candidate of choice.[89]

V.

Although the State's interest in linking the jurisdictional and electoral bases of its circuit and county court judges has minimal relevance in the totality of the circumstances analysis in this case, that interest plays a major role in our consideration of the remedies the appellants propose as alternatives to the challenged electoral schemes. *Holder v. Hall,* —— U.S. ——, ——, 114 S.Ct. 2581, 2587–88, 129 L.Ed.2d 687 (1994); *Houston Lawyers' Ass'n,* 501 U.S. at 426, 111 S.Ct. at 2380–81. Accordingly, we address each of these alternative remedies, considering each against the backdrop of the policies that linkage advances. We conclude that none of the alternatives constitutes an objectively reasonable and workable solution to

---

**89.** It should come as no surprise that the State's linkage interest has little, if any, probative value in resolving the question of whether racial bias in the voting community is diluting the plaintiff minority's voting power. Other courts, in determining whether the "results test" of § 2 has been met, have found the state policies underlying the challenged electoral processes to be relevant, but of marginal importance, in the totality of the circumstances analysis. *See, e.g., United States v. Marengo County Comm'n,* 731 F.2d 1546, 1571 (11th Cir.) (viewing state policy as a "relevant" but "less important" factor under the results test), *cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); *Jones v. City of Lubbock,* 727 F.2d 364, 383 (5th Cir.1984) (recognizing the "diminished importance" of the state policy factor).

the vote dilution present in this case.[90]

## A.

### 1.

One remedial option is the creation of electoral subdistricts within the territorial jurisdiction of the trial courts at issue. A model of single-member districts would call for one judge to be elected from each of twenty-eight circuit court and twelve county court subdistricts. An alternative would be to carve two or more broader multimember subdistricts out of the existing Fourth Circuit and Duval County territories. This alternative[91] appears to be the remedy the appellants preferred in the district court. *Nipper*, 795 F.Supp. at 1539.

The maintenance of the linkage between a trial court judge's territorial jurisdiction and electoral base serves to preserve judicial accountability. Florida's current model of trial court elections embodies a state judgment that the voters in a judge's jurisdiction should have the right to hold that judge accountable for his or her performance in office. Subdistricting, however, would disenfranchise every voter residing beyond a judge's subdistrict, thus rendering the judge accountable only to the voters in his or her subdistrict. Moreover, even in the judge's subdistrict, a group of voters would effectively be disenfranchised: In the white subdistrict, the voting power of blacks would be

diluted to a degree greater than the dilution presently existing; in the black subdistrict, the voting power of whites would be diluted. The Fifth Circuit discussed some of the negative effects this arrangement would have on minority voters:

> After subdistricting, a handful of judges would be elected from subdistricts with a majority of minority voters. Creating "safe" districts would leave all but a few subdistricts stripped of nearly all minority members. The great majority of judges would be elected entirely by white voters. Minority litigants would not necessarily have their cases assigned to one of the few judges elected by minority voters. Rather, the overwhelming probability would be that the minority litigant would appear "before a judge who has little direct political interest in being responsive to minority concerns."

*LULAC*, 999 F.2d at 873 (citation omitted). Although the effect of such a loss of minority influence has been debated in the legislative context, *see, e.g., De Grandy*, —— U.S. at ——, 114 S.Ct. at 2654–55; *Solomon*, 899 F.2d at 1038 (Hill, J., concurring), the concern is more pronounced here because trial court judges act alone in exercising their power. In the case of collegial bodies, all citizens continue to elect at least one person involved in the decisionmaking process and are, therefore, guaranteed a voice in most decisions. In the case of trial court judges,

---

**90.** The district court, having found no vote dilution, did not undertake this inquiry. The court did find that the appellants had satisfied the first *Gingles* threshold factor (which addresses the matter of remedy), but in so doing the court focused solely on whether an electoral subdistrict (with a black majority sufficient to elect a candidate of choice) could be drawn geographically. The court, however, did not equate the first *Gingles* factor with the feasibility of a remedy (as we do in this opinion); instead, it apparently read *Gingles* to mean that a remedy is available in any § 2 case if a district with sufficient minority voters to elect a candidate of choice can be drawn.

Nor did the panel, in remanding the case for the imposition of a remedy, undertake this inquiry. *Nipper*, 1 F.3d at 1184. The panel apparently assumed *sub silentio* that a remedy of subdistricts could be fashioned without adversely ef-

fecting the administration of justice in the Fourth Circuit and in Duval County.

**91.** In addressing this proposed remedy, the district court observed as follows:

> Plaintiffs presented expert testimony which indicated that a subdistrict containing a 60.09% black voting age population can be created within the Fourth Judicial Circuit and Duval County.... Plaintiffs have demonstrated that blacks are a sufficiently large and geographically compact group to constitute a majority in a subdistrict.

*Nipper*, 795 F.Supp. at 1539. The proposed subdistrict could be drawn in the northwest quadrant of Duval County with sufficient black population to elect six of the twenty-eight circuit court judges and three of the twelve county court judges. *Nipper*, 1 F.3d at 1175.

who conduct their decisionmaking process independently, subdistricting would eliminate the minority voters' electoral influence over the majority of the judges on both the Fourth Circuit and Duval County courts.

The record in this case is devoid of evidence that justice in those courts is currently being administered in a racially discriminatory manner. On the contrary, the witnesses at trial unanimously asserted that the judges were dispensing fair and impartial justice, without regard to the race of the litigants.

Against this backdrop, the *announced purpose* of a court-imposed subdistricting scheme would be to assist a predominantly black section of the circuit or county in electing black judges. We believe that the effect of having black judges accountable primarily to the black section of their district, due to the creation of subdistricts, and white judges answerable primarily to the white section of their district, would be detrimental to this pattern of fair and impartial justice. Thus, in a districting scheme, the race of the constituents would become the deciding factor in determining over which judges the constituents would exercise their oversight function.

In linking the size of judicial electoral districts to the court's territorial jurisdiction, Florida also has attempted to balance the desire for accountability of trial court judges to their electorate with the need to preserve judicial independence. Breaking this link by creating smaller electoral districts along racial lines would override the State's judgment concerning the appropriate size of trial court electorates and would foster the idea that judges should be responsive to constituents, thereby reversing Florida's trend towards deemphasizing "representation" by judges and consequently undermining the ideal of an independent-minded judiciary.

As we have observed, the legislature and electorate of the State of Florida have been moving steadily away from partisan judicial elections and towards the merit selection and resulting independence of the judiciary. Notwithstanding our consideration, as *Gingles* commands, that Florida has a history of racial discrimination and a judiciary elected in raw partisan politics, Florida has emphatically abandoned that past. Yet any districting remedy imposed by the district court would, by its very nature, alter this course and encourage greater "responsiveness" of judges to the special interests of the people who elected them. Such a remedy would reintroduce the very vices from which the state and its citizens have sought to insulate the judiciary.

Abandoning linkage through the creation of subdistricts would impair the operation of the partial "Missouri Plan" that Florida employs in selecting trial court judges. Because Florida requires its trial court judges to reside in the jurisdiction from which they are elected, subdistricting would limit the breadth of applications to the circuit and county nominating commissions. Even if the requirement that judges live in their subdistrict were eliminated, given the racial composition of the subdistricts, black attorneys would be reluctant to stand for office in white subdistricts and white attorneys would be reluctant to stand for office in black subdistricts. This would frustrate the nominating commission's efforts to discharge its statutory duty to present to the governor for circuit court appointment nominees who "reflect ... the racial and ethnic diversity of the population within the circuit." 1994 Fla.Sess.Law Serv. ch. 94–137, § 1.

The implementation of subdistricts would increase the potential for "home cooking" by creating a smaller electorate and thereby placing added pressure on elected judges to favor constituents—especially as election time approaches. As the district court observed, "[i]n a system of single-member subdistricts, there would be some pressure on elected judges to respond to specific electoral constituents when one of their constituents is involved in litigation against a nonresident of that subdistrict. The at-large system eliminates this pressure by linking the judge's jurisdiction and elective base." *Nipper*, 795 F.Supp. at 1547.

The appellants suggest that the favoritism effects subdistricting might engender could

be minimized by transferring cases to "neutral" judges when constituents from different subdistricts are litigants. If all cases are to be heard by judges who have not been elected by any of the litigants, such a system, which would essentially require that cases be decided by "visiting" judges, would clash with Florida's current model, which emphasizes a basic level of accountability of trial court judges to those over whom they exercise primary jurisdiction. If the message that race matters in the administration of justice is implicit in court-ordered subdistricts, "neutral" judges could not be located. Where favoritism concerns are rooted in racial issues, there seemingly cannot be any such thing as a "neutral" judge to whom a case involving litigants of different races could be transferred.

### 2.

A related remedy would be to carve out one or more new circuits from the existing Fourth Circuit territory, thereby creating new circuit courts instead of electoral subdistricts for the existing court.[92] The appellants note that their proposed subdistricts (which would be located in the northwest quadrant of Duval County and contain sufficient black voters to enable them to elect a candidate of choice) would actually have a population larger than the existing Third Circuit (which consists of seven rural counties in North Florida), thus suggesting that it easily could be converted into an independent circuit.

**92.** County courts are required by Article V of the Florida Constitution to follow county lines; thus, the creation of new county courts must be accompanied by the creation of new counties.

**93.** Under Florida venue law, "[a]ctions shall be brought only in the county where the defendant resides, where the cause of action accrued, or where the property in litigation is located." Fla. Stat.Ann. § 47.011 (West 1994).

**94.** The jury pools would reflect the racial compositions of the new circuit territories.

**95.** The appellants contended, in the district court, "that a remedial approach other than subdistricting, such as cumulative voting, would satisfy the state's interest in linking jurisdiction with elective base while promoting greater opportunities for black voters." *Nipper,* 795 F.Supp. at 1548.

Creating new circuit courts would preserve the State's linkage interest. Indeed, if linkage is the primary policy underlying the current Florida system of judicial elections, then creating subdistricts would do more to undermine the scheme than establishing additional (albeit smaller) circuit courts.

Although creating new majority-minority circuits would preserve the linkage interest, such an approach would require a modification of Florida's venue rules;[93] it would also alter the composition of the courts' jury pools.[94] With the creation of black jurisdictions and white jurisdictions, a system of separate justice would be established. Cases brought by blacks against blacks or by whites against whites could be transferred to the black or white courts, respectively. But there would be no transferee court for cases involving parties of more than one race.

### 3.

A third remedial option suggested by the appellants would be to adopt a cumulative voting system for the election of trial court judges.[95] Under a cumulative voting system, typically used in electing corporate directors, each voter casts a number of votes equal to the number of seats at issue and may allocate those votes among candidates as he or she sees fit.[96] Thus, votes may be concentrated on those candidates whom voters support most strongly.

**96.** According to Black's Law Dictionary 343 (5th ed. 1979), cumulative voting is defined as follows:

Type of voting in which a stockholder may cast as many votes for directors as he has shares of stock multiplied by the number of directors to be elected. The stockholder may cast all his votes for one or more but fewer than all the directors on the slate, and hence, minority representation is promoted. Cumulative voting is *required* under the corporate laws of some states, and is *permitted* in most states.

For a discussion of how cumulative voting might be employed to encourage minority representation in public office, see Karlan, *supra* note 4, at 231–36; *see also* Daniel D. Polsby & Richard D. Popper, *Ugly: An Inquiry Into the Problem of Racial Gerrymandering Under the Voting Rights Act,* 92 Mich.L.Rev. 652, 672 (1993).

Although cumulative voting would preserve linkage and avoid many of the concerns accompanying a subdistricting plan, such a scheme would create problems of its own. The traditional corporate cumulative voting method, or a modification thereof, would not be workable if Florida's numbered post system were maintained. Requiring judges to run for unnumbered seats on the court, meaning that all of the judges seeking reelection would be forced to oppose each other, would have a detrimental effect on the collegiality of the court's judges in administrative matters. Furthermore, requiring judges to face such opposition would dampen lawyer interest in a judicial career, thereby decreasing the pool of candidates. A lawyer contemplating a run for judicial office currently relies on the fact that he or she will not have to compete against every judge up for reelection. Moreover, the lawyer expects that, if elected, the power of incumbency (a feature of the current system) will probably ensure his or her retention in office. In addition to dampening lawyer interest in a judicial career, requiring judges to face opposition every time their terms expire would adversely affect the independence of the judiciary: Judges would begin running for reelection from the moment they took office.

Requiring judges to run against one another every time they seek reelection would also impinge on the operation of Florida's merit selection process. Merit selection insulates judges from popular pressure and facilitates impartial decisionmaking in controversial cases. Merit selection helps a qualified individual who lacks political clout or voter recognition both to obtain and to retain a judgeship; cumulative voting would have the inverse effect.

Finally, a cumulative voting system, like a subdistricting system, would encourage racial bloc voting. That, in turn, would necessarily fuel the notion that judges were influenced by race when administering justice.

## B.

The only benefit black voters could legitimately expect from a court order implementing one of the appellants' proposed remedies, which would enable them to elect black judges of their choice, is the *perception* that the challenged circuit and county judicial systems are colorblind. According to testimony presented to the district court, these systems are colorblind; the witnesses testified uniformly that the circuit and county court judges are deciding cases fairly, regardless of the race of the litigants.

By altering the current electoral schemes for the express purpose of electing more black judges, the federal court in fashioning the alteration, and the state courts in implementing it, would be proclaiming that race matters in the administration of justice. As Justice Brennan has observed, "even in the pursuit of remedial objectives, an explicit policy of assignment by race may serve to stimulate our society's latent race consciousness...." *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 173, 97 S.Ct. 996, 1014, 51 L.Ed.2d 229 (1977) (Brennan, J., concurring in part). Like other race-conscious remedies, this "tend[s] to entrench the very practices and stereotypes the Equal Protection Clause is set against." *De Grandy*, —— U.S. at ——, 114 S.Ct. at 2666 (Kennedy, J., concurring in part). The case at hand, therefore, presents a remedial paradox: A remedy designed to foster a perception of fairness in the administration of justice would likely create, by the public policy statement it would make, perceptions that undermine that very ideal.[97] In the eyes of the public and litigants, at least, justice would not remain colorblind.

In sum, because none of the remedies the appellants propose could be implemented without undermining the administration of justice in the courts of the Fourth Circuit

---

**97.** In the legislative context, a remedial plan may "reinforce[] racial stereotypes and threaten[] to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole." *Shaw v. Reno*,

—— U.S. ——, ——, 113 S.Ct. 2816, 2828, 125 L.Ed.2d 511 (1993). This effect may be more pronounced when interjected into an institution, like the state judiciary, that eschews the legislature's tradition of responsiveness.

and Duval County, the appellants are not entitled to relief under section 2 of the Voting Rights Act.

## VI.

In summary, we hold as follows: To establish a case of liability under section 2's results test, a plaintiff must demonstrate, under the totality of the circumstances, that the voting community is driven by racial bias and that the challenged electoral scheme allows that bias to dilute the voting power of the minority group the plaintiff represents. In cases challenging the election of judges, the totality of the circumstances analysis, which was developed in the legislative election context, must be altered to take into account the characteristics unique to judicial elections. Among the factors a court must consider in conducting that analysis is the state policy advanced by the judicial election scheme at issue. Finally, a section 2 plaintiff will not be granted relief if the remedy sought would have the effect of undermining the court's ability to administer justice.

The judgment of the district court is, therefore, AFFIRMED.

## IT IS SO ORDERED.

EDMONDSON, Circuit Judge, concurring in the opinion in part and concurring in the result, in which COX, BIRCH and DUBINA, Circuit Judges, join:

■ For me, the point that determines the outcome of the case is this one: The State of Florida's legitimate interest in maintaining linkage between jurisdiction and the electoral bases of its trial judges is, as a matter of law, great and outweighs (either at the vote-dilution-finding stage or at the remedy stage) whatever minority vote dilution that may possibly have been shown here. *See Houston Lawyers' Assoc. v. Attorney General*, 501 U.S. 419, 424–26, 111 S.Ct. 2376, 2380, 115 L.Ed.2d 379 (1991); *League of United Latin Amer. Citizens v. Clements,*

999 F.2d 831, 868 (5th Cir.1993); *see also, Holder v. Hall*, —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994). So, I concur in today's result.

I also concur in Parts III(A) and III(B)(1) of Chief Judge Tjoflat's opinion. I understand Part V of the Chief Judge's opinion to conclude that each of the remedies discussed is precluded given the State's interest in and right to formulate its own judicial system. I concur in this conclusion, which I see as the holding of this case. But I cannot agree (and I doubt the Chief Judge means to say) that a remedy must undermine the administration of justice in the state courts before that remedy would fall beyond the power of the federal courts to impose under the Voting Rights Act.

I do not say that the rest of the Chief Judge's opinion is wrong. But, I believe the conclusions reached in the other parts are unessential to deciding this case; and to decide nothing about what seem to be unnecessary issues seems best.

HATCHETT, Circuit Judge, dissenting, in which KRAVITCH, Circuit Judge, joins:

In this case, although the majority finds that a vote dilution occurred, the majority affirms the district court's decision to deny the appellants relief under section 2 of the Voting Rights Act (Act). In reaching this conclusion, two judges (Chief Judge Tjoflat and Judge Anderson) would have us hold, for the first time in American law, that in addition to the three threshold factors described in *Thornburg v. Gingles,* and the Senate factors, a plaintiff class must also show the existence of racial bias motivating the voting community in order to prevail on a section 2 claim. The majority holds that Florida's interest in linking the jurisdictional and electoral bases of its state circuit and county judges precludes the fashioning of any remedy the appellants suggest or a court could devise.[1]

To reach these results, the two judges employ a strained review of the legislative

---

**1.** Fortunately, the majority opinion should not have far reaching consequences. First, although

it is an *en banc* decision, one-third of the court did not participate in the consideration of this

history and Supreme Court interpretation of section 2 of the Voting Rights Act. Yet, despite this searching effort, absolutely no authority exists in either the case law, the legislative history, or the language of the Act to support the two judges' suggestion to impose a racial bias inquiry into Voting Rights Act litigation. As to the majority's holding regarding linkage of county and circuit courts, moreover, neither the appellants, appellees, nor the district court ever presented or considered any factual evidence to support the majority's conclusion that Florida's interest in linking the jurisdictional and electoral bases of its judges precludes the acceptability of *any* possible remedy the appellants could devise. This is the case for one simple reason: the district court never reached the question of a remedy. The panel never discussed a remedy because the district court found no violation of the Act. The *en banc* court has tried the remedy issues without the parties' participation. In essence, the *en banc* court has misconstrued voting rights jurisprudence, usurped the role of the district court as finder of fact, and substituted conjecture for evidence. For these reasons, I must dissent.

## I. The Inquiry Into the Racial Bias of the Voting Community

The history, development, and application of section 2 of the Voting Rights Act illuminates the frailty of the two judges' position that a successful voting rights challenge, brought pursuant to amended section 2 of the Voting Rights Act, requires a finding of racial bias in the voting community. A careful review of this history demonstrates that Congress and the Supreme Court have never required as a threshold issue an inquiry into the private motivations of individual voters to substantiate a vote dilution claim. Instead,

the Supreme Court's voting rights jurisprudence reveals that the proper focus of a voting rights challenge has always been whether the *state*, intentionally or otherwise, maintained an electoral system that disadvantages minorities on account of race. A review of this jurisprudence confirms that voting rights plaintiffs can challenge any state-enforced structural impediments that operate to disparately impact the ability of minority voters to elect their preferred candidates on account of race. The following brief historical review demonstrates that the racial motivations of private individual voters has never been the fundamental basis for a voting rights challenge.

### A. Development of Amended Section 2

The Constitutional Conveners designed the Fourteenth and Fifteenth Amendments to establish and protect the rights of the newly emancipated slaves. The Fourteenth Amendment endowed former slaves with citizenship and equal protection under the laws; the Fifteenth Amendment specifically prohibited the states from abridging or denying the rights of the former slaves to vote on account of race. U.S. Const.Amend. XIV, § 1; U.S. Const.Amend. XV, § 1. The framers authorized Congress to enforce the Fifteenth Amendment through appropriate legislation. U.S. Const. amend. XV, § 2.

However, the Supreme Court has never applied these two amendments to regulate the conduct of private individuals in elections for state officers. For example, Congress enacted several enforcement acts to more clearly define the contours of the new protections for black people afforded in the Fourteenth and Fifteenth Amendments. The enforcement acts, among other things, aimed to prohibit private individuals, such as the Ku

---

case. Second, the record in this case lacks any *evidence* regarding the state's relative interest in maintaining its at-large elections for trial judges. All of the judges participating in this case agree that black voters are unable to elect candidates of their choice in the Fourth Circuit and Duval County; but, a majority of the judges believe that no feasible remedy exists to redress the black voters' claim.

In future cases, the state will be required to present evidence regarding the relative strength of its interest in at-large elections for trial judges now that the *en banc* court has found that the at-large voting scheme in the presence of bloc voting constitutes vote dilution.

Klux Klan, from conspiring to prevent black people from exercising their newly acquired civil rights. *See* Robert M. Goldman, *A Free Ballot and a Fair Count: The Department of Justice and the Enforcement of Voting Rights in the South, 1877–1893* 11–15 (New York: Garland Publishing, 1990). The Supreme Court repeatedly struck down the convictions of private individuals under the acts because the Fourteenth and Fifteenth Amendments from which the acts derived their authority regulated the conduct of state officials rather than private individuals. *See United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1876) (holding that the Fourteenth Amendment only applies to state action); *Virginia v. Rives,* 100 U.S. 339, 25 L.Ed. 676 (1880) ("The provisions of the Fourteenth Amendment ... all have reference to state action exclusively, and not to any action of private individuals"); *Civil Rights Cases,* 109 U.S. 1, 3 S.Ct. 150, 27 L.Ed. 835 (1883); *James v. Bowman,* 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979 (1903) (the Fifteenth Amendment "relates solely to action 'by the United States or by any state,' and does not contemplate wrongful individual acts."); *but see Ex parte Yarbrough,* 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884) (the Fourteenth Amendment does not proscribe private action; but the interest of the federal government in national elections can proscribe individual interference with a citizen's voting rights).

The Voting Rights Act of 1965 represents the culmination of Congress's noble efforts to create an effective tool for rooting out and redressing discriminatory voting practices. *See* 42 U.S.C. §§ 1971 *et seq.* Amended section 2 of the Act prohibits a *state* from imposing any voting qualification or practice which results in the denial or abridgement of the right of any citizen to vote on account of race. Thus, Congress tailored this section to fit within the constitutional confines of its ability to regulate state action rather than the activity of private individuals.[2] The Supreme Court has upheld the validity of all or part of the Voting Rights Act of 1965 under the enforcement provisions of the Fourteenth and Fifteenth Amendments. *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); *Georgia v. United States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *Briscoe v. Bell,* 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977); *Rome v. United States,* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980); *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).

For this reason, in early voting rights litigation, the federal courts applied the same standards to vote dilution claims under the Fifteenth Amendment and section 2 of the Voting Rights Act. *See Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) ("the language of § 2 no more than elaborates upon that of the Fifteenth Amendment, and ... it was intended to have an effect no different from that of the Fifteenth Amendment itself"); *see also* Frank R. Parker, *The Results Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard,* 69 Va.L.Rev. 715 (1983) (the courts may have considered independent discussion of the section 2 standard to be superfluous). Successful Voting Rights Act challenges under the Fifteenth Amendment and the Act targeted only the intentions or consequences of state-enacted voting rights regimes. The racial bias inquiry was only relevant to demonstrate the intent of the legislature in utilizing a particular electoral system that disadvantaged racial minorities.

Hence, a fundamental flaw exists in the two judges' assertion that an inquiry into the

---

**2.** Certain sections of the Act prohibit individual action. Section 1971(b) prohibits interference with voting rights in federal elections. 42 U.S.C. § 1971(b). This provision, however, is consistent with the Supreme Court's approval of this type of prohibition in Ex Parte Yarbrough, 28 L.Ed. 274 (1884) pursuant to the federal government's interest in maintaining the integrity of its elections. Section 1973i(b) regulates the conduct of private individuals in all elections; however, the constitutionality of this section is questionable. *See United States v. Harvey,* 250 F.Supp. 219 (D.C.La. 1966) (holding that the section is unconstitutional as applied to private individuals in nonfederal elections in light of Supreme Court precedent). In any event, no reported case has upheld the application of section 2 to private individuals.

racial bias of the voting community is implicit in early vote dilution cases. The flaw is that the Supreme Court has never required an inquiry into the racial bias of a voting community because such a finding is unnecessary for a voting rights violation. The Act does not and cannot prohibit or question the racial biases of individual voters. To the extent racial bias is significant in a voting rights case, it concerns the motivations of state officials in employing a particular electoral scheme that operates to disadvantage voters on account of their race.

The various Supreme Court cases construing the Voting Rights Act in tandem with the Fourteenth and Fifteenth Amendment confirm that the Act never relied upon a finding of racial bias in the voting community as the significant factor in a vote dilution claim, but instead focused on the biases and effects of state action.

### B.  Section 2 Litigation Prior to *City of Mobile v. Bolden*

A trilogy of cases arose after enactment of the Voting Rights Act defining the scope and limitations of the protections against vote dilution under the Constitution and the Voting Rights Act.[3] *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973), *affirmed sub nom., East Carroll Parish Sch. Bd. v. Marshall;* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). In these three cases, the Supreme Court and the Fifth Circuit addressed the issue of what evidence was sufficient to establish a section 2 violation in a minority vote dilution case.

In *Whitcomb,* the Supreme Court concluded that the plaintiffs failed to prove a vote dilution claim because they presented no evi-

dence that the state's districts "were conceived, or operated as purposeful devices to further racial or economic discrimination" or that minorities had "less opportunity . . . to participate in the political process and elect legislators of their choice." *Whitcomb,* 403 U.S. at 149, 91 S.Ct. at 1872. Thus, the Supreme Court recognized that plaintiffs could utilize evidence of subjective intent of state officials or objective evidence of disparate impact to establish a claim.

Similarly, in *White,* the Supreme Court upheld a claim that "multimember districts [were] being used invidiously to cancel out or minimize the voting strength of racial groups" based solely on objective evidence. 412 U.S. at 765–67, 93 S.Ct. at 2339–40. The evidence consisted of various state-sponsored practices and the operation of a powerful political organization that utilized "racial campaign tactics in white precincts to defeat candidates who had the overwhelming support of the black community." 412 U.S. at 767, 93 S.Ct. at 2340.

Finally, in *Zimmer,* the Fifth Circuit held that a voting system is unconstitutional under the Fourteenth Amendment if certain objective factors demonstrate that the system results in the dilution of minority votes. The Fifth Circuit further clarified that plaintiffs can prevail on a vote dilution claim if they can prove either racial bias in the legislature or that an apportionment scheme operates to "minimize or cancel out the voting strength" of minorities. *Zimmer,* 485 F.2d at 1304. To prove the latter claim, the majority listed much of the same indicia concerning state action that the Supreme Court announced in *White* and *Whitcomb.*

The objective factors described in each of these cases concerned the activities of state and quasi-state officials in employing various devices to obstruct the ability of racial minor-

---

**3.** The principle that the right to vote can be abridged unconstitutionally through dilution of one's voting strength derives its authority from *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12

L.Ed.2d 506 (1964), the landmark one-person-one-vote legislative reapportionment case. The court concluded that the right to vote encom-

ities to elect candidates of their choice.[4] To the extent the courts even remotely invoked the concept of racial bias in the voting community, it only concerned whether political parties utilized racial appeals to cater to the racial preferences of voters.[5] *See White*, 412 U.S. at 767, 93 S.Ct. at 2340 (Court found party operatives relied "upon racial campaign tactics in white precincts to defeat candidates who had the overwhelming support of the black community").

Hence, in the pre–*Bolden* era, voting rights plaintiffs could demonstrate a vote dilution claim by either establishing that (1) the state purposely designed an electoral scheme to inhibit the ability of minorities to elect candidates, or (2) the state maintained an electoral scheme that resulted in the inability of minorities to elect candidates on account of their race. The pre-*Bolden* era did not proscribe individual voter racial discrimination; instead, it proscribed the machinations of state officials that intentionally or effectively presented a racial bar to the ability of minorities to elect their favored candidates. The utilization of voting districts that allow racial bloc voting to defeat minority candidates is one such racial bar. *See Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

### C. The Voting Rights Act After *Bolden*

After the Supreme Court eliminated the results test for proving a vote dilution claim under the Fourteenth or Fifteenth Amendment, *see Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), Congress amended the Act explicitly stating that it

wished to reinstate the test as previously articulated in *Whitcomb, White,* and *Zimmer.* Consequently, for the first time, the Voting Rights Act left the shadows of the Fourteenth and Fifteenth Amendments and became a potent and independent basis for protecting the rights of minorities against vote dilution. The text and legislative history of the Act clearly reject the two judges' attempt to impose a racial bias inquiry into section 2 vote dilution claims.

#### 1. Textual Analysis

The plain text of amended section 2 rails against the two judges' contention that Congress intended to retain a racial bias inquiry rather than rely merely on a results test in vote dilution claims. The text provides as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

> (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes ... are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected

---

passes protections against dilution of the vote as well as the right to cast a ballot.

**4.** Political party officials are quasi-state officials. For example, in *Smith v. Allwright*, 321 U.S..649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) the Supreme Court held that when primaries become an official part of the machinery for choosing state and national officials, the primary officials become state agents whose actions constitute state action. *See also Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) where the Supreme Court held that the activities of an unofficial political organization which effectively controlled the democratic party process could not

operate to avoid the impermissible shroud of state action under the Fifteenth Amendment.

**5.** As stated in note 4, political party officials are shrouded with the authority of the state. *See Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (holding that activities of state-regulated political parties constitute state action); *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (activities of unofficial political organization which effectively controls the Democratic party.fall within the confines of the Fifteenth Amendment).

to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis added).

The unambiguous language of section 2 expressly provides that voting standards, practices, or procedures may not be used in a manner that "results" in the denial of the right to vote on account of race, and a violation occurs if, based on the totality of the circumstances, minorities "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." In no manner does this language reference a need to inquire into the racial biases of individual voters. Instead, the plain language clearly envisions plaintiffs proving vote dilution solely through a showing of the discriminatory "results" or effects of a state's electoral system or practice. *See Gingles,* 478 U.S. at 35, 106 S.Ct. at 2758; *Chisom v. Roemer,* 501 U.S. 380, 384, 111 S.Ct. 2354, 2358, 115 L.Ed.2d 348, 356 (1991) (Section 2 makes "clear that certain practices and procedures that *result* in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge.").

The two judges would have us envision language that does not exist and ignore the language right before our eyes; for example, the assertion that a racial bias inquiry is implicit because the "on account of race" language must be reconciled with the language prohibiting proportional representation. Yet, the results test inquiry as described in the pre-*Bolden* era and adopted by Congress has never guaranteed a right to proportional representation; instead, it guarantees protection from vote dilution due to racial bloc voting. *White,* 412 U.S. at 765–66,

93 S.Ct. at 2339–40 ("it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its potential"); *Zimmer,* 485 F.2d at 1305 ("it is not enough ·to prove a mere disparity between the number of minority residents and the number of minority representatives."). As outlined in *Gingles,* a vote dilution claim only ensues when under the totality of the circumstances, racial bloc voting impedes the ability of a geographically compact, and politically cohesive racial minority to elect its preferred candidate.

Similarly, the assertion· that the "on account of race" language must refer to racial bias in the voting community is untenable. The phrase merely emphasizes that "race" *rather than some other factor* must be the identifiable impediment to the minority group's electoral success. In fact, the Senate Report accompanying the amendment expressly stated that the phrase "on account of race" does not imply any reference to purposeful racial discrimination. S.Rep. No. 417 at 27–28 n. 109, *reprinted in* 1982 U.S.C.C.A.N. at 177, 205–06.

Contrary to the two judges' assertion, the terms "racial bias," "intent," and "invidious discrimination" do not appear anywhere explicitly or implicitly in the text of section 2. Had Congress meant to require an inquiry into the racial bias of the voting community, it certainly would have recorded that intent more fully in the language of the amended statute.[6] It did not.

The two judges' intimation that our interpretation might render section 2 unconstitutional is also groundless. As discussed earlier, the Supreme Court never applied the Fifteenth Amendment and its implementing legislation to activities of private individuals. *United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1876) (holding that Fourteenth Amendment only applies to state action); *Virginia v. Rives,* 100 U.S. 339, 25 L.Ed. 676 (1880) ("The provisions of the Fourteenth

6. The section 2 result standard is the product of an extensive year long congressional debate commencing in May, 1981 and ceasing in June, 1982.

*See* Frank R. Parker, *The Results Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard,* 69 Va.L.Rev. 715 (1983).

Amendment ... all have reference to state action exclusively, and not to any action of private individuals"); *Civil Rights Cases,* 109 U.S. 1, 3 S.Ct. 150, 27 L.Ed. 835 (1883); *James v. Bowman,* 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979 (1903) (the Fifteenth Amendment "relates solely to action 'by the United States or by any state,' and does not contemplate wrongful individual acts."). The Court consistently held that the proper constitutional inquiry under voting rights claims is whether state-enforced election procedures obstruct the ability of racial minorities to elect their favored candidates, either intentionally or in effect. As the Supreme Court held in *City of Rome v. United States,* 446 U.S. 156, 173, 100 S.Ct. 1548, 1559–60, 64 L.Ed.2d 119 (1980), Congress may, "pursuant to § 2 [of the Fifteenth Amendment], outlaw voting practices that are discriminatory in effect."

### 2. Legislative History of Amended Section 2

The two judges' assertions also mistakenly rely upon the legislative history in an effort to locate some evidence of a congressional intent to require a racial bias inquiry. This interpretation is wrong as demonstrated by one passage in the Senate Report:

> During the Committee deliberations, opponents of the results test argued that the reported bill is inconsistent with the results standard because Section 2, as amended, still contains the phrase "a denial or abridgement [of the right to vote] on account of race or color." The argument is that the words "on account of" themselves create a requirement of purposeful discrimination. This claim overlooks the present structure of the Voting Rights Act, which completely refutes it. Section 5 of the present Act requires the Attorney General or the district court to disapprove a proposed voting law change unless the submitting jurisdiction establishes that it "does not have the purpose *and will not have the effect of denying or abridging the right to vote on account of race or color....*" ... Thus it is patently [clear]

> that *Congress has used the words "on account of race or color" in the Act to mean "with respect to" race or color, and not to connote any required purpose of racial discrimination.* Any other arguments based on similar parsing of isolated words in the bill, that there is some implied "purpose" component in Section 2, even when plaintiffs proceed under the results standard, are equally misplaced and incorrect.

S.Rep. No. 417 at 27–28 n. 109, *reprinted in* 1982 U.S.C.C.A.N. at 177, 205–06 (first emphasis in original, second emphasis added).

Congress could not have expressed more explicitly and emphatically its goal of dispensing with any requirement of proving discriminatory intent, instead focusing the inquiry on whether the state's electoral process allows objective factors as described in *Thornburg v. Gingles* to deny racial minority voters an equal opportunity to participate in the electoral process and elect candidates of their choice. 42 U.S.C. § 1973(b); *see also* S.Rep. No. 417 at 27, 28, *reprinted in* 1982 U.S.C.C.A.N. at 177, 204, 205.

In other sections of the Senate Report, Congress clearly described its objective to restore the legal landscape that governed voting discrimination cases prior to *Bolden.* S.Rep. No. 417 at 2, *reprinted in* 1982 U.S.C.C.A.N. at 177, 178–79. Congress believed that under the pre-*Bolden* case law, voting rights plaintiffs could rely solely upon the discriminatory effect of an electoral regime:

> In the pre-*Bolden* cases plaintiffs could prevail by showing that a challenged election law or procedure, in the context of the total circumstances of the local electoral process, had the result of denying a racial or language minority an equal chance to participate in the electoral process.

> . . . .

As the Supreme Court has repeatedly noted, discriminatory election systems or practices which operate, designedly *or otherwise,* to minimize or cancel out the voting strength and political effectiveness of

minority groups, are an impermissible denial of the right to have one's vote fully count, just as much as outright denial of access to the ballot box.

S.Rep. No. 417 at 16, 28, *reprinted in* 1982 U.S.C.C.A.N. at 177, 193, 205 (emphasis added).

In repudiating *Bolden* and returning to the *White/Zimmer* standard, Congress explicitly approved of the effect-based approach of the results test:

> The "results" standard is meant to restore the pre-*Mobile* legal standard which governed cases challenging election systems or practices as an illegal dilution of the minority vote. Specifically [the amendment] embodies the test laid down by the Supreme Court in *White*.
>
> If the plaintiff proceeds under the "results test", then the court would assess the *impact* of the challenged structure or practice on the basis of objective factors, rather than making a determination about motivations which lay behind its adoption or maintenance.

S.Rep. No. 417 at 28, *reprinted in* 1982 U.S.C.C.A.N. at 177, 205 (emphasis added). Thus, the two judges can find no solace in Congress's attempt to reinstate the pre-*Bolden* effect/impact-based test which required no inquiry into the racial motivations of the voting community.

Moreover, the passages the two judges rely upon to support their interpretation actually undermine their argument. For example, they invoke the following passage in the Senate Report to support their position:

> The results test makes no assumptions one way or the other about the role of racial political considerations in a particular community. If the plaintiffs assert that they are denied fair access to the political process, in part because of the racial bloc voting context within which the challenged election system works, they would have to prove it.

S.Rep. No. 417 at 34, *reprinted in* 1982 U.S.C.C.A.N. at 177, 212. This quoted passage proves nothing other than one of the *Gingles* prerequisites that the Supreme Court and all other federal courts have recognized: that is, voting rights plaintiffs must demonstrate racial bloc voting. It says nothing implying that the courts should look into the intent of the voting community when applying the results test. In fact, the Senate Report states: "The results test makes no assumptions one way or the other about the role of racial political considerations in a particular community."

In precise language, the Senate Report further explains that exploring racial motivations as an element of proof is exceedingly divisive because

> it involves charges of racism on the part of individual officials or entire communities.... Litigators representing excluded minorities will have to explore the motivations of individual counsel members, mayors, and other citizens under *Bolden*. The question would be whether their decisions were motivated by invidious racial discrimination.

The two judges profess that the preceding quote precludes our interpretation. Obviously, this quote means nothing other than what it says: Congress did not intend to require plaintiffs to inquire into the racist motives of either individual officials or entire communities—including the voters therein. S.Rep. No. 417 at 36, *reprinted in* 1982 U.S.C.C.A.N. at 177, 214.

The legislative history conclusively shows that, despite the two judges' emphasis on racial bias in the voting community, Congress intended to shift the entire focus of vote dilution claims to the discriminatory effect of an electoral regime upon minority voters. Senator Dole, who offered the substitute amendment which the Senate ultimately adopted, confirms this interpretation:

> It should be reemphasized that the "results" test contained in the substitute amendment *in no way includes an element of discriminatory purpose*. I am aware that some have sought to characterize the *White* holding as including an ulti-

mate purpose requirement or a so-called "objective design" element. The implication of this characterization is that the substitute amendment codifies the *White* standard, the amendment also includes some requirement of discriminatory purpose. But in presenting my compromise before the Committee, *I explicitly stated that "the supporters of this compromise believe that a voting practice or procedure which is discriminatory in result, should not be allowed to stand, regardless of whether there exists a discriminatory purpose. . . .*

[M]y colleagues and I who offered the substitute amendment remained convinced that Section 2 should only require plaintiffs to establish discriminatory "results" and rejected the notion that *any element of purpose should be incorporated into the standard.*

S.Rep. No. 417 at 194–95, *reprinted in* 1982 U.S.C.C.A.N. at 177, 365 (emphasis added). In concluding that Congress intended to include a racial bias element in amending Section 2, the two judges simply desecrate the legislative history surrounding that amendment.

In sum, the two judges' interpretation of the legislative history falls of its own weight. First, they state that the 1982 amendment was meant to restore the invidious discrimination requirement which was purportedly articulated in *Whitcomb* and *White.* In addition to the fact that no such intention appears in the legislative records or reports, as explained earlier, the *Whitcomb* and *White* courts only addressed the objective actions of state and quasi-state officials in hampering the ability of minorities to vote. Second, such an interpretation of the legislative history would render it incongruous. How could an inquiry into the racial bias of the voting community be any less divisive than an inquiry into the racial bias of state officials? Fortunately, the *en banc* court has rejected, or at the least, not approved of a racial bias test, in spite of the urgings of two judges.

### D. A More Viable Interpretation of Section 2

Congress clearly intended to dispense with any racial bias or intent inquiry in vote dilu-

tion claims without guaranteeing a right to proportional representation. Thus, under well-settled Supreme Court precedent, when voting rights plaintiffs establish the three *Gingles* threshold factors—geographical compactness, political cohesiveness, and racial bloc voting—defendants can still demonstrate that under the totality of the circumstances, the plaintiffs have failed to present a valid vote dilution claim. *See Johnson v. DeGrandy,* —— U.S. ——, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (totality of the circumstances could not support a vote dilution claim where Hispanics could be expected to elect their candidates in proportion to their percentage of the area's population).

In fact, the idea of a racial bias requirement is merely a resurrection in different garb of a claim expressly rejected by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 61–74, 106 S.Ct. 2752, 2772–79, 92 L.Ed.2d 25 (1986). In *Gingles,* North Carolina argued "that the term 'racially polarized voting' must, as a matter of law, refer to voting patterns for which the *principal cause is race.*" *Gingles,* 478 U.S. at 61, 106 S.Ct. at 2772 (emphasis in original). In rejecting this claim, the Supreme Court drives the final stake through the heart of the two judges' contention "that racial bias in the voting community remains the keystone of section 2 vote dilution claims." The Supreme Court rejected North Carolina's claim on the following basis:

[The] *suggestion that the discriminatory intent of individual white voters must be proved in order to make out a § 2 claim must fail* for the very reasons Congress rejected the intent test with respect to governmental bodies.

. . . .

In sum, we hold that the legal concept of racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates. *Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants*

*may not rebut that case with evidence of causation or intent.*

*Gingles,* 478 U.S. at 71, 106 S.Ct. at 2777 (emphasis added).

In amending section 2, Congress aligned voting rights law with the time-tested impact analysis utilized in other areas of statute-based civil rights law protecting minority members from disparate treatment on account of their race. *See, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (Title VII proscribes overt discrimination and practices which are discriminatory in operation); *Teamsters v. United States,* 431 U.S. 324, 335 n. 14, 97 S.Ct. 1843, 1854 n. 14, 52 L.Ed.2d 396 (1977) (discriminatory motive not required under adverse impact theory where focus is on consequences of selection criteria or challenged practice); *Ellston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1406 (11th Cir.1993) (regulations promulgated pursuant to Title VI validly proscribe actions having disparate impact on protected groups even if those actions are not intentionally discriminatory); *Baird v. Consolidated City of Indianapolis,* 976 F.2d 357, 360 (7th Cir. 1992) ("outcome approach" of Section 2 means an opportunity to show what would be called "disparate impact" in employment cases), *cert. denied,* —— U.S. ——, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993); *Potomac Group Home v. Montgomery County, Md.,* 823 F.Supp. 1285, 1295 (D.Md.1993) (plaintiffs may demonstrate violation of Fair Housing Amendments Act by showing discriminatory intent or discriminatory impact). We must not so casually disrupt the wisdom of this approach.

Rather than upsetting the Supreme Court's and Congress's well-established approach to evaluating vote dilution claims by requiring plaintiffs to prove invidious discrimination in the electorate as a whole as part of their prima facie case, we must continue to adhere to the time-tested totality of circumstances test prescribed in *Gingles.* If this court ever adopts the rejected racial bias/intent test, the court will ensure that a politically cohesive and geographically compact racial minority will rarely be permitted to elect representatives of their choice when serious racially polarized voting exists. A majority of the court wisely rejects the racial bias approach in voting cases.

## II.   Rejection of Plaintiffs' Remedies

I also dissent because this court has prematurely determined the issue of whether the appellants or the district court can devise a viable remedy for their vote dilution claim. *See Holder v. Hall,* —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (a court must find a reasonable alternative practice against which to measure the existing voting practice); *Houston Lawyers' Association v. Atty. Gen.,* 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991). After finding a violation of the Act, instead of properly remanding this case to the district court to make findings of fact and conclusions of law regarding viable remedies, the majority opinion relies almost entirely upon speculation and conjecture to support its holding that Florida's interest in conserving its current at-large voting system precludes any possible remedy the appellants or the district court can devise.

It is the district court, with the help of the parties, that must provide a remedy for a vote dilution violation. The en banc majority does not discuss district court findings, or conclusions, or witness testimony, or documents, or studies, or affidavits, or the testimony of expert witnesses to support its holding that no remedy can be afforded.

### A.   Inadequacy of the Trial Record and Necessity for Remand

It has long been the policy of this court that "[w]here the trial court fails to make findings ... on a material issue, and an appeal is taken, the appellate court will nor-

mally vacate the judgment and remand the action for appropriate findings to be made." *Davis v. United States*, 422 F.2d 1139, 1141 (5th Cir.1970).[7] This court will decide the "merits of an appeal in the absence of fact-findings in the rare case in which a full understanding of the issues can be reached without the aid of findings." *Davis*, 422 F.2d at 1142; *see also Tejada v. Dugger*, 941 F.2d 1551, 1555 (11th Cir.1991); *Armstrong v. Collier*, 536 F.2d 72, 77 (5th Cir.1976). Thus, this court rarely considers issues not ruled upon in the district court and only does so if the record sufficiently conveys all the relevant information for a full and complete review.

Prior to this appeal the district court found that Florida "has a legitimate interest in maintaining the current at-large system of electing judges in the Fourth Judicial Circuit and Duval County." *Nipper v. Chiles*, 795 F.Supp. 1525, 1548 (M.D.Fla.1992). The district court, however, expressly declined to consider whether Florida's interest in maintaining its at-large voting system precluded the acceptability of any of the appellants' proposed remedies because it found no voting rights violation. *See Nipper*, 795 F.Supp. at 1548 n. 28 ("The Court has no occasion to consider this contention, since proposed remedies are relevant only if a violation is proved."). In light of the majority's holding that a vote dilution has occurred, which I join, this court should remand the case to the district court to supplement the record with factual findings concerning the relative weight of Florida's interest in maintaining its current electoral system and the viability of any remedies. Only then can the *en banc* court properly exercise appellate review.[8]

**B. Florida's Interest in At–Large Elections Does not Preclude All of the Plaintiffs' Possible Remedies**

The majority opinion's analysis demonstrates that it could benefit from further fact-finding. The opinion holds, with no evidentiary corroboration, that Florida's interest in maintaining its current at-large electoral systems for judges precludes the acceptability of any of the appellants' proposed remedies including the use of subdistricts, the creation of new circuits, the adoption of cumulative voting, or any combination of these devises. Instead of evidence, the majority apparently relies upon disembodied conjecture to support its ultimate determination. A careful review of these alternative remedies, however, reveals the true complexity of the issues involved and the need for further hearings before the district court.

**1. The Use of Subdistricting in Judicial Elections**

The majority affords great weight to Florida's interest in linking the electoral and jurisdictional bases of its judges in Duval County and the Fourth Circuit. The majority believes the implementation of subdistricts to redress the plaintiffs' claim for vote dilution would unduly erode the independence of judges and balkanize the judicial landscape into black and white subdistricts governed by racially biased judges. Such a system, the majority concludes, will ultimately destroy the impartiality of the judges which exists today. To demonstrate that Florida wishes to insulate state judges from political pressures, the majority highlights Florida's progression towards a merit selection, merit retention or gubernatorial appointment sys-

---

**7.** In *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206 (11th Cir.1981) this court adopted as binding precedent all of the decisions of the Fifth Circuit rendered prior to September 30, 1981.

**8.** The plurality (Judge Edmondson's concurrence) holds that "Florida's interest in maintaining linkage between jurisdiction and the electoral bases of its trial judge is, as a matter of law, great and outweighs ... whatever minority vote dilution that may possibly have been shown

here." In fact, *Houston Lawyers' Assoc. v. Attorney General*, 501 U.S. 419, 426–28, 111 S.Ct. 2376, 2381, 115 L.Ed.2d 379 (1991), holds that "[b]ecause the State's interest in maintaining an at-large, district-wide electoral scheme for single-member offices is merely one factor to be considered in evaluating the 'totality of the circumstances,' that interest does not automatically, and in every case, outweigh proof of racial vote dilution."

tem.[9]

The majority fails to note that subdistricting plans already have been successfully utilized to remedy vote dilution claims in the judicial context. *Martin v. Mabus,* 700 F.Supp. 327 (S.D.Miss.1988); *Clark v. Roemer,* 777 F.Supp. 471 (M.D.La.1991). For example, in *Mabus,* a federal district judge fastidiously designed a subdistricting plan that maintained the integrity of judicial impartiality while redressing the plaintiffs' claim. The remedial plan provided for the election of trial judges from single-member subdistricts and required that these judges serve their judicial districts as a whole. The court also held that while candidates for judicial office must reside in the judicial district, they need not reside in the electoral subdistrict in which they run for office. New York and Louisiana have experimented with similar subdistricting plans for trial judges. N.Y. Const. art. VI, § 15(a); *Clark v. Roemer,* 777 F.Supp. 471, 477 (M.D.La.1991). To date, no challenge has arisen in either state concerning the impartiality of the judges elected under the subdistricting plans. To the contrary, one such judge "denied being affected by local pressures, noting that in most cases he does not know whether a party resides within his subdistrict. He also stated that he is aware of no pressure upon his colleagues of either race." *Roemer,* 777 F.Supp. at 477.

Moreover, the majority's aversion to subdistricting plans based on a concern for racial impartiality ignores the fact that the districts from which judges currently are elected have racial characteristics. For instance, the judicial districts in Duval County and the Fourth Judicial Districts now encompass electorates with an overwhelming white majority. If one reasons that the creation of judicial districts comprised predominantly of one racial group destroys racial independence, then judicial independence cannot exist anywhere. Moreover, if elections from districts with overwhelming white majorities produce impartial judges, then no defensible reason exists to believe that black majority districts will produce biased judges.

Similarly, the majority's emphasis on linkage between trial judges and their electoral base is not necessarily warranted. Contrary to the majority's conjecture, Florida has not clearly evidenced that linking these two conditions is a primary component of state policy. The appellees did not introduce any evidence to support such a conclusion. In fact, current assignment rules generally allow judges elected in one district to sit on cases in a different district when necessary or convenient. *See* Fla.Stat. § 26.57 (assignment of county judges to sit as circuit judges). Even when sitting within their own districts, judges must frequently decide cases involving litigants from different districts. Presumably, judges can adjudicate fairly in these situations. It is rather offensive to conclude that the impartiality of judges will somehow become tainted when elected from subdistricts that permit minority voters to elect their preferred candidates.

The majority also assumes that the creation of smaller subdistricts will subject judges to greater political pressure. Yet, the size of Florida judicial election districts already varies widely within the state of Florida. The subdistricts that would result from the appellants' proposed remedies would exceed the size of most of the circuits in other parts of Florida. Florida has no legitimate justification for precluding the use of judicial subdistricts in this case when existing circuits are smaller or about the same size as the proposed subdistrict. Moreover, Florida's maintenance of a judicial election system implies that Florida does not exhibit a strong state policy for insulating judges from political pressures. *See Chisom,* 501 U.S. at 401–02, 111 S.Ct. at 2367, 115 L.Ed.2d at 367 ("The fundamental tension between the ideal character of the judicial office and the real world of electoral politics cannot be resolved by crediting judges with total indifference to the popular will while simultaneously requiring them to run for elected office.")

---

**9.** The error in highlighting merit selection and merit retention is that an election is involved in the retention scheme. Such an election may be subject to the Voting Rights Act.

### 2. Cumulative Voting and Limited Voting

The majority also glosses over two innovative techniques commentators favor for redressing vote dilution claims. Cumulative voting, a technique, borrowed from the corporate governance law, allows each voter a determinate number of votes that the voter may cast for preferred candidates. Thus, in a cumulative voting regime in which the election involved six candidates, the voter could cast all six votes for the same candidate. This capacity significantly enhances the ability of minorities to elect candidates free of the impediment of recurring bloc voting.

The majority opinion rejects cumulative voting because requiring judges to run against each other "would have a detrimental effect on the collegiality of the judges in administrative matters." In a similar vein, the majority relies in part on the speculation that cumulative voting will dampen lawyer interest in seeking judicial offices. Certainly these trivial concerns are not the core state policy that the Supreme Court envisioned to defeat a vote dilution claim.

The second alternative, which the majority opinion fails to discuss, is limited voting: a device in which voters cast fewer votes than the total number of candidates. This particular electoral technique has garnered strong support among scholars interested in Voting Rights Act litigation. For an analysis of the benefits of limited voting, see Samuel Issacharoff, *The Texas Judiciary and the Voting Rights Act: Background and Options* (1989); see also Edward Still, *Alternatives to Single Member Districts, in Minority Vote Dilution,* 249, 253–55 (Chandler Davidson ed. 1984); L. Weaver, *Semi–Proportional and Proportional Representation Systems in the United States, In Choosing an Electoral System: Issues and Alternatives,* 191 (Arend Lijphart & Bernard Grofman ed. 1984); Pamela S. Karlan, *Maps and Misreadings: The Role of Geographic Compactness in Racial Vote Dilution Litigation,* 24 Harv.C.R.–

C.L.L.Rev. 173, 223–36 (1989); Daniel R. Ortiz, Note, *Alternative Voting Systems as Remedies for Unlawful At–Large Systems,* 92 Yale L.J. 144 (1982); Note, *Affirmative Action and Electoral Reform,* 90 Yale L.J. 1811 (1981). Limited voting has several advantages. First, limited voting can be employed in at-large elections, thereby avoiding the disadvantages of single-member districts. Similarly, the problem of state judges being too closely linked to their political constituencies will be strongly diminished. Second, limited voting abolishes the discriminatory effect of multi-member at-large elections by removing the possibility of minority vote dilution.

Although the United States has seldom employed limited voting, other countries have employed the electoral device with inspiring success. For example, England and Japan have used the device to elect certain members of their representative houses. In each case, minority groups were able to elect party members in numbers more proportionate to their percentage of the electorate as a whole than possible under an electoral system based entirely upon single-member districts. *See generally* Shawn Fremstad, *State Judicial Elections and the Voting Rights Act: Defining the Proper Remedial Scheme,* 76 Minn.L.Rev. 101, 114 & n. 77 (1991). In Alabama, limited voting successfully remedied a minority vote dilution claim and increased the number of minority elected officials. *Id.* at 114 n. 78.[10]

### 3. State's Interest in Increasing Minority Representation on the Bench

Moreover, Florida has expressed a strong state interest in diversifying the complexion of its judicial officers. *See* Florida Supreme Court Racial and Ethnic Bias Study Commission Report, Volumes I and II (December 11, 1990) ("Commission Report"). For example the Commission Report has recognized that the court "must reflect the complexion, de-

---

**10.** The above exploration of remedies in no way suggests that any particular remedy is appropriate in this case but merely illustrates the need for

fact-finding and consideration by the district court.

meanor, and dialect of its workforce." Commission Report, Vol. 1, p. 10. The Commission has also noted that "the current process which provides for circuit-wide at-large elections is not yielding sufficient representation of minorities on Florida's bench." Commission Report, Vol. 1, p. 16–17. Thus, the findings of the Commission Report demonstrate the necessity of remanding this case to the district court to carefully develop and clarify the competing state interests involved in the current litigation.[11]

### III. Conclusion

In summary, the opinion is flawed in two fundamental respects. First, two judges introduce a new racial bias hurdle which Congress plainly rejected in its recent amendment to the Voting Rights Act. In erecting this hurdle, the judges misconstrue Supreme Court precedent, the plain text, and the legislative history of the Act. Fortunately, the *en banc* court does not embrace this approach.

Second, the majority inappropriately embarks on an analysis and rejection of any and all remedies the appellants and the district court could conceive to redress their claim for vote dilution. To dispose of appellants' proposed remedies, the majority essentially concludes that the "only benefit black voters could legitimately expect from a court order implementing one of the appellants' proposed remedies ... is the *perception* that the challenged circuit and county judicial systems are colorblind." (Emphasis added.) The majority concludes that the disruption of the current system will create the impression that each racial group has its own particular judges to hear its claims. These criticisms misconstrue the thrust of voting rights litigation. Judicial election lawsuits do not center on the concern that sitting judges are preju-

diced one way and should be replaced by judges prejudiced in a different direction. *See* Brenda Wright, *Symposium: The Bench and the Ballot: Applying the Protections of the Voting Rights Act to Judicial Elections,* 19 Fla.St.U.L.Rev. 669, 686–89 (1992). As one commentator succinctly stated, the true concern is that "elected judges wield important governmental powers, and minorities wish to have some meaningful opportunity to participate in choosing who will exercise those powers. Fairness in voting procedures is crucial even though most citizens, whether black or white, will never appear as litigants before the judges for whom they vote." *Id.*

Thus, balancing the state's relative concerns in maintaining its current judicial structure and diversifying its judiciary should be left to the versatile fact-finding process of the district court.

Accordingly, I respectfully dissent from the majority's determination that the state's interest in maintaining a linkage between the jurisdictional and electoral bases of the judiciary precludes the consideration of possible remedies by the district court, thus obviating the necessity of remand to the district court for fact-finding. I also dissent from the position urged by two judges that a plaintiff class must show racial bias in the community in order to prevail in a section 2 Voting Rights Act claim.

---

**11.** The Florida Bar and the Florida legislature have simply watched this litigation without attempting to design a plan that will allow Florida's minority voters to elect the judicial officers of their choice. Through inaction, the leaders of Florida's judicial concerns are leaving several federal judges the task of designing court systems on a circuit-by-circuit basis. Florida must have a uniform court system that conforms to constitutional and Voting Rights Act mandates. Instead of continuing as a model for the nation, the Florida court system, through multiple federal court decrees, will become a senseless hodgepodge of arrangements varying from circuit to circuit. Florida officials need to act on the problem discussed in this litigation—now!